THE LAW OFFICES OF ANDREW J. BROWN
ANDREW J. BROWN (160562)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/501-6550
andrew@thebrownlawfirm.com

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| JOHN COFFEE, MEI-LING MONTANEZ, and S.M., a minor by MEI-LING MONTANEZ, S.M.'s parent and guardian, on behalf of themselves and all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | **CLASS ACTION** |
| v. | |
| GOOGLE LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

"We should be very reticent of creating an experience where the outcome can be influenced by spending money. ***Loot boxes play on all the mechanics of gambling except for the ability to get more money out in the end.***"

"Do we want to be like Las Vegas, with slot machines or do we want to be widely respected as creators of products that customers can trust?"

"***We have businesses that profit by doing their customers harm.***"

- Tim Sweeney, Co-Founder of Epic Games

1

00164916

Plaintiffs JOHN COFFEE, MEI-LING MONTANEZ, and S.M., a minor by MEI-LING MONTANEZ, S.M.'s parent and legal guardian ("Plaintiffs"), file this Class Action Complaint against Google LLC ("Google" or "the Company"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through undersigned counsel.

## NATURE OF THE ACTION

1.      The California legislature has declared: "Gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families." Cal. B & P Code § 19801(c). Through the games it sells and offers for free to consumers through its "Google Play" store, Google engages in predatory practices enticing consumers, including children to engage in gambling and similar addictive conduct in violation of this and other laws designed to protect consumers and to prohibit such practices.

2.      Not unlike Big Tobacco's "Joe Camel" advertising campaign, Google relies on creating addictive behaviors in kids to generate huge profits for the Company. Over the last four years Defendant's Google Play store games have brought in billions of dollars, even though the vast majority of the games are free to download.

3.      A large percentage of Google's revenues from Google Play store games come from the in-game purchases of what are known in the gaming industry as "loot boxes" or "loot crates." Dozens (if not hundreds) of Google Play store games rely on some form of Loot Box or similar gambling mechanism to generate billions of dollars, much of it from kids.

4.      Loot Boxes are purchased using real money, but are simply randomized chances within the game to obtain important or better weapons, costumes or player appearance (called "skins"), or some other in-game item or feature that is designed to enhance game-play. If obtained, these weapons, skins, and other items can help the player advance in the game and enhance the game playing experience. But buying a Loot Box is a gamble, because the player does not know what the Loot Box actually contains until it is opened.

5.      Unsurprisingly, the perceived best "loot" in the game is also the most difficult to obtain, and least likely to be received via Loot Box. Conversely, most items in the Loot Boxes tend

2

00164916

Case 5:20-cv-03901   Document 1   Filed 06/12/20   Page 4 of 35

to be "common" or undesirable to the player – either because it is easily obtained or because the player already possesses the item.

6.      Some of these specific high-demand items in the game can be so difficult (and costly) to obtain that a "gray market" has sprung up on the internet – websites where the game accounts and in some cases individual items can be (and are) bought and sold for real money outside of the game itself. Numerous websites have been created to broker these transactions, bringing buyer and seller together to sell these items and accounts, for real money outside of the game.

7.      Loot Boxes have all the hallmarks of a Las Vegas-style slot machine, including the psychological aspects to encourage and create addiction – especially among adolescents. Moreover, under California law they constitute illegal "slot machines or devices" when played on a mobile phone, tablet, computer, or other similar device. California Penal Code § 330(d) broadly defines an unlawful "slot machine or device" as,

> a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value.

Cal. Pen. Code § 330(b)(d).

8.      Governments, regulators, and psychologists all agree that Loot Boxes, like the ones in games Defendant offers through its Google Play store, operate as gambling devices for those that play the game, including minors, and that they create and reinforce addictive behaviors.

9.      For instance, the Government of Belgium examined the use of Loot Boxes in various videogames and determined that they violated that country's gambling laws, specifically finding,

> The paid loot boxes in the examined games Overwatch, FIFA 18 and Counter-Strike: Global Offensive fit the description of a game of chance because all of the constitutive elements of gambling are present (game, wager, chance, win/loss).

3

CLASS ACTION COMPLAINT

00164916

10.    Likewise, in September 2019 Great Britain Parliament's Digital, Culture, Media and Sport Committee issued a report to Parliament determining that Loot Boxes constitute gambling and encourage addictive behavior, and recommending that the sale of Loot Boxes to children should be banned. Committee Chair Damian Collins MP said:

> Loot boxes are particularly lucrative for games companies but come at a high cost, particularly for problem gamblers, while exposing children to potential harm. Buying a loot box is playing a game of chance and it is high time the gambling laws caught up. We challenge the Government to explain why loot boxes should be exempt from the Gambling Act.

11.    Similarly, psychologists who have studied the issue agree that Loot Boxes correlate with problem gambling, especially among adolescents. For example, one such survey analysis of current studies concluded,

> [T]he findings are very consistent that there is an association between problem gambling and loot box buying among both adolescents and adults (and that the association may be even stronger among adolescents).

12.    Even Google implicitly concedes the Loot Boxes in its Google Play store games are a form of gambling. Like the California state lottery, Google requires its App Developers to disclose the "odds of winning" particular items in the Loot Boxes for the games it distributes. Google's "Developer Program Policies" for App Developers states:

> ***Apps offering mechanisms to receive randomized virtual items from a purchase (i.e. "loot boxes") must clearly disclose the odds of receiving those items in advance of purchase.***[1]

13.    While Google does not itself create these games and the Loot Box mechanism used to entice children to gamble, Google profits handsomely by 1) marketing, selling, and/or distributing the games to kids on Google products and through its Google Play store platform; 2) acting as the agent for the developer in selling the Loot Boxes; and 3) handling the money in all of the transactions – taking a 30% cut of all money spent by players before transferring the remainder to the developer.

---

[1]    Available at https://play.google.com/about/developer-content-policy-print/. Google apparently does not regulate the method of ***how*** those odds are disclosed, as they are frequently difficult to find or simply not available until the player has already decided to purchase the Loot Box.

4

## THE PARTIES

14.     Plaintiff John Coffee is a citizen of the State of California and a resident of Tehama County. Since at least 2018, Plaintiff has owned and played Final Fantasy Brave Exvius, a game marketed, sold and/or distributed by Defendant Google, and which he downloaded through the Google Play store on to his Android mobile device. In the course of playing Final Fantasy Brave Exvius and other games including War of the Visions: Final Fantasy Brave Exvius, Dragon Ball Legends, The Seven Deadly Sins: Grand Cross, Dragon Quest, Puzzles & Dragons, Dragon Ball Z Dokkan Battle, Brave Frontier, Arms of War, Mobius Final Fantasy, Final Fantasy Record Keeper, and Clash Royale, and as a result of Defendant's conduct, Plaintiff has been induced to spend money to purchase "Loot Boxes" in-game. Plaintiff Coffee continues to play Final Fantasy Brave Exvius and other games offering Loot Boxes on his Android mobile device. Plaintiff Coffee estimates he has spent in excess of $500 on in-game Loot Boxes in exchange for the random-chance possibility of winning valuable items. Plaintiff Coffee still owns and plays Final Fantasy Brave Exvius as well as other games downloaded through the Google Play store, which contain Loot Boxes. To the extent he plays these games in the future, he will be subjected to Google's predatory Loot Box scheme.

15.     Plaintiff Mei-Ling Montanez is the parent and legal guardian of S.M., a minor. She is and at all relevant times was a citizen of the State of New York who resides in Brooklyn, New York. Since at least 2019, her son S.M. has owned and played Dragon Ball Z Dokkan Battle ("Dragon Ball Z"), a game sold and/or distributed by Defendant Google. In the course of playing Dragon Ball Z and other games on Google-enabled devices, Plaintiff's son S.M. has been induced to spend his parents' money and perhaps his own money to purchase "Loot Boxes" in-game.

16.     Plaintiff S.M. is a minor. He is and at all relevant times was a citizen of the State of New York who resides in Brooklyn. Since at least 2019, S.M. has owned and played Dragon Ball Z, a game owned and published by Bandai Namco Entertainment. Dragon Ball Z was downloaded by S.M. onto a Samsung smartphone device, which uses the Google Android operating system. S.M. downloaded the game Dragon Ball Z from Google's App Store called "Google Play" directly onto the Google Android device in order to play it.

17.     In the course of playing Dragon Ball Z, S.M. has been induced to spend his parents' money to purchase "Loot Boxes" in-game. In Dragon Ball Z, the Loot Box mechanism is called a "Summons," which S.M. has purchased.

18.     S.M. played, and continues to play, Dragon Ball Z on the Samsung smartphone. Mei-Ling Montanez estimates S.M. has spent more than $100 on in-game purchases including Loot Boxes. The money spent on Loot Boxes was done in exchange for the random-chance possibility of winning valuable items in-game. S.M. used his parents' credit card, which is on file with Google for its "Google Play" App Store, to purchase some of the Dragon Ball Z Loot Boxes. Mei-Ling Montanez is unsure but S.M. may also have made Loot Box purchases directly through their smartphone network provider. S.M. still owns Dragon Ball Z and other Google-enabled games which contain Loot Boxes. To the extent he plays these games in the future, he will be subjected to Google's predatory Loot Box scheme.

19.     Defendant Google LLC is a Delaware limited liability company with its principal place of business and global headquarters at 1600 Amphitheatre Parkway, Mountain View, California, 94043. Google is a global technology company that specializes in internet-related services and products. Google developed, owns and operates the Google Play store and Android operating system.

## JURISDICTION AND VENUE

20.     This Court has diversity jurisdiction over the claims asserted herein on behalf of a nationwide class pursuant to 28 U.S.C. § 1332, as amended in February 2005 by the Class Action Fairness Act. Jurisdiction is proper because:

(a)     The proposed class includes more than 100 members, and many of the named plaintiffs and class members are citizens of states that are diverse from the state of Defendants' citizenship, the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and,

(b)     Defendants have purposefully availed themselves of the privilege of conducting business activities within the State of California, where Google has its principal place

of business; where its officers direct, control, and coordinate Google's activities, and where Google engaged in the unlawful conduct alleged herein.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the challenged conduct or omissions complained of herein occurred in this judicial district, and defendant caused harm to at least one of the named plaintiffs and numerous class members in this judicial district.

### INTRADISTRICT ASSIGNMENT

22.     Pursuant to Civil L.R. 3-2(c) and (d), assignment to the San Jose Division is proper because a substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this district and specifically in Santa Clara County where Google is headquartered. Additionally, Google's Terms of Service contain a provision in favor of this Division.

### SUBSTANTIVE ALLEGATIONS

**The Google Play "App" Store**

23.     Google creates and maintains a virtual online "store" where it makes available to consumers various software applications ("Apps") that are generally (but not exclusively) created by other developers in an effort to increase revenues for the Company. These Apps are downloaded by the consumer through Defendant's "Google Play" App store, which itself appears as an App and comes preloaded on mobile devices running on Google's own Android operating system, including the majority of Android smartphones and tablets.

24.     As of March 2020, the Google Play store features over 2.9 million apps – 95% of which are free to download. In 2019, Google Play users downloaded 84.3 billion mobile apps globally.

25.     The Google Play store is exclusively owned and operated by Google. It controls which Apps are allowed in Google Play and maintains strict requirements and guidelines for App developers who want to distribute an App via Google Play. Google Play contains hundreds of game Apps which can be downloaded directly onto the Android device and played. Many of the Google Play games are free, or very inexpensive to download.

00164916

26.     Google makes money through two methods of generating revenue from each game that is downloaded through its Google Play store. First, if the developer charges a price for the game itself, Google will receive a portion of the purchase price (30% of the total). Second, after the game is purchased and downloaded, Google and the game developer entice the player to make in-app purchases. Google receives 30% of all of these in-app purchases as well.

27.     Google does not act as a traditional "retailer" by re-selling Apps in its Google Play store. Instead of buying Apps from the developers and reselling the Apps to customers at a profit, Google places the developers' Apps on the virtual shelves of its Google Play store, sells them directly to Android smartphone and tablet customers, charges and collects the full price (set by the developer) from customers, keeps its 30% of the customer payment from every sale or license, and then remits the balance of the purchase price to the developer.

28.     Payment for the Apps, including all in-game purchases after the game is downloaded by the consumer (e.g., Loot Boxes), is controlled entirely by Google. Using Google Play's payment system, the payments go directly to Google and, after Google takes its 30% of the total, the remainder is distributed to the App developer. Thus, for every Loot Box sale in a game downloaded from the Google Play store, Google receives 30% of the revenue before the developer gets any money at all.

**Loot Boxes Explained**

29.     Google describes "Loot Boxes" as in-App mechanisms that provide users with randomized virtual items from a purchase.

30.     In their paper entitled "Predatory monetization schemes in video games (e.g. 'loot boxes') and internet gaming disorder," Professors Daniel King and Paul Delfabbro provided the following description of a Loot Box:

> A loot box refers to an in-game reward system that can be purchased repeatedly with real money to obtain a random selection of virtual items. The low probability of obtaining a desired item means that the player will have to purchase an indeterminate number of loot boxes to obtain the item. Loot boxes resemble

00164916

gambling slot machines because they require no player skill and have a randomly determined outcome (i.e. prize).[2]

31.     In the Google Play games, Loot Boxes can only be purchased by the consumer through the Google Play-linked Android device. Loot Boxes are purchased using real-world currency, usually through electronic means of entering a credit card number or using Google Play gift card.[3]

32.     For example, if the player is using an Android smartphone, while playing the game they can choose to make a purchase in the game itself. Doing so will take the player to a Google Play store screen which will show the game, the player's Google Play account identifying information (such as an email address tied to the account), and confirm that the player wants to purchase the item by requiring the player to press the "Purchase" button.

33.     Upon pressing the "Purchase" button, the amount of the purchase is immediately charged by Google to the credit card number on file with the Google Play store. There is no additional confirmation of any kind. A minor can accomplish the purchase without parental consent, or even parental knowledge.

34.     To further entice consumers to spend real money on Loot Boxes, many of the games use a "virtual" money system within the game. That is, instead of buying Loot Boxes directly for a set dollar amount, the player must first purchase the in-game currency, which is then used to purchase Loot Boxes. In-game currencies frequently take the form of expensive-sounding items like "gems" or "gold coins" so the player feels they are getting something of value for their money.

35.     For example, in Mario Kart Tour the player is required to purchase "Rubies," virtual items that cost real money and appear as large red gems (i.e. each one looks like a ruby). Rubies are then used to purchase a "Pipe" which is the version of the Loot Box style gambling mechanism in that game. In Final Fantasy Brave Exvius, players spend money to purchase "Lapis Crystals." In

---

[2]     King, Daniel and Delfabbro, Paul H., "Predatory monetization schemes in video games (e.g. 'loot boxes') and internet gaming disorder," *Addiction*, 2018.

[3]     In some games, a Loot Box can also be "earned" by playing the game for a period of time or achieving some in-game goal (such as "experience level").

CLASS ACTION COMPLAINT

Brawl Stars, kids are encouraged to spend money to purchase in-game "gems." In Roblox, the player spends money to purchase "Robux."

36.     This intermediate level of virtual currency is designed to "disconnect" the player from the concern that he is gambling with real money. According to the Brussels Gaming Commission:

> The use of points (coins) and especially their size are psychologically very sophisticated and aimed at creating a personal reality which is then disconnected from the real world. FIFA 18 teaches players to think in FUT currency and FIFA coins. . . .. In Overwatch and Star Wars Battlefront II, the value of real money is also fully disconnected from the value of the in-game currency, causing players to lose contact with the real value.

37.     The Loot Box mechanism relies heavily on the psychology of gambling – doing everything possible to build up the player's hoped-for win, tension, and excitement. For example, in many games opening the Loot Box coincides with triumphant music, the Loot Box itself bursting open with bright lights and colors. Yet this colorful animated system more often than not gives the player disappointing items, and rarely does the player get exactly the item he wanted.

38.     These Loot Boxes are designed to create a slot machine effect, where even when a player is not receiving the desired result – which happens frequently – there still exists a belief and hope that the next Loot Box will contain the desired item(s). This is further reinforced when viewing favorable results from other players opening Loot Boxes.[4]

39.     One researcher described the physical experience invoked by this Loot Box mechanism:

> Research by Kim (1998) found that waiting for the outcome of a gamble can activate the brain's chemical reward system, releasing endorphins that create pleasure. In a gaming context, think of someone who really wants the Pharah Anubis skin in Overwatch. They buy five loot boxes and get excited during the big flashy box-opening animation. This excitement happens five times in a short space of time, with five flashy box-opening animations that are almost an event in itself.

---

[4]     There are thousands of videos on YouTube.com of gamers opening Loot Boxes in many, many different games. See, e.g., video of opening FIFA Ultimate Team packs with over 14 million views at: https://www.youtube.com/watch?v=CX0OZtaQ_kQ.

40.     Commenting on the Loot Box mechanism incorporated into videogames like the ones at issue here, Hawaiian congressman Chris Lee noted that Loot Boxes "*are specifically designed to exploit and manipulate the addictive nature of human psychology*."

41.     Loot Boxes can contain numerous items, and the contents are ranked by order of probability with terms such as: "Common," "Rare," "Epic," and "Legendary." According to Google's Developer Program Policies, each game developer must somewhere publish the odds of winning a desirable item in any given Loot Box. *See* https://play.google.com/about/developer-content-policy-print/ ("Apps offering mechanisms to receive randomized virtual items from a purchase (i.e. 'loot boxes') must clearly disclose the odds of receiving those items in advance of purchase."). But, as Google knows, publication of the odds of winning do not deter slot machine users, much less gamers including children who are unlikely to understand them.[5]

42.     Especially rare Loot Box items often come with long odds. For example, a "Legendary" Brawler in Brawl Stars has approximately 0.30% probability of appearing in any particular "Brawl Box." Although there is no guarantee, obtaining a "Legendary" Brawler in this game can mean buying hundreds of Loot Boxes at a cost of $100 or more, based on these probabilities.[6]

43.     Through its Google Play store, Google sells and distributes dozens of games that bring in hundreds of millions of dollars every year through the Loot Box gambling mechanism. Below are six popular examples.

**Example 1:    Mario Kart Tour**

44.     Mario Kart Tour is a wildly popular and "free" animated kart-racing game released by Nintendo in September 2019. Google gave it an "E" for "Everyone" age rating. Across the

---

[5]     See, e.g., *Score Family Fun Ctr. v. County of San Diego*, 225 Cal. App. 3d 1217, 1221 (1990) (rejecting the argument that the ability to calculate odds meant a virtual casino game was not illegal gambling: "this [odds] calculation does not predict, to the individual player, whether his particular ticket will win").

[6]     The probability of receiving a specific item from a Loot Box is referred to as the "drop rate." Each Brawl Box provides 3 random draws, and each random draw has the same drop rate of approximately 0.1%.

CLASS ACTION COMPLAINT

Google Play store and Apple App Store, Mario Kart Tour was downloaded more than 123 million times during its first month, generating $37.4 million in player in-game spending during that time. As of March 2020, Mario Kart Tour has been the number one app by overall downloads in 65 countries on Google Play. The console version of the game is banned in Belgium because of its Loot Boxes. In Mario Kart Tour, the Loot Box mechanism is called a "Pipe," which is a Pipe that shoots out a random Driver, Kart or Glider which each have a level of rarity.

45.     "Rubies" are the main premium currency in the game. "Pipes" in the game are purchased with "rubies." Rubies, in turn, are purchased with money, in odd lots and on a sliding scale. For example, the player can purchase 3 Rubies for $1.99 ($0.66 per Ruby), 23 Rubies for $12.99 ($0.56 per Ruby), or 135 Rubies for $69.99 ($0.52 per Ruby). They can also be earned in limited amounts through game play.

46.     By spending Rubies, the player can use the "Pipe" to unlock new and better racers and karts. Pipes can shoot out a new driver, kart or glider, all of which have their own rarities.[7] For example, and depending on the Pipe, each Pipe contains a determined amount of "Normal," "Super," and "High-End" items, all of which are chosen randomly within their class and rarity, plus a featured driver, kart and glider. The items are not ordered, so each item can be potentially found in any placement within the pipe. Of course, it is also possible – even likely – that a player obtains an item from a Pipe that already has been obtained or that is simply not desirable. Below is a screenshot of a player "opening" a "Pipe:"

---

[7]     Players can only view the odds of winning from each "drop" by tapping the "Details" button right before they open the pipe in the game.

12

00164916



47.     According to one video game critic who played the beta version of the game upon its release to the public in September 2019, the Loot Box mechanics of the game are designed to hook children into spending money on the game:

> Mario Kart Tour locks its racers, karts and gliders behind a randomized, loot box system, where if you spend a couple of rubies you can get a green Mario pipe to fire out some new item, maybe one of those super rare characters you've been wanting or maybe that glider you need to get five stars on that same clone of the same course you've raced on five times already. There isn't even a character I particularly want here, and yet I keep pulling this thing down and reveling in its "surprise mechanic" of an animation, hoping that whatever emerges from that glowing white ball will give me some sort of peace. Spoilers! It won't.

> And this is the beating heart of Mario Kart Tour, the reason that Nintendo turned its game into a morass of currencies, unlocks, XP bars and [loot box] mechanics. The reason is that they work: they give us a little dopamine drip in our brains that the developer can parcel out to push us towards buying rubies on our own rather than "earning" them by grinding through what is bound to be an endless series of samey races. All it needs to do is give you a few rewards for free before you're hooked into that glorious feeling of pulling that pipe back: it's why loot boxes in so many games have such elaborate animations and detailed sound effects: those loot boxes are the heart of the experience, and they need to hit your animal brain as hard as they can. And it works in Mario Kart Tour as well as any. I opened up the game to take a

13

screenshot for this article and played a few races, throwing a few more arbitrary stars onto my totals.

I haven't spent any money on Mario Kart Tour yet, and I don't plan on doing so. I can hold out until Shadowkeep for Destiny 2 launches, opening up a much broader and more satisfying dopamine source. ***But others won't be so lucky, particularly children. They'll shell out some huge amount of money for some miniscule chance to unlock musician Mario, and then they'll shell out more for the next thing. It's disappointing to see from Nintendo, but the developer is clearly going to keep doing it. It works.***[8]

**Example 2:    FIFA Soccer**

48.     FIFA Soccer (mobile) is an online sports game developed by EA Sports that is free to download from the Google Play store. The Google Play store describes FIFA as age-rated "E" for "Everyone". FIFA mobile allows players to complete drills, contests, play online against other players, and compete in online tournaments and leagues.

49.     A large part of the FIFA game revolves around creating your own ultimate team, which is used to play throughout the game. To get the best players on your team, players are encouraged to purchase "Card packs" through the in-game store.

50.     "Card packs" or "Player packs" (FIFA's take on Loot Boxes) feature a random assortment of players that are available for purchase using FIFA Ultimate Team ("FUT") Coins, an in-game currency that can be purchased using real world money, or obtained in small amounts through playing the game.

51.     Critics have described the Cards Packs akin to gambling on a slot machine:

"The thrill of opening a pack to hopefully land on of soccer's most prominent names is similar to rolling the ice in roulette or pulling the lever on a slot machine. It often leads to disappointment, but the potential, however small, to win big keeps players buying packs. When FUT coins run dry, players can purchase FIFA points using real world currency and use them towards card packs. It a vicious cycle and one insidiously glorified in countless loot box YouTube videos."[9]

---

[8]     "I'm Still Playing Mario Kart For The Worst Reason," *Forbes* October 1, 2019 (Thier, Dave). Available at https://www.forbes.com/sites/davidthier/2019/10/01/im-still-playing-mario-kart-tour-for-the-worst-reason/#977582468cad

[9]     "Proof You'll Regret Wasting Money on That FIFA 20 Loot Box." Thomas Bardwell. CCN, *Gaming News*. Available at https://www.ccn.com/proof-youll-regret-wasting-money-on-that-fifa-20-loot-box/.

52.     While the game now "displays" the odds of receiving the desirable players, it is not prominently displayed but hidden in a small "more info" box that must be clicked on right before purchase. However, what *is* prominently displayed are the most desirable and unlikely rewards, that picture only star players such as Mbappe, Lewandowski, and Hazard. While the odds of receiving these players are low, children are enticed to believe that they will receive one of the players by buying the pack. Below is a screenshot of the probabilities feature:



53.     The producer and writer for *Bleacher Reports*' gaming content also described FIFA as a gambling system:

> "Like any effective gambling system, the big prizes—say, Lionel Messi or Cristiano Ronaldo—are not going to appear often but always seem within reach. This can lead to accumulating massive spends without knowing. A common response to the survey was players admitting they didn't realise how much they'd spent until they sat down to work it out. One user estimated spending $280,000 across a decade."[10]

---

[10]     "Is It Too Expensive To Be Good At FIFA?" Nick Ackerman. *Bleacher Report*. May 20, 2019. Available at https://bleacherreport.com/articles/2836528-is-it-too-expensive-to-be-good-at-fifa . This article is not limited to "Apps" but appears to refer to the console and computer versions of the game as well.

15

54.     The FIFA game forces players to purchase Loot Boxes and to gamble in order to get better players and to be competitive in the game. At January's FUT Champions Cup, a staple of the FIFA esports calendar, players were competing with each other using teams ***with a real-world value of approximately $27,000***.

55.     EA Sports has generated huge sums from this "free" game. According to one report, by the end of 2018 EA Sports had taken in an estimated $1 billion or more from its free to play mobile games. Approximately 36% of that amount, or $360 million, from FIFA.[11]

**Example 3:     Roblox**

56.     Roblox is a massively popular "free" multiplayer online video game and game creation system that allows users to design their own games and play a wide variety of different types of games created by other users. It is very popular among kids and is currently ranked #1 in Google Play apps for Family / Action & Adventure games. Roblox has more than an estimated 100 million active monthly users and has generated over $1 billion in estimated revenue. It is age-rated "Everyone 10+" in the Google Play store."[12]

57.     Roblox permits game developers to create their own game in the Roblox virtual world, as well as play games already created. Thus, Roblox is not one single game, but instead contains numerous games that users can play. Many of those games within Roblox offer Loot Boxes as a way to get desirable items in the game. As described in the Roblox developer forums, Loot Boxes are popular among them because they generate much so revenue.

58.     The Loot Box systems within Roblox can differ significantly depending on the various games and developers who create them. But as Roblox Developers themselves admit, some Roblox games use Loot Boxes as nothing more than a way to "scam" children. According to one

---

[11]     "EA Sports Scores More Than $1 Billion from Free-To-Play Titles, led by Madden." Oliver Yeh. *Sensor Tower*. Jan 28, 2019. Available at https://sensortower.com/blog/ea-sports-mobile-revenue-1-billion.

[12]     These numbers include Google Play and Apple users. "Roblox Mobile Has Grossed over $1 billion in Lifetime Revenue." Nov. 15, 2019. Katie Williams. *Sensor Tower*. Available at https://sensortower.com/blog/roblox-one-billion-revenue.

Roblox game developer, "[a] lot of times it always seems as if they were trying to scam children, obviously this is not always the case, but some really do."[13]

59.     The money in Roblox is called "Robux" and is purchased with real money. Although Google takes its cut from the income, Developers who receive Robux earned from various products in their games – such as Loot Boxes – are able to convert their Robux back into real world currency through the Developer Exchange system.

**Example 4:    Brawl Stars**

60.     Brawl Stars is a multiplayer online battle arena game where players battle against other players online in multiple game mode. Brawl Stars was created by videogame company SuperCell and generated over $420 million in revenue in the first year. Brawl Stars in currently ranked #37 in Google's action game apps and is age-rated by Google "Everyone 10+."

61.     Brawl Stars players can unlock and play against each other (or the computer) with different brawlers. Each brawler has its own unique offensive or defensive "kit." Due to the competitive nature of the game, players want the best brawlers to increase their chances of winning in the game.

62.     Players can obtain new brawlers by opening Brawl Boxes (the game's version of a Loot Box). Brawl Boxes are purchased in game using the in-game currency "Gems." Gems can be earned through game play in small amounts or purchased in the game's "store" with real money in varying amounts and prices. For example, a "fistful of Gems" is 30 Gems and costs $1.99, "pouch" of 80 gems is $4.99, and a "crate full" of 950 Gems will cost $49.99.

63.     Loot Boxes may also be purchased in varying amounts and prices. A "Big Box" is the equivalent of 3 "Brawl Boxes," and costs 30 Gems. Mega Boxes cost 80 Gems each and are the equivalent of 10 regular Brawl Boxes.

64.     As required by Google, Brawl Stars displays the odds of obtaining certain items in the Brawl Boxes. The best brawler in the game – and therefore the most coveted – is called a 'Legendary Brawler'. While the chances of receiving items in a Brawl Box constantly changes,

---

[13]     Available at https://devforum.roblox.com/t/guidelines-around-users-paying-for-random-virtual-items/307189/66

CLASS ACTION COMPLAINT

"opening" any given Brawl Box usually results in approximately a 0.3% chance of receiving a Legendary Brawler.

65. In order to incentivize players to open more and more Brawl Boxes, Brawl Stars employs an algorithm to slightly increase the odds of receiving a Legendary Brawler each time the player opens a Brawl Box. This feature entices players to purchase additional Brawl Boxes as the player sees his/her chances improve, and works in tandem with the player's understanding that he/she has already spent a certain amount of money to obtain that better chance of receiving the Legendary Brawler.

**Example 5: Final Fantasy Brave Exvius**

66. Final Fantasy Brave Exvius is free-to-play, turn-based role-playing game where players command their characters to attack and move through a series of stages until they encounter and defeat the boss. Final Fantasy Brave Exvius, which was published by videogame company Square Enix and released worldwide in June 2016, has been downloaded over 40 million times worldwide and currently generates $2 million a month in revenue. Final Fantasy Brave Exvius is age-rated in the Google Play store as "T" for "Teen."

67. Final Fantasy Brave Exvius is a loot-box based game where new and better characters are obtained by buying "Lapis Crystals" (purchased with real-world money), which are in turn used to "summon" a single, randomized character. Summons are the in-game Loot Boxes that offer random rewards and characters. The best characters are the most rare and difficult to get in the summons.

68. An article titled "Players keep spending thousands of dollars on Final Fantasy Brave Exvius" describes its additive, loot-box-based gameplay:

> The main way of improving your collection is by taking pulls on a slot machine. It's what many call a gacha game, after Japanese gachapon toy-vending machines. Instead of having characters join the party during the story like they might in a traditional role-playing game, the player buys loot box-like crystals that each contain a single random character in a "summon" tab. Making progress in the game earns a trickle of free Lapis gems, the currency used to buy summons, but the amount pales in comparison to buying Lapis with real money.
>
> That leaves players feeling underfunded, as most pulls only have a 3 percent chance to get the rarest and best rank, a "rainbow" five-star character. And that rate was all rumor and supposition until a patch in late January 2018, when Gumi added the exact chances to pull a four- or five-star character, shortly after Apple announced plans to

18

require posted drop rates for in-game purchases in iOS games. The change didn't just affect Brave Exvius; gacha games often use low drop rates and limited-time promotions to encourage players to pull and pull and pull to get the latest new addition. And many of these games encourage players to repeatedly pay large amounts.[14]

69.    A middle-aged, married man going by "Nothing024" on Reddit reported spending $1,500 in a day to obtain one character in Final Fantasy Brave Exvius. The odds of obtaining the particular character were 1-in-400, and each try cost $2.50. The same man described another time when he spent $700 for a character known as "Greg":

> I put in my money again, $99....no Greg, $99....no Greg, $99....no Greg.... I took a break for a little bit. My family had plans for the day. I was angry now. How could I have spent $300 and not gotten what I wanted? When nobody was looking, around everyone, I did it again. $99....no Greg, $99...no Greg, $99...no Greg, $99... Finally. I had Gilgamesh. [...] Yeah, I spent $700, but I would stop now. I had enough.[15]

70.    In Final Fantasy Brave Exvius, new characters are released as "banners." A banner promotion features three to six units, which are almost always better than previous units. The banner's limited run is the best time to get new characters: Summoning during its two-week period — "pulling on a banner" — makes that Loot Box pull relatively more likely to be one of the promoted characters. An estimated one pull in three will land one of them — a fact that still is not explained anywhere in the game. While players get a small amount of resources (known as Lapis Crystals) to make free pulls, it is often not enough to get all — or any — of the units on a banner before it ends. Thus, the lure to buy more crystals for a chance to obtain the newest and best characters is always there. The in-game currency is also less expensive when purchased in bulk, which prevents players from easily figuring out the real-money cost of each pull on the Loot Box.

71.    In November 2018, Square Enix (the game's publisher) announced it was no longer offering Final Fantasy Brave Exvius in Belgium because of "the present uncertain legal status of 'loot boxes' under Belgian law." Nevertheless, Google and Square Enix have continued to market

---

[14]    "Players keep spending thousands of dollars on Final Fantasy Brave Exvius: Community members tell stories of banner addiction" Jay Allen. *Polygon*. June 8, 2018. Available at https://www.polygon.com/features/2018/6/8/17435980/final-fantasy-brave-exvius-gambling-addiction-gacha.

[15]    *Id.*

and sell Final Fantasy Brave Exvius and its in-game Loot Boxes to consumers throughout the United States.

### Example 6:    Dragon Ball Z: Dokkan Battle

72.     Dragon Ball Z: Dokkan Battle is a free-to-play mobile game based on the Dragon Ball anime franchise and television series. Dragon Ball Z: Dokkan Battle is offered on Google Play and is an "Editors' Choice" game. Since its release in 2015, the game has exceeded 300 million downloads and grossed more than $2 Billion worldwide.

73.     The main game is made up of levels that work similarly to board games, with spots dedicated to items, power-ups, traps, and fights. During the fights, gamers can unlock "super attacks," which is much more powerful than a typical attack. Gamers can also play with different characters. Gamers can unlock new characters with "Summons," which are the in-game Loot Boxes that offer random rewards and characters. The best characters are most rare and difficult to get in the Summons. Summons can only be purchased with the in-game currency, called "dragon stones."

74.     Dragon stones are earned through gameplay or purchased with real money. Dragon stones cost approximately 50 cents to 99 cents each, depending on the number of dragon stones that the gamer purchases. For example: 1 dragon stone costs 99 cents, 6 dragon stones costs $3.99 and 90 dragon stones costs $44.99.

75.     Summons are offered in a single summons or multi-summons. A single summons costs approximately 5 dragon stones and a multi-summons costs 50 dragon stones (approximately $25 or more).

76.     One of the main criticisms of the game – even among adult gamers – is the poor odds (drop rate) of obtaining something valuable in the game. As one online critic wrote:[16]

> [The] game requires immense Free-2-Play luck or some cash investment; however, even with cash investments, there's no guarantee. This is a prime example of subtle gambling (not so much as subtle for adults, but for children) where the player buys a few stones, tries to pull for the character they want, but didn't get them, so they'll think, "Why not a few more stones? I really like this character."

---

[16]     https://appgrooves.com/app/dragon-ball-z-dokkan-battle-by-bandai-namco-entertainment-inc/negative

**Loot Boxes Create Addictive Behaviors in Kids, Especially Adolescents, Akin to Gambling Addiction**

77.     Psychologists call the principle by which Loot Boxes work on the human mind, 'variable rate enforcement'. This kind of reward structure underpins many forms of gambling. It results in people quickly acquiring behaviors and repeating these behaviors frequently in hopes of receiving a reward. Dopamine cells are most active when there is maximum uncertainty, and dopamine system responds more to an uncertain reward than if the same reward delivered on a predictable basis.

78.     For numerous reasons minors, and adolescents in particular, are especially vulnerable to this type of manipulation. By some estimates, teenage gambling is the fastest rising gambling addiction. "Teenage gambling, like alcohol and drug abuse in the 1930s, is the fastest growing addiction."

79.     First, adolescents have low impulse control. The teenage brain is still developing; the part of the brain that's responsible for good impulse control and decision making is not fully developed. Dr. Frances Jensen, the chair of the department of neurology at the University of Pennsylvania Perelman School of Medicine and formally Harvard professor and director of neuroscience at Boston's Children's Hospital, explains it as follows: "their frontal lobes are there. They're there and they're built. They're just not accessed in as rapid a manner because the insulation to the wiring to them isn't fully developed, so the signals go more slowly. Hence, teenagers are not as readily able to access their frontal lobe to say, oh, I better not do this. An adult is much more likely to control impulses or weigh out different factors in decisions, where a teenager may not actually have full on-line, in-the-moment capacity". Dr. Frances Jensen, Why Teens are Impulsive-Prone and Should Protect Their Brains. NPR. Fresh Air. Jan. 28, 2015. Adolescence is a developmental period characterized by suboptimal decisions and actions. Casey, B. J., Jones, R. M., & Hare, T. A. (2008). The adolescent brain. Annals of the New York Academy of Sciences, 1124, 111–126. During this time, impulse control is still relatively immature. *Id*.

80.     Second, adolescents are more inclined to engage in risk-taking behaviors and risky decision making than are adults. Gardener M, Steinberg L. Peer influence on risk taking, risk

preference, and risky decision making in adolescence and adulthood: an experimental study. Developmental Psychology. 2005;41:625–635. Adolescents and young adults are more inclined to risk taking because development of executive brain function and appreciation of risk is continuing in this period. Kelley, A.E., Schochet, T. & Landry, C.F. (2004). Risk taking and novelty seeking in adolescence: Introduction to Part I. Annals of the New York Academy of Sciences, 1021, 27-32. Steinberg, L. (2005). Cognitive and affective development in adolescence. Trends in Cognitive Sciences, 9(2), 69-74.

81.     Third, not only are adolescents more likely to take risks, but they are also more prone to addiction. "They build a reward circuit around that substance to a much stronger, harder, longer, stronger addiction. That is an important fact for an adolescent to know about themselves - that they can get addicted faster." Dr. Frances Jensen, Why Teens are Impulsive- Prone and Should Protect Their Brains. NPR. Fresh Air. Jan. 28, 2015.

82.     Last, children and adolescents often lack a critical understanding of money and financial management. Approximately one in four students in the 15 countries and economies that took part in the latest OECD Programme for International Student Assessment (PISA) test of financial literacy are unable to make even simple decisions on everyday spending, while only one in ten can understand complex issues, such as income tax. OECD (2017), PISA 2015 Results (Volume Iv); Students' Financial Literacy, PISA, OECD Publishing, Paris.

83.     As set forth in detail above, purchasing and opening a Loot Box – by design – is visually, physically, and aurally stimulating. Opening a Loot Box gives the player a rush; the moment of anticipation followed by release. The Loot Box mechanism has been proven to be effective on adults, and its effects are only intensified when used on minors who are more prone to engage in risk-taking behaviors, more prone to gambling addiction, and "are less equipped to critically appraise the value proposition of these schemes."

84.     In fact, virtually every study published to date on the connection between Loot Boxes and gambling has found an association.

00164916

1
2

**"Given all everything we know about the similarities between boxes and slot machines, it would actually be astounding and surprising were there not such a connection. They are, in many ways, so closely related."[17]**

3
4
5
6
7

85.    Dan Trolaro, the Assistant Executive Director of the Council on Compulsive Gambling of New Jersey, explained, "The mechanics within a loot box look and feel like a gamble. Once minors are exposed to game of chance mechanisms, there is a significantly higher risk that they will have problems with it at a later stage in their lives. The literature indicates that exposure at an early age increases the risk of addiction and the severity of the addiction."

8
9
10
11
12

86.    Other experts agree. For example, the mental health director of the UK's National Health Service summarized their studies by declaring that the gaming industry is "setting kids up for addiction by teaching them to gamble." And according to Keith Whyte, the Executive Director of the National Council On Problem Gambling, "Those who play loot boxes, may well be on their way to developing gambling problems due to their loot box play."

13
14
15
16
17
18
19

87.    Peer-reviewed empirical research bears this out. For example, Zendle, Meyer and Over (2019) examined the relationship between Loot Box buying and problem gambling (using the Canadian Adolescent Gambling Inventory) in a survey of 1,115 adolescents aged 16-18 years. They reported that the association between Loot Box buying and problem gambling was stronger than that found among previous studies examining adults. Their results "suggest that loot boxes either cause problem gambling among older adolescents, allow game companies to profit from adolescents with gambling problems for massive monetary rewards, or both."

20
21

88.    Professor Mark D. Griffiths conducted a survey of the available literature in 2019 and concluded,

22
23
24

Based on the few studies carried out to date, the findings are very consistent that there is an association between problem gambling and loot box buying among both adolescents and adults (and that the association may be even stronger among adolescents).

25
26
27
28

[17]    Keith Whyte, Executive Director of the National Council On Problem Gambling: Inside the Game: Unlocking the Consumer Issues Surrounding Loot Boxes. An FTC Workshop. August 7, 2019.

00164916

**Some Countries Have Banned Loot Boxes For Violating Gambling Laws**

89.     Over just the last two years, some countries have banned Loot Boxes (Belgium, Netherlands, Japan), while others report current investigations (including Australia who issued a report that they are "psychologically akin to gambling"). Similarly, lawmakers in Hawaii, Minnesota and Washington have introduced state legislation to ban the use of Loot Boxes in videogames.

90.     For instance, in the study completed in Belgium, the regulators looked at Loot Boxes in a variety of videogames and determined that they fit the description of a game of chance because all of the constitutive elements of gambling are present, specifically finding,

> The paid loot boxes in the examined games Overwatch, FIFA 18 and Counter-Strike: Global Offensive fit the description of a game of chance because all of the constitutive elements of gambling are present (game, wager, chance, win/loss).[18]

91.     In Australia, they too determined the Loot Box mechanism constitutes a form of gambling that targets minors. They recently passed new regulations that,

> require that any person purchasing videogame loot boxes will have to show ID. According to the Office of the eSafety Commissioner, access to these boxes and other simulated gambling elements in computer or video games will be restricted to "adults aged 18 years or over, including through the use of mandatory age verification.

92.     Here in the United States, the Federal Trade Commission recently hosted a workshop on Loot Boxes and U.S. Senators Maggie Hassan (D-NH)), and Josh Hawley (R-MO) introduced a bill co-sponsored by Ed Markey (D-MA) and Richard Blumenthal (D-CT) titled "The Protecting Children From Abusive Games Act" that would prohibit Loot Boxes in minor-oriented games. The proposed bill includes a prohibition in minor-oriented games of Loot Boxes, which it defines as "an add-on transaction to an interactive digital entertainment product that in a randomized or partially randomized fashion unlocks a feature of the product or adds to or enhances the entertainment value of the product[.]"

---

[18]     "FIFA Soccer" is the title of the current App version of what used to be called "FIFA 18" which is currently available in Defendant's Google Play store in the United States.

1       **Google Game Ratings Do Not Disclose Gambling Or the Loot Box Mechanism**

2       93.    In the United States, the videogame industry "self-regulates" through the

3 Entertainment Software Ratings Board ("ESRB"). According to the ESRB's website,

4       ESRB ratings provide information about what's in a game or app so parents and
consumers can make informed choices about which games are right for their family.

5       Ratings have 3 parts: Rating Categories, Content Descriptors, and Interactive

6       Elements.

7       94.    Since 2015, Google has provided ESRB-based age-ratings for games in its Google

8 Play store. Notably, Google's ratings do *not* contain any disclosures concerning the use of Loot

9 Boxes and gambling. The only related disclosure available to parents is that a game "Offers in-app

10 purchases." As an example, below is a screen shot of Google Play's disclosures concerning the FIFA

11 game[19]:

12

13
14
15
16
17
18



19

20       95.    Thus, there is no notice – and no requirement of any notice by Google – to the parent

21 or the child that a game contains Loot Boxes or other gambling mechanisms.

22       **Google Earns Huge Profits From Minors Purchasing Loot Boxes in its App Games**

23       96.    Google does not report earnings based on Loot Boxes specifically, or even amount

24 of revenue obtained from in-game purchases from the Google Play store. However, Google Play's

25 estimated revenue for just the first half of 2019 exceeded $14.2 billion – an increase of 19.6% versus

26

27

28       [19]    https://play.google.com/store/apps/details?id=com.ea.gp.fifamobile&hl=en_US

the previous year.[20] During the third quarter of 2019, Google Play users spent $6.5 billion on mobile game purchases.[21]

97.     Moreover, Google derives substantial revenue from its Android mobile operating system business. Google's revenues for Android are also affected by its ability to sell in-game Loot Boxes for its App Developers. The availability of Apps in the Google Play store – which Google relies upon from independent App developers – is a factor considered by consumers when purchasing phones and tablets. That is, when deciding whether to purchase an Android mobile device or a competitor product from Apple, consumers will consider which Apps are available on that device.

**Loot Boxes Constitute Gambling in Violation of California Law**

98.     Loot Boxes are a form of gambling and violate California's anti-gambling laws. According to the California Bureau of Gambling Control, by paying for and opening Loot Boxes within the game, the game is creating a "gambling device." It states:

99.     California's gambling device statutes are broad in their coverage and prohibit any person from owning, renting, or possessing illegal gambling devices. (Penal Code, §§ 330a, 330b, 330.1.) An illegal gambling device has three features:

>       A.     It is a machine, apparatus, or device (coin operation is not required);

>       B.     Something of value is given to play the device; and

>       C.     The player has the opportunity to receive something of value by any element of hazard or chance ("something of value" is not limited to coins, bills, or tokens—it also includes free replays, additional playing time, redemption tickets, gift cards, game credits, or anything else with a value, monetary or otherwise.) (Penal Code, §§ 330a, 330b & 330.1.)

100.    None of these elements can be in dispute. A player uses his Android smartphone or tablet with the downloaded game on it (#1); The player pays real-world currency for the opportunity

---

[20]     https://sensortower.com/blog/app-revenue-and-downloads-1h-2019

[21]     https://sensortower.com/blog/app-revenue-and-downloads-q3-2019

1    to open a Loot Box (#2); and the Loot Box is a randomized chance to obtain something valuable in-

2    game (#3).

3        101.    In fact, there is a market for many of the games' player accounts to be bought and

4    sold outside of the game itself. The value, or price, of each game account is determined by the

5    "Loot" the player possesses in the account. There is even a selection of online companies who claim

6    to specialize in buying and selling these App videogame accounts.

7                              **CLASS ACTION ALLEGATIONS**

8        102.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek certification of a

9    nationwide class consisting of:

10       All persons who paid to receive randomized virtual items from a purchase (also
         known as "Loot Boxes") within an App downloaded from the Google Play store.
11

12       103.    The Class excludes Google's officers and directors, current or former employees,

13   including their immediate family members, as well as any judge, justice or judicial officer presiding

14   over this matter and members of their immediate families and judicial staff. Plaintiffs reserve the

15   right to amend the Class definition or include subclasses if discovery and further investigation reveal

16   that the Class should be expanded or otherwise modified.

17       104.    Plaintiffs' claims are typical of the claims of the members of the Class, because

18   Plaintiffs and all other members of the Class were damaged by the same wrongful conduct

19   committed by Defendant, as alleged more fully herein.

20       105.    Plaintiffs will fairly and adequately protect the interests of the Class. The interests of

21   the class representatives are coincident with, and not antagonistic to, the interests of the other

22   members of the Class.

23       106.    Plaintiffs have retained counsel competent and experienced in the prosecution of

24   class action litigation.

25       107.    Questions of law and fact common to the members of the Class are central here and

26   predominate over questions that may affect only individual members. Among the questions of law

27   and fact common to the Class are:

28

00164916

(a)     Whether Defendant's Google Play store games containing Loot Boxes and similar mechanisms create and/or exacerbate addictive behaviors in its players;

(b)     Whether Defendant's Google Play store games containing Loot Boxes and similar mechanisms exploit addictive behaviors in its players;

(c)     Whether Defendant's Google Play store games containing Loot Boxes and similar mechanisms constitute gambling or create a gambling device under California law and in violation of Cal Penal Code §§ 330, *et seq.*;

(d)     Whether Defendant's Google Play store games containing Loot Boxes and similar mechanisms violate the Illegal Gambling Business Act (18 U.S.C. § 1955), and the Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367);

(e)     Whether Google violated Business & Professions Code § 17200 by engaging in an "unlawful" business practice by marketing, selling and distributing videogames with gambling features and in violation of various state and federal laws as set forth herein;

(f)     Whether Google violated Business & Professions Code § 17200 by engaging in an "unfair" business practice by marketing, selling and distributing videogames with gambling features and that create and/or exacerbate addictive behaviors, especially in minors, as alleged herein;

(g)     Whether Google violated Civil Code §§ 1770(a)(14);

(h)     Whether Google was unjustly enriched as a result of the conduct alleged herein;

(i)     Whether Google's conduct violated the other provisions of statutory and common law outlined in this Complaint.

108.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The burden and expense that would be entailed by individual litigation makes it

28

00164916

1  impracticable or impossible for Class members to prosecute their claims individually. Further, the

2  adjudication of this action presents no unusual management difficulties.

3      109.    Unless a class is certified, Google will retain monies received as a result of its

4  improper conduct. Unless a classwide injunction is issued, Google will continue to commit the

5  violations alleged, and will continue to promote and engage in the unfair and unlawful gambling

6  activities discussed herein. Google has acted or refused to act on grounds that are generally

7  applicable to the Class so that injunctive and declaratory relief is appropriate to the Class as a whole.

8  **FIRST CAUSE OF ACTION**

9
10  **Unlawful and Unfair Business Practices**
**in Violation of California's Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

11      110.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the

12  preceding paragraphs of this Complaint.

13      111.    Plaintiffs and Defendant are "persons" within the meaning of the UCL. Cal. Bus. &

14  Prof. Code § 17201.

15      112.    The UCL defines unfair competition to include any "unlawful, unfair or fraudulent

16  business act or practice." Cal. Bus. Prof. Code § 17200.

17      113.    By committing the acts and practices alleged herein, Google has engaged in unlawful

18  and unfair business practices in violation of the UCL.

19      114.    Unlawful Conduct: As a result of engaging in the conduct alleged in this Complaint,

20  Google has violated the UCL's proscription against engaging in unlawful conduct by virtue of its

21  violation of California's gambling laws, its violation of Federal gambling laws, and its violations of

22  the California Civil Code §§ 1710 and 1711, as well as the Consumers Legal Remedies Act,

23  California Civil Code § 1770(a)(14).

24      115.    More specifically, Google has violated the UCL's proscription against engaging in

25  "unlawful" business practices by virtue of its conduct in violation of California Business &

26  Professions Code §§ 19800, *et seq.*, California Penal Code §§ 330, *et seq.*, the Illegal Gambling

27  Business Act (18 U.S.C. § 1955), and the Unlawful Internet Gambling Enforcement Act of 2006

28  (31 U.S.C. §§ 5361-5367) as set forth herein. Plaintiffs reserve the right to allege other violations

29

of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

116.    Unfair Conduct: In the course of conducting business, Google has violated the UCL's proscription against "unfair" business practices by, among other things:

(a)    Engaging in the conduct alleged in this Complaint, which is illegal and also violates legislatively-declared policies articulated in, inter alia, California Business & Professions Code §§ 19800, *et seq.*, California Penal Code §§ 330, *et seq.*, the Illegal Gambling Business Act (18 U.S.C. § 1955), and the Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) by conducting illegal and unlicensed gambling business including at places not suitable for gambling activities, knowingly accepting payments from those who participated in Defendant's unlawful Internet gambling, and promoting predatory gambling as entertainment for children and families;

(b)    Intentionally profiting from conduct designed to create and/or exploit addictive tendencies in vulnerable minors, and adolescents in particular; and,

(c)    Omitting important information and misleading parents of vulnerable minors and adolescents concerning the addictive, costly and random chance nature of the Loot Box mechanism and its use in Defendant's Google Play store games.

117.    Google has also violated the UCL's proscription against unfair conduct as a result of engaging in the conduct alleged in this Complaint, which violates legislatively-declared policies articulated in, *inter alia*, California Civil Code §§ 1710, 1711, and 1770(a)(14).

118.    There is no societal benefit from Google's conduct which includes promoting addictive gambling as entertainment for children and families. There is only harm from Google's conduct. While Plaintiffs were harmed, Google was unjustly enriched by its deceptive, predatory and harmful conduct. As a result, Google's conduct is "unfair," as it offended an established public policy. Further, Google engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers as the gravity of Google's conduct outweighs any alleged benefits attributable to such conduct.

119.   There were reasonably available alternatives to further Google's legitimate business interests, other than the conduct described herein.

120.   Google's violations of the UCL continue to this day. As a direct and proximate result of Google's violations of the UCL, Plaintiffs have suffered actual damage in that they paid for and downloaded games, and paid for illegal Loot Boxes and other gambling mechanisms, and subjected themselves and/or their children to exploitative games as alleged herein.

121.   Unless restrained and enjoined, Google will continue to engage in the unlawful and unfair conduct described herein.

122.   Pursuant to Section 17203 of the UCL, Plaintiffs and the class seek an order that requires Google: (a) to prohibit download and sales of App games that contain Loot Boxes and other similar exploitative mechanisms; (b) to provide owners of App games containing those features with restitution for moneys paid to purchase the game or purchase Loot Boxes and similar mechanisms in-game; (c) to otherwise make full restitution of all moneys wrongfully obtained from its violations of the UCL, as alleged in this Complaint; and (f) requires Google to pay the attorney fees and costs incurred by counsel for Plaintiffs and the proposed class in accordance with California Code of Civil Procedure § 1021.5.

## SECOND CAUSE OF ACTION

**Unfair and Deceptive Acts and Practices
in Violation of the Consumers Legal Remedies Act
(Cal. Civ. Code §§ 1750,** *et seq.***)**

123.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

124.   This claim for relief is brought pursuant to the CLRA. Plaintiffs and members of the class are "consumers," as that term is defined by Civil Code § 1761(d), because they bought and downloaded videogames and Loot Boxes or similar gambling mechanisms for personal, family, or household purposes.

125.   Plaintiffs and Class Members have engaged in a "transaction" with Google, as that term is defined by Civil Code § 1761(e).

31

126.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA, and were undertaken by Google in transactions intended to result in, and which resulted in, the sale of goods to consumers; namely, the sale of Google Play store game Apps containing Loot Boxes, and the sale of Loot Boxes or similar gambling mechanisms.

127.    By engaging in the conduct described herein, Google has violated subdivision (a)(14) of California Civil Code §1770 by,

> (14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.

128.    Defendant violated the CLRA by representing to Plaintiffs and Class members transactions involving Loot Boxes confer or involve rights to potentially valuable prizes, when in fact these transactions constitute unlawful gambling transactions that are prohibited by law.

129.    Defendant's violations of the CLRA proximately caused injury in fact to Plaintiffs and the Class.

130.    Plaintiffs and the Class members transacted with Defendant on the belief that the transaction was lawful. Indeed, a reasonable consumer believes in the lawfulness of his or her transactions.

131.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiffs, individually and on behalf of the other members of the Class, seek a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

132.    Pursuant to Cal. Civ. Code § 1782(a), Defendant was notified in writing by certified mail of the particular violations of Section 1770 of the CLRA, which notification demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. A copy of the letter is attached as Exhibit A.

133.    If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act, Plaintiffs will amend this Complaint to add claims for actual, punitive and statutory damages, as appropriate.

134.    Defendant's conduct is fraudulent, wanton, and malicious.

135.    Pursuant to §1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

**THIRD CAUSE OF ACTION**

**Unjust Enrichment**

136.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

137.    By its wrongful acts and omissions, Google was unjustly enriched at the expense of and to the detriment of Plaintiffs and the Class. Google was unjustly enriched as a result of the compensation it received from marketing and selling the unlawful and unfair Loot Boxes to Plaintiffs and the Class.

138.    Plaintiffs and the Class seek restitution from Google and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Google from its wrongful conduct.

139.    Plaintiffs and the Class have no adequate remedy at law.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief in this Complaint as follows:

(a)    For an order certifying the Class as requested herein;

(b)    For restitution and disgorgement of the revenues wrongfully retained as a result of Google's wrongful conduct;

(c)    For declaratory and injunctive relief as permitted by law or equity, including enjoining Google from continuing the unlawful practices as set forth herein;

(d)    For an award of attorney fees, where applicable;

(e)    For an award of costs; and

(f)    For any and all other relief the Court deems just and appropriate.

CLASS ACTION COMPLAINT

1

## <u>DEMAND FOR JURY TRIAL</u>

2

Based on the foregoing, Plaintiffs, on behalf of themselves, and all others similarly situated,

3

hereby demand a jury trial for all claims so triable.

4

Respectfully submitted,

5

Dated: June 12, 2020

THE LAW OFFICES OF ANDREW J. BROWN
ANDREW J. BROWN (160562)

6

7

By:          *s/ Andrew J. Brown*
             ANDREW J. BROWN

8

9

10

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 61/501-6550
andrew@thebrownlawfirm.com

11

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

12

13

14

15

*Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

34

00164916