BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

THE LAW OFFICES OF ANDREW J. BROWN
ANDREW J. BROWN (160562)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/501-6550
andrewb@thebrownlawfirm.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| JOHN COFFEE, MEI-LING MONTANEZ, and S.M., a minor by MEI-LING MONTANEZ, S.M.'s parent and guardian, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:20-cv-03901-BLF<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>District Judge Beth Labson Freeman<br>Courtroom 3, 5th Floor, San Jose<br>Magistrate Judge Susan van Keulen<br>Courtroom 6, 4th Floor, San Jose<br><br>Complaint Filed:  June 12, 2020<br>Trial Date:  Not Set<br><br>**JURY TRIAL DEMANDED** |

1

**TABLE OF CONTENTS**

2

                                                                                                    **Page**

3    NATURE OF THE ACTION.................................................................................................5

4    THE PARTIES ................................................................................................................8

5    JURISDICTION AND VENUE.........................................................................................10

6    INTRADISTRICT ASSIGNMENT ...................................................................................10

7    SUBSTANTIVE ALLEGATIONS ....................................................................................11

8         A.    The Rise of In-App Purchases, Google Play Store, and Google's Control of
                Apps ..............................................................................................................11
9

10        B.    What Is a Loot Box?.......................................................................................16

11        C.    Examples of Loot Boxes ...............................................................................18

12        D.    Loot Boxes Create and Reinforce Addictive Behaviors Akin to Gambling
                Addiction.......................................................................................................27

13              1.   Loot Boxes Are Structurally Similar to Traditional Gambling Games
                     and Exploit Gambling's Cognitive Traps.............................................28
14

15              2.   Loot Box Gambling Exploits Vulnerable Populations Such as Children .........34

16              3.   All Published, Quantitative Research Demonstrates Loot Boxes Are
                     Linked to Problem Gambling ...............................................................37

17        E.    Countries Have Banned Loot Boxes For Violating Gambling Laws ......................42

18        F.    The Hague's October 2020 Ruling That Loot Boxes Are Illegal Gambling............46

19        G.    Loot Boxes Constitute Gambling in Violation of California Law.........................48

20              1.   Violations of California Penal Code §§ 330 *et seq.* ............................48

21              2.   Violations of California's Gambling Control Act..............................55

22    CLASS ACTION ALLEGATIONS ...................................................................................56

23    FIRST CAUSE OF ACTION
      Violation of the "Unlawful Prong" of California's Unfair Competition Law
24    ("UCL") (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)...........................................58

25    SECOND CAUSE OF ACTION
      Violation of the "Unfair Prong" of California's Unfair Competition Law ("UCL")
26    (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)...........................................................62

27    THIRD CAUSE OF ACTION
      Violation of the Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750, *et seq.*) ..........67
28

2

00175649

FOURTH CAUSE OF ACTION
    Unjust Enrichment................................................................................72

PRAYER FOR RELIEF................................................................................73

DEMAND FOR JURY TRIAL......................................................................73

00175649

FIRST AMENDED CLASS ACTION COMPLAINT

1    "We should be very reticent of creating an experience where the outcome can be

2    influenced by spending money. ***Loot boxes play on all the mechanics of gambling except***

3    ***for the ability to get more money out in the end.***"

4    "Do we want to be like Las Vegas, with slot machines or do we want to be widely

5    respected as creators of products that customers can trust?"

6    "***We have businesses that profit by doing their customers harm.***"

7

8    -  Tim Sweeney, Co-Founder of Epic Games

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

Plaintiffs John Coffee, Mei-Ling Montanez, and S.M., a minor by Mei-Ling Montanez, S.M.'s parent and legal guardian ("Plaintiffs"), file this Class Action Complaint against Google LLC ("Google" or "the Company"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through undersigned counsel.

## NATURE OF THE ACTION

1. Though its Google Play Store, Google promotes and sells randomized chances to win prizes through "loot boxes," a type of gambling device. A loot box is a type of slot machine. A player pays money to take a chance on a loot box. Playing a loot box takes no skill. One simply pays money and then clicks on the loot box, like a gambler pulling the arm of a slot machine. The loot box then lights up, flashes, and makes noises to build excitement as the player anxiously waits to see if he or she will win a rare and valuable prize. The chance of winning a prize is randomized, with the more desirable prizes much less likely to win. Playing a loot box is a gamble because one never knows what the loot box contains until after the wager is made and the loot box is opened. Sought-after prizes include important or better weapons, costumes, or player appearances (called "skins"), or some other in-game item or feature designed or perceived to enhance gameplay or provide competitive advantage. By design, the prizes that are the least likely to win are the most valuable to players. While these prizes often can be bartered or sold, they also have inherent value. Google, in concert with game developers, purposefully limits the availability of certain prizes so their scarcity increases their value; conceptually like the JPG file by the artist Beeple that recently sold at an art auction for $69.3 million. The JPG file is nothing but a virtual image that could be infinitely, indefinitely, and perfectly duplicated. However, because the artist made the JPG file scarce – limited to just one copy – it broke art sale records. The virtual file has value to the purchaser, just like the virtual prizes offered through loot boxes.

2. Loot boxes are very common. 58% of the top-100 grossing games in the Google Play Store contain loot boxes. Of those, 93% are rated at the Google Play Store as suitable for children aged 12 and above, and 57% are rated suitable for children aged 7 and up. Loot box games rated suitable for children aged 3 and up were installed 545 million times from the Google Play Store.

FIRST AMENDED CLASS ACTION COMPLAINT

3.     Loot boxes constitute an illegal gambling device under California law. The California Legislature has declared gambling against public policy and has enacted laws broadly defining and prohibiting it, including prohibiting the control, operation, and dissemination of gambling devices. As the Legislature declared: "Gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families." Cal. Bus. & Prof. Code § 19801(c).

4.     Computer games used to be sold, but now are available online for free. Google, working in concert with game developers, has monetize these seemingly free games through in-game purchases. Loot box are the king of in-app purchases, making up a large percentage of in-game sales. Google exercises absolute control over the types of games and other activities permitted on the Google Play Store. While Google prohibits other forms of gambling, it promotes and encourages game developers to place loot boxes in games. It even coaches game developers on "[h]ow to build and grow your app's revenue streams" through "implementing the right monetization strategy" with loot boxes. In return for its active participation in permitting, controlling, and developing loot boxes, Google receives 30% of all loot box plays sold.

5.     Loot boxes are also predatory, just like other forms of gambling. High quality research shows loot boxes foster the same compulsive and addictive behavior, including gambling addiction, as other forms of gambling. The compulsive behavior Google fosters in children, teenagers, and adults generates hundreds of millions of dollars for Google annually in violation California's gambling laws and established public policy designed to protect children, families, and other consumers from this type of predatory conduct.

6.     Google exercises absolute control over the types of games and other activities permitted on the Google Play Store. While Google prohibits other forms of gambling, it encourages game developers to place loot boxes in games. It even coaches game developers on "[h]ow to build and grow your app's revenue streams" through "implementing the right monetization strategy" with loot boxes. In return for its active participation in permitting, controlling, and developing loot boxes, Google receives 30% of all loot box plays sold.

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

7.      With regard to loot boxes, Defendant's Google Play Store is no different than a physical casino. Just like a casino, Google permits, promotes, facilitates, and profits off gambling. Because Google makes it so, the Google Play Store is the only place to buy the currency to play the loot boxes, and it is the only place where they can be accessed. Just like casinos, while Google may not manufacture the slot machines or design their random-chance algorithms, Google houses the slot machine, and takes a cut off the top from every wager that is placed. However, unlike and worse than a traditional licensed casino, Google facilitates gambling practices that are entirely unregulated, bring 24/7 access to gambling into the homes of families everywhere, and exploit children as young as four years old. Given the structural and psychological similarities, researchers have characterized loot boxes as "gamblification of gaming" (Brooks & Clark 2019) and "predatory monetization schemes" that disguise long-terms costs and "entraps" the player in a belief that repeated spending of money is justified as it increases the likelihood of obtaining valuable items (King & Delfrabbro 2018). The "disguised character" of the loot box gambling game "is extra problematic in the case of children."[1]

8.      Governments, regulators, psychologists, and other researchers agree loot boxes are gambling devices that foster, create, and reinforce addictive behaviors. Those who have studied the issue unanimously agree that loot boxes have all the structural and psychological hallmarks of gambling and correlate with problem gambling among children, teenagers, and adults. The proven link to problem gambling is robust. Numerous regulators around the world have prohibited or restricted the use of loot boxes. Countries that have expressly regulated or are considering regulations of loot boxes include the Netherlands, Belgium, the United Kingdom, Japan, France, and China.

9.      While Google does not itself create these videogames or the loot box games used to entice gamers to gamble, Google works hand-in-glove with game developers in the creation, marketing and sale of loot boxes in these games. Google's contract with game developers makes

---

[1]      Belgian Gaming Commission, *Research Report on Loot Boxes* (April 2018), available at https://www.gamingcommission.be/opencms/export/sites/default/jhksweb_nl/documents/onderzoeksrapport-loot-boxen-Engels-publicatie.pdf

FIRST AMENDED CLASS ACTION COMPLAINT

Google their agent and merchant of record for every loot box sale.  It also requires certain content regarding loot boxes, and specifically allows them even though it purports to otherwise prohibit "gambling." Google thus profits handsomely by facilitating and providing ancillary and necessary services to the illegal and predatory practices at issue, including by 1) marketing, selling, and/or distributing the games on Google products and through its Google Play Store platform; 2) acting as the exclusive agent and merchant of record for the game developer in selling the loot boxes; and 3) processing, permitting, and handling all of the transactions with gamers, including taking a 30% cut of all money spent by players before transferring the remainder to the developer.

10.     Plaintiffs bring this action on behalf of all persons who paid to receive randomized virtual items from a loot box within an app downloaded from the Google Play Store. On behalf of themselves and the Class, Plaintiffs assert claims violations of the unlawful prong of Californian Business & Professions Code § 17200, the unfair prong of California Business & Professions Code § 17200, the Consumers Legal Remedies Act, and unjust enrichment for damages, restitution, and injunctive relief.

**THE PARTIES**

11.     Plaintiff John Coffee is a citizen of the State of California and a resident of Tehama County. Since at least 2018, Plaintiff has owned and played Final Fantasy Brave Exvius, a game marketed, sold and/or distributed by Google, and which he downloaded through the Google Play Store onto his Android mobile device. While playing Final Fantasy Brave Exvius and other games including War of the Visions: Final Fantasy Brave Exvius, Dragon Ball Legends, The Seven Deadly Sins: Grand Cross, Dragon Quest, Puzzles & Dragons, Dragon Ball Z Dokkan Battle, Brave Frontier, Arms of War, Mobius Final Fantasy, Final Fantasy Record Keeper, and Clash Royale, and as a result of Defendant's conduct, Plaintiff lost money and property by purchasing "loot boxes" in-game and suffered injury in fact. The only way to purchase a chance on a loot box is to purchase with money virtual currency[2] directly from Google, and Plaintiff has done just that. Therefore,

---

[2]     Virtual currency is a type of unregulated digital currency that is only available in electronic form. It is stored and transacted through designated software, mobile or computer applications, or through dedicated digital wallets, and the transactions occur over the internet through secure,

8

Plaintiff has lost money and property as a result of Google's unfair business practices alleged when he purchased virtual coins with money to buy chances on loot boxes and lost property in the form of the virtual coins he used to buy chances on loot boxes. Plaintiff Coffee estimates he has paid Google more than $500 to purchase plays on loot boxes in exchange for the random chance of winning valuable items. These amounts were charged by and paid to Google. Using his Google Play Store-linked device to engage in the transaction, these amounts were charged by Google to Plaintiff's credit card that Google keeps on file. Plaintiff Coffee still owns and plays Final Fantasy Brave Exvius and other games with loot boxes downloaded through the Google Play Store. To the extent he plays these games on his Google Android mobile device in the future, he will be subjected to Google's predatory conduct involving loot boxes.

12.     Plaintiff Mei-Ling Montanez is the parent and legal guardian of S.M., a minor. She is and at all relevant times was a citizen of the State of New York who resides in Brooklyn, New York. Since at least 2019, her son S.M. has owned and played Dragon Ball Z Dokkan Battle ("Dragon Ball Z"), a game sold and distributed by Google. While playing Dragon Ball Z and other games on Android devices, Plaintiff's son S.M. has been induced to spend his parents' money and perhaps his own money to purchase loot boxes in-game from Google. Specifically, S.M. purchased a chance on a "Summons," which is the name given the loot box in Dragon Ball Z. Plaintiff and her son lost money and property by purchasing loot boxes and suffered injury in fact. They lost money when S.M. purchased virtual coins to buy chances on loot boxes and lost property in the form of the virtual coins when he used them to buy chances on loot boxes. Therefore, Plaintiff and S.M. lost money and property as a result of Google's unfair business practices alleged.

13.     Plaintiff S.M. is a minor. He is and at all relevant times was a citizen of the State of New York who resides in Brooklyn. Since at least 2019, S.M. has owned and played Dragon Ball Z. Dragon Ball Z was downloaded by S.M. from the Google Play Store onto a Samsung smartphone device, which uses the Google Android operating system. S.M.'s mother estimates S.M. has paid Google more than $100 on in-app purchases from the Google Play Store, including on purchasing

_____

dedicated networks. Cryptocurrency is also a form of digital currency.

FIRST AMENDED CLASS ACTION COMPLAINT

the virtual currency required to buy loot boxes. S.M. used his parents' credit card to buy the loot box, which is on file with Google. S.M. played, and continues to play, Dragon Ball Z on his Samsung smartphone. To the extent he plays these games in the future, he will be subjected to Google's predatory conduct involving loot boxes.

14.     Defendant Google LLC is a Delaware limited liability company with its principal place of business and global headquarters at 1600 Amphitheatre Parkway, Mountain View, California, 94043. Google is a global technology company that specializes in internet-related services and products. Google developed, owns, controls, manages, and operates the Google Play Store and Android operating system.

## JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction over the claims asserted herein on behalf of a nationwide class pursuant to 28 U.S.C. § 1332, as amended in February 2005 by the Class Action Fairness Act. Jurisdiction is proper because:

(a)     The proposed class includes more than 100 members, and many of the named plaintiffs and class members are citizens of states that are diverse from the state of Defendants' citizenship, the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and

(b)     Defendants have purposefully availed themselves of the privilege of conducting business activities within the State of California, where Google has its principal place of business; where its officers direct, control, and coordinate Google's activities, and where Google engaged in the unlawful conduct alleged herein.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the challenged conduct or omissions complained of herein occurred in this judicial district, and defendant caused harm to at least one of the named plaintiffs and numerous class members in this judicial district.

## INTRADISTRICT ASSIGNMENT

17.     Pursuant to Civil L.R. 3-2(c) and (d), assignment to the San Jose Division is proper because a substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this district

00175649

1    and specifically in Santa Clara County where Google is headquartered. Additionally, Google's

2    Terms of Service contain a provision in favor of this Division.

3    **SUBSTANTIVE ALLEGATIONS**

4    **A.      The Rise of In-App Purchases, Google Play Store, and Google's Control of Apps**

5    18.     Videogames have been popular for decades. For much of that time, game developers

6    created and sold videogames to consumers either directly or through third-party retailers, such as

7    GameStop, a model known as "pay-to-play." Before the widespread use of the internet, pay-to-play

8    was the way for videogames generates revenue. Under this model, consumers paid an upfront, single

9    price to obtain a fully functional videogame: most of the time consumers paid for a physical

10   computer disc or cartridge that was loaded with the game. With the advent of the internet, the "free-

11   to-play" model began, which was further accelerated by the rise of smartphone use and apps. With

12   the free-to-play model, anyone could play the functional game for free, but the game had a mixed

13   variety of paid and free business models with assorted monetization strategies. They included selling

14   advertisements, but also "microtransactions." "Microtransactions" are transactions where players

15   can purchase virtual items for relatively small amounts of money. They are commonly employed in

16   free-to-play games. Loot boxes are a form of in-app microtransaction.

17   19.     As the pay-to-play model started to disappear, Google met the demand for free and

18   low-cost apps through its Google Play Store. About one billion people have devices loaded with

19   Google's Android operating system, the most pervasive operating system in the world. To load an

20   app onto one of these Android devices, one must go to the Google Play Store, accessed through its

21   own app that comes preloaded on Android devices.

22   20.     As of March 2020, the Google Play Store featured over 2.9 million apps. Ninety five

23   percent of these apps are free to download. In 2019, Google Play customers downloaded 84.3 billion

24   mobile apps globally.

25   21.     The Google Play Store contains thousands of game apps which can be downloaded

26   directly onto the Android-based device and played. Game apps are an activity, just like any other

27   game. Game apps are simply videogames – computer code that turns smart phones, tablets, and

28   computers into gaming devices.

00175649

22.     In concert with game developers, Google makes enormous profits from its free-to-download videogames through microtransactions such as loot boxes, something for which the Google Play Store is ideally optimized.

23.     Google promotes and markets game apps directly to those with Android device users and places the apps on virtual shelves in the Google Play Store.

24.     Google requires all game developers who want to sell games through the Google Play Store to enter into a "Developer Distribution Agreement." The Developer Distribution Agreement is a partnership contract between Google and the developers. By its terms, the Developer Distribution Agreement creates an agency relationship between Google and the game developers in the commercial enterprise of distributing, marketing, and selling loot box plays and their contents. Google and the game developers consider loot boxes to be products. The Developer Distribution Agreement states:

> 2.1 This agreement ("Agreement") forms a legally binding contract between You and Google in relation to Your use of Google Play to distribute Products.
>
> * * *
>
> 3.1 You hereby appoint Google as Your agent or marketplace service provider as outlined here to make Your Products available in Google Play.

25.     Google's Developer Distribution Agreement contains the following definitions:

> <u>Developer or You</u>: Any person or company who provides Products for distribution through Google Play in accordance with the terms of this Agreement.
>
> <u>Google Play</u>: The software and services, including the Play Console, which allow Developers to distribute Products to users of Devices.
>
> <u>Products</u>: Software, content, digital materials, and other items and services as made available by Developers via the Play Console.

26.     The Developer Distribution Agreement contains numerous other provisions in which Google is given the right and obligation to act on behalf of the game developer, including exercising sole control over payment for in-game purchases, including loot boxes, the collection and payment of taxes (at Google's discretion), and refunding payments to consumers (again, at Google's discretion).

00175649

27.     Google is the "Merchant of Record" under the Developer Distribution Agreement for the in-game purchases distributed and sold in the United States.

> 3.4 Acting as Your agent, and with You acting as a principal, Google is the merchant of record for Products sold or made available to users in the countries/territories described here.

28.     Google provides a variety of services in addition to processing payments of in-app purchases. It promotes, markets, and sells in-app purchases. It also helps game developers design in-app purchases to maximize revenue potential and provides software development kits to assist game developers in creating loot boxes.

29.     Google is well paid for the many services it provides in the development and sale of loot boxes and other in-app items. In accordance with the Developer Distribution Agreement, the payment for all in-game purchases, including loot boxes, is controlled entirely by Google. Using Google Play's required billing payment system, the payments go directly to Google. However, as illustrated by the pay structure, Google does far more than merely process online payments. An online payment processor charges about 3% for processing payments over the internet. In recognition of the role Google plays, Google and its game developers have a revenue sharing arrangement where Google receives 30% of all revenue from the sale of loot boxes.

30.     Google helps game developers create loot boxes and other in-game purchases that maximize revenue. In so doing, Google exercises absolute control over numerous aspects of the development, marketing, and sale of loot boxes and other in-app purchases, including deciding whether to permit activities such as loot boxes and other forms of gambling through the Google Play Store.

31.     Under the Developer Distribution Agreement, Google requires game developers to comply with its Developer Program Policy and provides that the game developers will develop and sell in-app purchases with Google. The Developer Program Policy explains:

///

///

///

///

00175649

> Your innovation is what drives our shared success, but with it comes responsibility. These Developer Program Policies, along with the Developer Distribution Agreement, ensure that together we continue to deliver the world's most innovative and trusted apps to over a billion people through Google Play.[3]

32. Through the Developer Distribution Agreement, Google creates and controls much of the content of these games. For example, Google requires game developers to use Google's "Software Development Kit" for the games to be offered on Google Play. Only by using Google's SDK can the game developer also use the Google Analytics service to gain information about a gamer's use of the game, or use Google's "ad exchange" services such as AdMob.

33. The Software Development Kit has its own code that is written and developed by Google. Google requires it to be incorporated into every app game. The Software Development Kit content provides Google a significant commercial benefit in addition to in-app loot box purchases because not only is it the means for a developer to access the Google Play payment processor, but it causes the app games to copy and transmit many different types of "communications" between the user on the one hand, and the game developers on the other hand, which Google can use for targeted advertising and other commercial purposes.[4]

34. Google's Developer Program Policy controls and regulates the type of games and in-app purchases that are allowed, including whether to permit activities such as gambling and the extent to which they are permitted by Google, including loot boxes.

35. The Developer Program Policy permits loot boxes, while prohibiting all other types of gambling. The Developer Program Policy prohibits wagering with money or with in-app items purchased with money, such as virtual currency. With respect to gambling generally, the Developer Program Policy advises game developers that:

> We don't allow content or services that enable or facilitate users' ability to wager, stake, or participate using real money (including in-app items purchased with money) to obtain a prize of real world monetary value. This includes but is not limited to, online casinos, sports betting, and lotteries that fail to meet the requirements for

---

[3]      https://support.google.com/googleplay/android-developer/answer/10355942?hl=en
[4]      Google's coercive use of the SDK and surreptitious copying of app user information is currently the subject of an MDL proceeding against Google in the Northern District of California, titled *In re: Google Play Store Antitrust Litigation*, Case No. 3:21-md-02981 (Donato, J.).

FIRST AMENDED CLASS ACTION COMPLAINT

Gambling apps noted above, and games that offer prizes of cash or other real world value.

36.     However, it makes an exception for loot boxes by placing a meaningless condition on their use. The Developer Program Policy provides:

Apps that employ in-store or in-app purchases must comply with the following guidelines:

Apps offering mechanisms to receive randomized virtual items from a purchase (i.e. "loot boxes") must clearly disclose the odds of receiving those items in advance of purchase.

37.     Separately, Google generally requires parental disclosures according to specific guidelines determined by Google and undertakes to police those guidelines. Those required disclosures include "age appropriate" disclosures and whether games involve activities such as "gambling" or "simulated gambling." But Google does not require any disclosure that the games contain loot boxes or that loot boxes are a form of gambling. In effect, Google prohibits warnings that loot box play is a form of gambling because it dictates how and when disclosures are made.[5]

38.     Google also requires developers to use the Entertainment Software Ratings Board ("ESRB") disclosures published by the Entertainment Software Association. The Entertainment Software Association is a lobbying group for the videogame industry. It describes itself and its mission as follows:

The Entertainment Software Association serves as the voice and advocate for the video game industry.  Our mission is to expand and protect the dynamic worldwide marketplace for video games.[6]

39.     According to the ESRB's website,

ESRB ratings provide information about what's in a game or app so parents and consumers can make informed choices about which games are right for their family.

---

[5]     Last year the ESRB announced it was adding a requirement for games containing loot boxes that the game must disclose "In-Game Purchases (Includes Random Items)." Although this does not actually disclose gambling or loot boxes, even this small concession has not been implemented by Google. For example, as set forth below the FIFA Soccer game only states "Offers in-app purchases."

[6]     *See* https://www.theesa.com/about-esa (last visited Mar. 16, 2021); *see also* https://www.theesa.com/esa-research/2020-essential-facts-about-the-video-game-industry/ ("[t]he ESA represents the U.S. video game industry").

00175649

Ratings have 3 parts: Rating Categories, Content Descriptors, and Interactive Elements.

40.     For games that contain lucrative loot boxes, the ESRB does not require a disclosure that loot box plays are sold through the games that contain them, that they constitute gambling, or that they foster compulsive and addictive behaviors, even for games rated for children and teenagers. By requiring developers to follow ESRB ratings guidelines, Google effectively prohibits game developers from making disclosures about loot boxes.

41.     Since 2015, Google has provided ESRB-based age-ratings for games available from the Google Play Store, but never discloses to parents the presence of loot boxes, that they are gambling devices, or that they can lead to compulsive behavior and addiction. The only related disclosure available to parents is that a game "Offers in-app purchases." As an example, below is a screen shot of Google Play's disclosures concerning the FIFA game[7]:



**B.     What Is a Loot Box?**

42.     A loot box is a type of in-app purchase that, for a fee, allows a player to take a randomized chance to obtain something of value. That is, a loot box is a gambling device. Google describes loot boxes as an in-app "mechanism" that provides users with "randomized virtual items from a purchase."[8]

---

[7]     https://play.google.com/store/apps/details?id=com.ea.gp.fifamobile&hl=en_US
[8]     https://support.google.com/googleplay/android-developer/answer/9858738?hl=en; https://support.google.com/googleplay/android-developer/answer/10355942?hl=en

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

43.     A loot box is sold within another game that Google typically offers for free. Loot boxes work like a slot machine. Functionally, a loot box works the same regardless of the game in which it is found. First, through the Google Play Store, a player purchases virtual coins used to buy a chance at a loot box. Once purchased, the player clicks on the loot box. The loot box then lights up, flashes, and makes noises to build excitement as the player anxiously waits to see if he or she will win a rare and valuable prize. No skill whatsoever is required – a loot box is purely game of chance.

44.     A loot box play is purchased only through the Google Play Store using money, usually with a credit card number or Google Play gift card. The player uses money to purchase virtual currency, and then uses the virtual currency to purchase a chance on a loot box. Whether the purchase is viewed as being made with fiat currency or with property in the form of virtual currency purchased with money, a loot box play costs real money.

45.     With an Android device, Google makes it very easy for a player to purchase a loot box. Once the "Purchase" button is pressed, Google charges the credit card number on file with the Google Play Store or deducts the amount from the Google Play gift card. There is no additional confirmation. A minor can accomplish the purchase without parental consent or knowledge. Loot boxes generated revenue in excess of $30 billion during 2018 and is projected to reach $50 billion by 2022.[9]

46.     In accordance with Google's game design recommendations and to create scarcity, game developers assign very long odds to the more desirable loot box prizes. In attempt to placate loot box critics, Google requires game developers to publish the odds of winning loot box prizes. *See* https://play.google.com/about/developer-content-policy-print/ ("Apps offering mechanisms to receive randomized virtual items from a purchase (i.e. 'loot boxes') must clearly disclose the odds of receiving those items in advance of purchase."). However, stating the odds of winning does not

---

[9]     Wright, M. (Apr. 17, 2018), *Video gamers will be spending $50 billion on gambling-like loot box features by 2022, according to analysts*, available at https://www.telegraph.co.uk/technology/2018/04/17/video-gamers-willspending-50-billion-gambling-like-loot-box/.

FIRST AMENDED CLASS ACTION COMPLAINT

deter people from gambling. It does not work with slot machine players or loot box players, especially children and teenagers.[10]

47.    Google permits, encourages, and directs developers to place loot boxes in every category of game offered through the Google Play Store, including games in the categories of "Educational," "Trivia," "Word," "Casual," "Action," "Adventure," "Sports," and "Strategy."

**C.    Examples of Loot Boxes**

48.    Below are seven examples of loot boxes found in some of the most popular games. Regardless of the game, loot boxes and the currency for purchasing them remains the same. Like slot machines found in a casino, the superficial aspects of loot boxes found in different games – such as the names, graphics, and sounds of the loot boxes – may differ, but the loot box devices are the same. Regardless of the game, each loot box contains the elements that constitute gambling: consideration, chance, and the possibility to win prizes of value. Any differences are purely cosmetic.

**<u>Example 1</u>:    Mario Kart Tour**

49.    Mario Kart Tour is a popular and "free" animated kart racing game released by Nintendo in September 2019. The game is rated it "E" for "Everyone." Mario Kart Tour was downloaded more than 123 million times during its first month. During that short time, it generated $37.4 million in player in-app revenue. As of March 2020, Mario Kart Tour has been the number one app by overall downloads in 65 countries on Google Play.

50.    A loot box in Mario Kart is called a "Pipe." A player purchases a Pipe, clicks on it, and then the Pipe shoots out a random prize of value. The prize may be a driver, kart, or glider of common or rare variety.

51.    Virtual "rubies" are the main form of currency in the game. A player buys a "pipe" in-game with the "rubies" purchased for money through Google Play. Google sells them in various

---

[10]    *See, e.g., Score Family Fun Ctr. v. County of San Diego*, 225 Cal. App. 3d 1217, 1221 (1990) (rejecting the argument that the ability to calculate odds meant a virtual casino game was not illegal gambling: "this [odds] calculation does not predict, to the individual player, whether his particular ticket will win").

00175649

lots. For example, the player can purchase 3 Rubies for $1.99 ($0.66 per Ruby), 23 Rubies for $12.99 ($0.56 per Ruby), or 135 Rubies for $69.99 ($0.52 per Ruby). They can also be earned in limited amounts through game play.

52. Depending on the Pipe, each Pipe contains a determined amount of "Normal," "Super," and "High-End" items that one has a theoretical possibility of winning. Google and the game developer set the odds of winning a given prize based on their class and rarity. By design, the results are randomized, with the more valuable items being less likely to win. It is most likely a player will win an item that already has been obtained or is otherwise not desirable.

53. The following is a screenshot of a player opening a Pipe:



54. As one video game critic noted, the mechanics of Mario Kart's loot box are designed to cause children to spend money on Pipes:

> Mario Kart Tour locks its racers, karts and gliders behind a randomized loot box system, where if you spend a couple of rubies you can get a green Mario pipe to fire out some new item, maybe one of those super rare characters you've been wanting or maybe that glider you need to get five stars on that same clone of the same course you've raced on five times already. There isn't even a character I particularly want here, and yet I keep pulling this thing down and reveling in its "surprise mechanic" of an animation, hoping that whatever emerges from that glowing white ball will give me some sort of peace. Spoilers! It won't.
>
> And this is the beating heart of Mario Kart Tour, the reason that Nintendo turned its game into a morass of currencies, unlocks, XP bars and [loot box] mechanics. The reason is that they work: they give us a little dopamine drip in our brains that the developer can parcel out to push us towards buying rubies on our own rather than "earning" them by grinding through what is bound to be an endless series of samey

races. All it needs to do is give you a few rewards for free before you're hooked into that glorious feeling of pulling that pipe back: it's why loot boxes in so many games have such elaborate animations and detailed sound effects: those loot boxes are the heart of the experience, and they need to hit your animal brain as hard as they can. And it works in Mario Kart Tour as well as any. I opened up the game to take a screenshot for this article and played a few races, throwing a few more arbitrary stars onto my totals.

I haven't spent any money on Mario Kart Tour yet, and I don't plan on doing so. I can hold out until Shadowkeep for Destiny 2 launches, opening up a much broader and more satisfying dopamine source. ***But others won't be so lucky, particularly children. They'll shell out some huge amount of money for some miniscule chance to unlock musician Mario, and then they'll shell out more for the next thing. It's disappointing to see from Nintendo, but the developer is clearly going to keep doing it. It works.***[11]

55.    In September 2019, Nintendo (the game's publisher) announced it was not offering Mario Kart Tour in Belgium because its loot boxes are prohibited under Belgian law. Nevertheless, Google and Nintendo have continued to market and sell Mario Kart Tour and its in-game loot boxes to consumers throughout the United States.

**Example 2:    FIFA Soccer**

56.    FIFA Soccer (mobile) is an online sports game developed by EA Sports that is free to download from the Google Play store. FIFA is rated "E" for "Everyone". FIFA mobile allows players to complete drills and contests, play online against other players, and compete in online tournaments and leagues.

57.    A large part of the FIFA game revolves around creating one's own team, which the player uses to play other teams. To get the best players for one's team, one can take a chance on FIFA's version of a loot lox, known as a "Card Pack" or "Player Pack." These Packs are purchased with FIFA Ultimate Team ("FUT") Coins, the name of the virtual currency used in FIFA and purchased through Google Play. The potential prizes one can win by playing these loot boxes are players for one's team.

58.    Critics view the Card and Player Pack loot boxes as slot machines:

---

[11]    "I'm Still Playing Mario Kart For The Worst Reason," *Forbes* October 1, 2019 (Thier, Dave). Available at https://www.forbes.com/sites/davidthier/2019/10/01/im-still-playing-mario-kart-tour-for-the-worst-reason/#977582468cad

FIRST AMENDED CLASS ACTION COMPLAINT

"The thrill of opening a pack to hopefully land on of soccer's most prominent names is similar to rolling the ice in roulette or pulling the lever on a slot machine. It often leads to disappointment, but the potential, however small, to win big keeps players buying packs. When FUT coins run dry, players can purchase FIFA points using real world currency and use them towards card packs. It a vicious cycle and one insidiously glorified in countless loot box YouTube videos."[12]

59.     Researchers have found FIFA's loot boxes "clearly serve as a proxy for gambling, encouraging money bets on items of chance, which increases a player's exposure to gambling-related content and promotes perceived-efficacy for gambling."[13]

60.     While burying the odds of winning desirable players in a drop-down box, the most desirable players are prominently displayed to sell loot boxes chances. These hard-to-win but prominently displayed soccer players include Mbappe, Lewandowski, and Hazard. While the odds of winning these players are extremely low, players are enticed by the thought of the win.

61.     The producer and writer for *Bleacher Reports*' gaming content described FIFA as a gambling system:

"Like any effective gambling system, the big prizes—say, Lionel Messi or Cristiano Ronaldo—are not going to appear often but always seem within reach. This can lead to accumulating massive spends without knowing. A common response to the survey was players admitting they didn't realise how much they'd spent until they sat down to work it out. One user estimated spending $280,000 across a decade."[14]

62.     The Belgian Gaming Commission described how the prizes from FIFA loot boxes are valuable:

A win and loss is experienced with the paid loot boxes. The loot boxes always contain one or various players and items that can be used throughout the game to win something. The more expensive the loot box, the bigger and more exceptional the win is portrayed as being. Wins and losses are clearly shown in the system of duplicate prizes. Winning duplicate items in a loot box is a regular occurrence; items that cannot be quickly sold because they are not worth anything and that cannot be

---

[12]     "Proof You'll Regret Wasting Money on That FIFA 20 Loot Box."  Thomas Bardwell. CCN, *Gaming News*.  Available at https://www.ccn.com/proof-youll-regret-wasting-money-on-that-fifa-20-loot-box/.

[13]     Wen Li, Devin Mills, Lia Nower, *The relationship of loot box purchases to problem video gaming and problem gambling*, Addictive Behaviors, 97:27-34 (Oct. 2019).

[14]     "Is It Too Expensive To Be Good At FIFA?" Nick Ackerman. *Bleacher Report*. May 20, 2019. Available at https://bleacherreport.com/articles/2836528-is-it-too-expensive-to-be-good-at-fifa . This article is not limited to "Apps" but appears to refer to the console and computer versions of the game as well.

saved either, forcing the player to immediately transact them, as it were. This is noteworthy because as soon as the loot box is opened, the computer system lets the player know that this is a duplicate prize, which means that this duplicate prize could have been avoided. In the case of a paid loot box, the player has thus received a useless item, which constitutes a lost wager.

The goal of the online game with paid loot boxes is to compile the strongest possible football team in order to win matches and gain status among the other players. If you obtain strong players by purchasing loot boxes, then this constitutes a win in the game. Rankings are also provided for teams that indicate which position a player has won or lost. These rankings appear to be greatly locally/regionally oriented.[15]

### Example 3:    Roblox

63.    Roblox is a popular multiplayer online video game and game creation system that gamers download for free from the Google Play Store. With Roblox, relatively unskilled developers can design games that are then played by others. Roblox-designed games are particularly popular with children and is ranked #1 in Google Play apps in the Family/Action & Adventure category. Roblox has more than 100 million active monthly users and has generated over $1 billion in revenue. It is age-rated "Everyone 10+" in the Google Play Store."[16]

64.    Loot boxes are put into many games that require no skill and are targeted to children. Roblox developers often admit they often use loot boxes merely to "scam" children. According to one Roblox game developer, "[a] lot of times it always seems as if they were trying to scam children, obviously this is not always the case, but some really do."[17]

65.    The virtual currency used to buy loot boxes in Roblox is called "Robux" and is purchased with real money.

### Example 4:    Brawl Stars

66.    Brawl Stars is a multiplayer online battle arena game where players battle against other players. Brawl Stars is free to download from the Google Play Store. It is currently ranked #37 in Google's action game apps and is age-rated as "Everyone 10+."

---

[15]    Belgian Gaming Commission, *Research Report on Loot Boxes* (April 2018).
[16]    These numbers include Google Play and Apple users. "Roblox Mobile Has Grossed over $1 billion in Lifetime Revenue." Nov. 15, 2019. Katie Williams. *Sensor Tower*. Available at https://sensortower.com/blog/roblox-one-billion-revenue.
[17]    Available   at   https://devforum.roblox.com/t/guidelines-around-users-paying-for-random-virtual-items/307189/66

00175649

67.     Brawl Stars players can unlock and play against each other (or the computer) with different brawlers. Each brawler has its own unique offensive or defensive "kit." Players want the best brawlers to increase their chances of winning games.

68.     The name of the Brawl Stars' loot box is the "Brawl Box." Brawl Boxes are purchased with Brawl Stars' version of in-game currency called "Gems." Gems are purchased through the Google Play Store for money. A "fistful of Gems" is 30 Gems and costs $1.99, a "pouch" of 80 gems is $4.99, and a "crate full" of 950 Gems is $49.99.

69.     As required by Google, Brawl Stars displays the odds of winning Brawl Box prizes. The best brawler in the game – and therefore the most coveted – is a "Legendary Brawler." A player typically has only a 0.3% chance of winning a "Legendary Brawler." That means a gamer must purchase hundreds of loot box plays to be sure to win a Legendary Brawler.[18] To tempt players to purchase Brawl Boxes, Brawl Stars uses an algorithm to slightly increase the odds of winning a Legendary Brawler each time the player purchases a Brawl Box.

### Example 5:   Final Fantasy Brave Exvius

70.     Final Fantasy Brave Exvius is a role-playing game where players command their characters to attack and move through a series of stages until they encounter and defeat the "boss." Final Fantasy Brave Exvius is free to download from the Google Play Store. It has been downloaded over 40 million times. Final Fantasy Brave Exvius is age-rated "T" for "Teen."

71.     The name of the Final Fantasy Brave Exvius' loot box is the "Summons." A Summons is purchased with Final Fantasy Brave Exvius' version of in-game currency called "Lapis Crystals." Lapis Crystals are purchased through the Google Play Store for money. A Summons offers the chance of winning rewards and new and better characters. One has the worst odds of obtaining the best characters from a Summons.

72.     In an article published in *Polygon* about loot box addiction, the author describes how the Summons loot box works:

---

[18]     The probability of receiving a specific item from a loot box is referred to as the "drop rate." Each Brawl Box provides 3 random draws, and each random draw has the same drop rate of approximately 0.1%.

FIRST AMENDED CLASS ACTION COMPLAINT

The main way of improving your collection is by taking pulls on a slot machine. It's what many call a gacha game, after Japanese gachapon toy-vending machines. Instead of having characters join the party during the story like they might in a traditional role-playing game, the player buys loot box-like crystals that each contain a single random character in a "summon" tab. Making progress in the game earns a trickle of free Lapis gems, the currency used to buy summons, but the amount pales in comparison to buying Lapis with real money.

That leaves players feeling underfunded, as most pulls only have a 3 percent chance to get the rarest and best rank, a "rainbow" five-star character. And that rate was all rumor and supposition until a patch in late January 2018, when Gumi added the exact chances to pull a four- or five-star character, shortly after Apple announced plans to require posted drop rates for in-game purchases in iOS games. The change didn't just affect Brave Exvius; gacha games often use low drop rates and limited-time promotions to encourage players to pull and pull and pull to get the latest new addition. And many of these games encourage players to repeatedly pay large amounts.[19]

73.     A middle-aged, married man going by "Nothing024" on Reddit reported spending $1,500 in a day to obtain one character in Final Fantasy Brave Exvius. The odds of winning the character were 1-in-400, and each try cost $2.50. The same man described another time when he spent $700 for a character known as "Greg":

> I put in my money again, $99....no Greg, $99....no Greg, $99....no Greg.... I took a break for a little bit. My family had plans for the day. I was angry now. How could I have spent $300 and not gotten what I wanted? When nobody was looking, around everyone, I did it again. $99....no Greg, $99...no Greg, $99...no Greg, $99... Finally. I had Gilgamesh. [...] Yeah, I spent $700, but I would stop now. I had enough.[20]

74.     In November 2018, Square Enix (the game's publisher) announced it was no longer offering Final Fantasy Brave Exvius in Belgium because of "the present uncertain legal status of 'loot boxes' under Belgian law." Nevertheless, Google and Square Enix have continued to market and sell Final Fantasy Brave Exvius and its in-game loot boxes to consumers throughout the United States.

---

[19]     "Players keep spending thousands of dollars on Final Fantasy Brave Exvius: Community members tell stories of banner addiction" Jay Allen. *Polygon*. June 8, 2018. Available at https://www.polygon.com/features/2018/6/8/17435980/final-fantasy-brave-exvius-gambling-addiction-gacha.

[20]     *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

1

**Example 6:**    **Dragon Ball Z: Dokkan Battle**

2      75.      Dragon Ball Z: Dokkan Battle is a free-to-play mobile game based on the Dragon

3   Ball anime franchise and television series. Dragon Ball Z: Dokkan Battle is available from the

4   Google Play Store for free. Since its release in 2015, the game has exceeded 300 million downloads

5   and grossed more than $2 billion worldwide. Dragon Ball Z: Dokkan Battle is rated "T" for teen.

6      76.      The name of Dragon Ball Z: Dokkan Battle's loot box is also the "Summons." A

7   Summons is purchased with Dragon Ball Z: Dokkan Battle's version of in-game currency called

8   "dragon stones." Dragon stones are purchased through the Google Play Store for money. One dragon

9   stone costs 99 cents, 6 dragon stones costs $3.99 and 90 dragon stones costs $44.99.

10     77.      Dragon Ball Z: Dokkan Battle is made up of levels that play like a board game, with

11  spots dedicated to items, power-ups, traps, and fights. During the fights, gamers can unlock "super

12  attacks," which is much more powerful than a typical attack. Gamers can also play with different

13  characters. A Summons offers players the chance to win rewards and characters useful in the game.

14     78.      As one online critic wrote about Summonses:[21]

15
16
17
18

[The] game requires immense Free-2-Play luck or some cash investment; however, even with cash investments, there's no guarantee. This is a prime example of subtle gambling (not so much as subtle for adults, but for children) where the player buys a few stones, tries to pull for the character they want, but didn't get them, so they'll think, "Why not a few more stones? I really like this character."

19  **Example 7:**    **"Who Wants To Be A Millionaire?"**

20     79.      In the "Trivia" category, Google offers for free an app game version of the TV game

21  show "Who Wants To Be A Millionaire?"

22     80.      "Who Wants To Be A Millionaire?" is rated "E for Everyone."

23     81.      The name of the loot box in this game is the "Mystery Box." A Mystery Box is

24  purchased with Who Wants To Be A Millionaire?'s version of in-game currency called "gems."

25  Gems are purchased through the Google Play Store for money. 150 gems cost $1.99, 225 gems cost

26
27

---

[21]    https://appgrooves.com/app/dragon-ball-z-dokkan-battle-by-bandai-namco-entertainment-inc/negative

28

$2.99, 400 gems cost $4.99 (marketed as providing "6% More"), 900 gems cost $9.99 ("20% More"), 2,000 gems cost $19.99 ("33% More"), and 5,500 gems cost $49.99 ("46% More").

82.     Gems can only be spent on playing the Mystery Box loot boxes. A "Silver Mystery Box" (which "Contains at least one Rare card!") costs 250 gems, a "Gold Mystery Box" (which "Contains at least two Rare card!") costs 500 gems, and a "Diamond Mystery Box" (which provides the "Best chance for Epic Experts") costs 750 gems. Thus, given the conversion rate for dollars-to-gems, playing the Silver Mystery Box for example costs $2.27 to $3.31.

83.     Who Wants To Be A Millionaire? is a trivia game played head-to-head versus other players. Similar to the television show, during the app's trivia contests, gamers can use "lifelines" to help them answer trivia questions. Mystery Boxes offer players the chance to win rewards such as "experts" that come in four "rarities: Common, Uncommon, Rare, and Epic," that are useful in the game to help answer questions.

84.     The following is a screenshot of a player opening a Mystery Box:

///

///

///

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21
22

**D.      Loot Boxes Create and Reinforce Addictive Behaviors Akin to Gambling Addiction**

23      85.      Loot boxes are designed to and do create and reinforce the same addictive and
24  harmful behaviors associated with traditional gambling activities. Researchers have reached this
25  conclusion by first examining the structural aspects and cognitive biases created by loot boxes and
26  comparing them to casino games. Children, problem gamblers, and others are particularly
27  susceptible to these cognitive traps. Researchers next performed quantitative research. Without
28  exception determined that loot box spending is strongly associated with problem gambling behavior.

00175649

1

          1.       **Loot Boxes Are Structurally Similar to Traditional Gambling Games and Exploit Gambling's Cognitive Traps**

2

3        86.      "The 'starting block' of problem gambling is often the availability of gambling

4 activities."[22] Recent peer-reviewed research (Zendle 2020) found that 58% of the top-100 grossing

5 games in the Google Play Store contained loot boxes, that 93% of the games containing loot boxes

6 (54 of 58) were rated at the Google Play Store as suitable for children aged 12 and above, and 57%

7 were rated suitable for children aged 7 and up. Loot box games rated suitable for children aged 3 and

8 up were installed 545 million times from the Google Play Store.

9        87.      In their paper entitled "Predatory monetization schemes in video games (e.g. 'loot

10 boxes') and internet gaming disorder," Professors Daniel King and Paul Delfabbro provided the

11 following description of a loot box, noting they all involve purchases with real money and resemble

12 "gambling slot machines":

13        A loot box refers to an in-game reward system that can be purchased repeatedly with real money to obtain a random selection of virtual items. The low probability

14        of obtaining a desired item means that the player will have to purchase an indeterminate number of loot boxes to obtain the item. Loot boxes resemble

15        gambling slot machines because they require no player skill and have a randomly determined outcome (i.e. prize).[23]

16

17        88.      To further entice consumers to spend real money on loot boxes, many of the games

18 use a "virtual" money system within the game. In the academic literature, this spending of real

19 money to obtain the requisite virtual in-game currency is referred to as the "eligibility condition" to

20 buying a loot box. That is, just like a casino exchanges cash for chips, instead of buying loot boxes

21 directly for a set dollar amount, the player must first purchase the in-game currency, which is then

22 used for loot boxes. In-game currencies frequently take the form of expensive-sounding items like

23 "gems" or "gold coins" so the player also feels he or she is getting something of value for the money.

24 The fact that loot box games do not allow the player to put physical money in the slot is not relevant,

25

26

27   [22]    Zendle D, Meyer R, Cairns P, Waters S, Ballou N, *The prevalence of loot boxes in mobile and desktop games*, Addiction, 115(9):1768-1772 (Sep. 2020).

28   [23]    King, Daniel and Delfabbro, Paul H., "Predatory monetization schemes in video games (e.g. 'loot boxes') and internet gaming disorder," *Addiction*, 2018.

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

as contemporary gambling typically also is fully digitized (King et al. 2012). Further, the requirement to convert real money to proprietary currencies is the standard for gambling – with casino chips being the classic example.

89.     This intermediate level of virtual currency acquired through abnormal exchange rates is also designed to reduce the salience of the real-world cost of loot box purchases and "disconnect" the gamer from the concern that real money is being gambled. The real money conversion necessary to purchase loot boxes has been analogized to the deception underlying casinos requiring the use of exchanged chips as its "in-game currency" because it is known players gamble "significantly more with chips than real cash."[24] In fact, researchers have found that loot box systems are more highly associated with problem gambling when the amount players can spend on loot boxes is hidden behind the purchase of in-game currency.[25]

90.     Just like casinos handing out free chips or slot plays, certain games also award limited in-game currency for loot boxes as an introductory prize or at certain stages of gameplay. In gambling psychology, earned or free play is an addiction hook to give players a "taste" of what can be more quickly purchased.

91.     In connection with its investigation into loot boxes, the Brussels Gaming Commission reached a similar conclusion about the deceptiveness of gambling with what is perceived to be virtual currency:

> The use of points (coins) and especially their size are psychologically very sophisticated and aimed at creating a personal reality which is then disconnected from the real world. FIFA 18 teaches players to think in FUT currency and FIFA coins. . . .. In Overwatch and Star Wars Battlefront II, the value of real money is also fully disconnected from the value of the in-game currency, causing players to lose contact with the real value.[26]

---

[24]     Xiao Leon Y. and Henderson Laura L., "Towards and Ethical Game Design Solution to Loot Boxes: a Commentary on King and Delfabbro," *Int'l J. of Mental Health and Addiction*, 2019. Julius Weintraub coined the famous saying "The guy who invented poker was bright, but the guy who invented the chip was a genius."

[25]     Zendle et al., *Adolescents and loot boxes: links with problem gambling and motivations for purchase*, Royal Society Open Science, 6(6):190049 (June 2019).

[26]     Belgian Gaming Commission, *Research Report on Loot Boxes* (April 2018).

00175649

FIRST AMENDED CLASS ACTION COMPLAINT

92.     In their 2014 book *Virtual Economies*, Professors Vili Lehdonvirta and Edward Castronova explain there are no differences between "real" or fiat currency and virtual currency – "Both the US Dollar and World of Warcraft coins are fiat money."[27] That is, "virtual world money" is just a digital form of money like Bitcoin cryptocurrency or other now innumerable examples.

93.     Loot boxes rely heavily on all the cognitive traps and behavioral heuristics involved in gambling – doing everything possible to build up the player's hoped-for win, tension, and excitement, and in the process exploiting cognitive biases such as the gambler's fallacy, near misses, losses disguised as wins, sunk cost bias, an illusion of control, and the gambling behavior known as chasing. Keith Whyte, Executive Director of the National Council On Problem Gambling, explained to the FTC that loot boxes and slot machines are "so closely related":

> Given all everything we know about the similarities between boxes and slot machines, it would actually be astounding and surprising were there not such a connection. They are, in many ways, so closely related.[28]

94.     The similarities between gambling and loot boxes start with audio-visual effects that provide the sensory feedback long used in casinos. For example, in many games opening the loot box coincides with triumphant music (like the sounds of falling tokens onto a metal tray, loud buzzing or musical tunes after winning on a casino's slot machine), the loot box itself bursting open with bright lights and colors. Yet these manufactured sound effects and colorful animations often give the player common or duplicate items, and rarely does the player get exactly the item he wanted.

95.     Gambling experts have raised concerns because loot boxes play off the identical sensory feedback used in traditional casino games:

> I would suggest you watch some of the animations used in games when 'opening a loot box,' try to divorce them from similar animation and sound techniques used on poker machines, you probably won't be able to.
>
> . . . . . .

---

[27]     Vili Lehdonvirta & Edward Castronova, *Virtual Economies: Design and Analysis*, at 191 (2014).

[28]     Workshop transcript from *Inside the Game: Unlocking the Consumer Issues Surrounding Loot Boxes*. An FTC Workshop (Aug. 7, 2019), available at https://www.ftc.gov/system/files/documents/videos/inside-game-unlocking-consumer-issues-surrounding-loot-boxes-session-2/ftc_loot_boxes_workshop_transcript_segment_2.pdf.

FIRST AMENDED CLASS ACTION COMPLAINT

When opening the boxes, the possibilities of what may be ultimately draw for the player is scrolled across before them on their screen. This is identical to the way a slot machine scrolls around before ultimately stopping. As with the slot machine, the graphic display eventually stops on an item, which is given to the player – regardless of whether that is what they desired or not.[2930]

96.     The loot box lights and sounds exploit the near-miss psychological effect of gambling. The player typically experiences the following when opening a loot box: shaking or dramatic animations, exciting or suspenseful noises, and above all, the split-second glimpse of the rarity of the items that are about to be unlocked. This, just before being awarded with something the player already possesses (a double, a common skin, or weapon, etc.), disappointing the player and not really "winning". The player already owns the "won" prize and therefore will not benefit from it. The disappointment and the intensity of the effect increase when the "reward prediction error"[31] is low. This occurs when the player has low expectations, then suddenly glimpses the colors of the possible items he is about to receive. For a split second, he sees a rare color, and there comes the rush of dopamine, as the player is pleasantly surprised by the fact that he is about to win a rare item – only to be disappointed at the reveal that that particular item is something he already owns. On the flip side, another scenario could be that the player has won an extremely rare item when his expectations were low, and was therefore pleasantly surprised. He might give it another try, but this time the expectations will be higher due to the previous win – and the disappointment will also be higher when the same stroke of luck does not happen.

97.     Loot boxes use more than just the audio-visual effects and near-miss psychologic triggers associated with traditional gambling mechanisms. Loot boxes are also designed to exploit the other major cognitive biases that explain gambling behavior and create gambling addiction. For instance, loot boxes are designed to create a slot machine effect and play off gambling's cognitive

---

[29]     Commonwealth of Australia, The Senate, *Environment and Communications References Committee: Gaming micro-transactions for chance-based items*, at p.37 (Nov. 2018).

[30]     Similarly, the Belgian Gaming Commission also observed that "the player is confronted with animations that are very similar to animations used in slot machine operation." Belgian Gaming Commission, *Research Report on Loot Boxes* (April 2018).

[31]     Reward Prediction Error or "RPE" refers to when low expectations award a higher amount of dopamine at the unexpected pleasant result of an action or event, and when high expectations award a bigger disappointment to the unexpected disappointing result.

00175649

bias characteristic known as the "gambler's fallacy," where even when a player is not receiving the desired result – which happens frequently – there still exists a belief and hope that the next loot box will contain the desired item(s). This is further reinforced when viewing favorable results from other players opening loot boxes.[32] The bias occurs when "the expectation that the probability of winning increases with the length of an ongoing run of losses."[33]

98.    One researcher described the physical experience invoked by this loot box mechanism. The prime culprit is dopamine and loot boxes' uncertainty boosting its effects:

> Research by Kim (1998) found that waiting for the outcome of a gamble can activate the brain's chemical reward system, releasing endorphins that create pleasure. In a gaming context, think of someone who really wants the Pharah Anubis skin in Overwatch. They buy five loot boxes and get excited during the big flashy box-opening animation. This excitement happens five times in a short space of time, with five flashy box-opening animations that are almost an event in itself.

99.    Another cognitive bias unfairly exploited by loot boxes is known as "sunk cost" bias. Sunk cost bias describes a decision-making heuristic where an individual escalates their commitment to a previously chosen, but unsuccessful course of action to justify these prior investments. If a gamer spends $5 on loot boxes and does not receive the prize he or she was hoping to win, the gamer faces the choice of either stopping and accepting the loss or spending an additional $5, $10, $100, *etc*. to recuperate the initial loss. Once a player has started down this path it is often hard to stop. This is particularly true for children, teenagers, and others vulnerable to gambling.

100.    Commenting on loot boxes, Hawaiian congressman Chris Lee noted that loot boxes "are specifically designed to exploit and manipulate the addictive nature of human psychology."

101.    Loot boxes are built around artificial scarcity. The main idea behind loot boxes is that sales will increase because the more items the gamer already has, the less probable it is that they will get what they want with a single purchase. The result of this statistical scarcity is that gamers must purchase more loot boxes to increase their odds.[34] Therefore, loot box prizes are

---

[32]    There are thousands of videos on YouTube.com of gamers opening loot boxes in many, many different games. *See, e.g.*, video of opening FIFA Ultimate Team packs with over 14 million views at: https://www.youtube.com/watch?v=CX0OZtaQ_kQ.

[33]    Willem A. Wagenaar, *Paradoxes of Gambling Behaviour*, at 13 (2016 ed.).

[34]    In fact, the manufactured odds of receiving some loot box items are so slim the Nevada

FIRST AMENDED CLASS ACTION COMPLAINT

classified using value-laden words to describe rarity levels, such as "Common," "Rare," "Epic," and "Legendary" depending on the probably of getting them (which results from the randomized prizes awarded). Loot boxes also often play off notions of seasonal rarity, which often can be more aesthetically polished, and time-locked – that is, a gamer can only get them for a limited time, which adds to the pressure to buy the loot box in the moment to win. The most common ones are recurrent, with themes like Halloween, Christmas, Chinese New Year, April Fools, Easter, or the game's own anniversary. Others, on the other hand, are unique or take place more occasionally – like World Championships, World Cups or the Olympics.



102.    Larche *et al*. (2021) conducted experiments that found "loot boxes containing rare items are more valuable, arousing, rewarding and urge-inducing to players, similar to the way slots gamblers treat rare large wins in slots play."[35]

103.    It is most likely a player will win an item that already has been obtained or is otherwise not desirable. However, these "losses disguised as wins" (LDWs) are another psychological factor at play with both traditional gambling games and with loot boxes. This psychological factor traditionally occurs when a player gains a credit on the spin of a slot machine, but it is fewer credits than the original wager. It also takes place when casinos offer "complementary" food, drinks, and accommodations. This outcome alters the gambler's experience because the player feels like he or she won something out of the ordeal, but in reality lost. Obtaining

---

Gaming Control Board would declare them illegal for slot machines.

[35]    Larche CJ, Chini K, Lee C, Dixon MJ, Fernandes M, *Rare Loot Box Rewards Trigger Larger Arousal and Reward Responses, and Greater Urge to Open More Loot Boxes*, J Gambl Stud, 37(1):141-163 (Mar. 2021).

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

a common or duplicate item when opening a loot box is a loss; it is like "winning a free drink" or "winning $1" after wagering $2 – the player won something, but de facto lost.[36]

104.   Psychologists call the principle of how loot boxes work on the mind "variable ratio reinforcement." This kind of reward structure underpins many forms of gambling such as slot machines. It results in people quickly acquiring behaviors and repeating these behaviors frequently in hopes of receiving a reward by thinking they are one step closer to getting the reward the next time. Dopamine cells are most active when there is maximum uncertainty, and dopamine system responds more to an uncertain reward than if the same reward delivered on a predictable basis.

### 2.   Loot Box Gambling Exploits Vulnerable Populations Such as Children

105.   Children and adolescents are especially vulnerable to the type of psychological manipulation at play with loot boxes. Teenage gambling, like alcohol and drug abuse in the 1930s, is the fastest growing addiction.

106.   First, adolescents have low impulse control. The teenage brain is still developing; the part of the brain that is responsible for good impulse control and decision making is not fully developed. Dr. Frances Jensen, the chair of the department of neurology at the University of Pennsylvania Perelman School of Medicine and formally Harvard professor and director of neuroscience at Boston's Children's Hospital, explains: "their frontal lobes are there. They're there and they're built. They're just not accessed in as rapid a manner because the insulation to the wiring to them isn't fully developed, so the signals go more slowly. Hence, teenagers are not as readily able to access their frontal lobe to say, oh, I better not do this. An adult is much more likely to control impulses or weigh out different factors in decisions, where a teenager may not actually have full on-line, in-the-moment capacity." Dr. Frances Jensen, *Why Teens are Impulsive- Prone and Should Protect Their Brains*, NPR (Jan. 28, 2015). Adolescence is a developmental period characterized by suboptimal decisions and actions. Casey et al., *The Adolescent Brain*, Annals of the New York

---

[36]   Graydon C, Stange M, Dixon MJ, *Losses Disguised as Wins Affect Game Selection on Multiline Slots*, J Gambl Stud, 34:1377–1390 (2018) ("Despite the net loss to the player, LDWs are accompanied by salient visual graphics and high fidelity winning sounds…players behaviorally miscategorize LDWs as wins" and "LDWs can lead players to continue gambling despite financial loss, and increase play durations.").

1  Academy of Sciences, 1124(1):111–126 (2008). During this time, impulse control is still relatively

2  immature. *Id.*

3      107.    Second, adolescents are more inclined to engage in risk-taking behaviors and risky

4  decision making than are adults. Margo Gardener & Laurence Steinberg, *Peer influence on risk*

5  *taking, risk preference, and risky decision making in adolescence and adulthood: an experimental*

6  *study*, Developmental Psychology, 41L625-635 (2005). Adolescents and young adults are more

7  inclined to risk taking because development of executive brain function and appreciation of risk is

8  continuing in this period. Kelley et al., *Risk taking and novelty seeking in adolescence: Introduction*

9  *to Part I*, Annals of the New York Academy of Sciences, 1021(1):27-32 (2004); Laurence Steinberg,

10  *Cognitive and affective development in adolescence*, Trends in Cognitive Sciences, 9(2):69-74

11  (2005).

12      108.    Third, not only are adolescents more likely to take risks, but they are also more prone

13  to addiction. "They build a reward circuit around that substance to a much stronger, harder, longer,

14  stronger addiction. That is an important fact for an adolescent to know about themselves - that they

15  can get addicted faster." Dr. Frances Jensen, *Why Teens are Impulsive- Prone and Should Protect*

16  *Their Brains*, NPR (Jan. 28, 2015).

17      109.    Last, children and adolescents often lack a critical understanding of money and

18  financial management. Approximately one in four students in the 15 countries and economies that

19  took part in the latest OECD Programme for International Student Assessment (PISA) test of

20  financial literacy are unable to make even simple decisions on everyday spending, while only one

21  in ten can understand complex issues, such as income tax. OECD, PISA 2015 Results (Volume IV);

22  *Students' Financial Literacy*, PISA, OECD Publishing, Paris (2017).

23      110.    As detailed above, purchasing and opening a loot box is designed to be visually,

24  physically, and aurally stimulating. Opening a loot box gives the player a rush; the moment of

25  anticipation followed by release. The loot box mechanism has been proven to be effective on adults,

26  and its effects are generally intensified when used on minors who are more prone to engage in risk-

27  taking behaviors, more prone to gambling addiction, and "are less equipped to critically appraise

28  the value proposition of these schemes."

00175649

111.    Professor David Zendle was one of the invited academic participants to the Federal Trade Commission's August 2019 workshop investigating loot boxes. Dr. Zendle has published numerous peer-reviewed papers discussing his research and surveys examining links and similarities between gambling and loot boxes. Based on his and others' scientific findings, Dr. Zendle explained to the FTC the serious potential consequences of exposing vulnerable consumers to videogame loot boxes:

> That's what I'm here to talk about today. So the reason why problem gambling is such a big topic when it comes to loot boxes, and why people care about gambling and loot boxes, is because loot boxes look so much like gambling. Both when you're playing on a roulette wheel or while you're opening a loot box, you're wagering something that you have in your hand of value now on the uncertain hope of getting something of greater value later on. It's that reason that loot boxes have tripped gambling regulations in a couple of countries within Europe, because of those formal similarities, and because of those formal similarities, people are a bit worried for a very long time that loot boxes by act as a gateway to problem gambling, particularly amongst young and vulnerable populations…

> We know that one of the main pathways to problem gambling is a process of conditioning, whereby the gambler comes to need and expect the excitement associated with the gambling win. So what we think-- one of the possible explanations for this effect, is a situation in which people are buying a loot box, getting excitement, buying a loot box, getting excitement, buying a loot box, getting that reward, getting that hit, going out into the real world, seeing something that has many of the formal characteristics of the loot box, like a slot machine, and that conditioning transfers over. So therefore, spending money on loot boxes, literally causes people to engage in gambling, leading to problem gambling.[37]

112.    Dan Trolaro, the Assistant Executive Director of the Council on Compulsive Gambling of New Jersey, explained, "The mechanics within a loot box look and feel like a gamble. Once minors are exposed to game of chance mechanisms, there is a significantly higher risk that they will have problems with it at a later stage in their lives. The literature indicates that exposure at an early age increases the risk of addiction and the severity of the addiction."

113.    Other experts agree. For example, the mental health director of the UK's National Health Service summarized their studies by declaring that the gaming industry is "setting kids up for addiction by teaching them to gamble."

---

[37]    *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

114.    According to Keith Whyte, the Executive Director of the National Council On Problem Gambling, "Those who play loot boxes may well be on their way to developing gambling problems due to their loot box play."

### 3.    All Published, Quantitative Research Demonstrates Loot Boxes Are Linked to Problem Gambling

115.    The amount of scientific research examining loot boxes has exploded in the last five years. Numerous teams of researchers have studied thousands of adults, teenagers, and children in industry-independent, peer-reviewed, independently funded, and published studies.

116.    At least ten articles have been now published, which report findings of original quantitative research on links between loot boxes and gambling. The scientific conclusions from all ten peer-reviewed articles are consistent that loot boxes are strongly correlated with clinically significant, severe gambling behavior in both children and adults:

a.    Brooks & Clark (2019): Results replicated in two surveys (n=257) that "demonstrate that besides the surface similarity of loot boxes to gambling, loot box engagement is correlated with gambling beliefs and problematic gambling behaviour in adult gamers."

b.    Drummond et al. (2020): Survey of people (n=1049) from the United States, New Zealand, and Australian showed effects that were "generally clear cut," "practically significant," and "highlight the psychological similarity between loot boxes and traditional modes of gambling" – those "with higher gambling symptoms and more risk loot box related engagement spent more on loot boxes than those without" and "participants with greater loot box spending experienced greater negative mood, and more psychological distress."[38]

c.    Kristiansen & Severin (2020): Analysis of participants (n=1137) aged 12-16 showed "a significant positive correlation between loot box engagement and problem gambling severity."[39]

---

[38]    Drummond A, Sauer JD, Ferguson CJ, Hall LC, *The relationship between problem gambling, excessive gaming, psychological distress and spending on loot boxes in Aotearoa New Zealand, Australia, and the United States-A cross-national survey*, PLoS One,15(3):e0230378 (Mar. 2020).

[39]    Søren Kristiansen & Majbritt Christine Severin, *Loot box engagement and problem*

1   d.   <u>Li, Mills, & Nower (2019)</u>: Analysis of adult video gamers (n=618) revealed

2   that "loot box purchasing was directly related to higher online gambling frequency, more extended

3   online gambling sessions, and great problem gambling severity."[40]

4   e.   <u>Macey & Hamari (2018)</u>: International survey of gamers (n=582) with 27%

5   under 18 years old and 31.3% between 18 and 21, revealed "evidence of a strong relationship

6   between loot box opening (paid and unpaid) and gambling."[41]

7   f.   <u>Zendle & Cairns (2018)</u>: Large-scale analysis of gamers (n=7422) providing

8   "empirical evidence of a relationship between loot box use and problem gambling" that "was neither

9   small, nor trivial" – "It was stronger than previously observed relationships between problem

10   gambling and factors like alcohol abuse, drug use, and depression." "[T[he strength of the

11   relationship that was observed here…suggests that important gambling-related harm is experienced

12   by users of loot boxes."[42]

13   g.   <u>Zendle & Cairns (2019)</u>: Large-scale analysis of gamers (n=1172) that

14   "confirm[ed] the size and positive correlation between loot box spending and problem gambling

15   that was previously observed" in Zendle & Cairns (2018). Results suggested "the relationship

16   between problem gambling and loot box spending may be comparable in strength to the relationship

17   between problem gambling and known risk factors in the gambling literature."[43]

18   h.   <u>Zendle (2020)</u>: Large-scale analysis of gamers (n=1200) that "strongly

19   suggest that paying money for loot boxes is linked to problem gambling" and that this "robust and

20

21

22   _____

23   *gambling among adolescent gamers: Findings from a national survey*, Addict Behav., 103:106254 (Apr. 2020).

24   [40]   Wen Li, Devin Mills, Lia Nower, *The relationship of loot box purchases to problem video gaming and problem gambling*, Addictive Behaviors, 97:27-34 (Oct. 2019).

25   [41]   Joseph Macey & Juho Hamari, *eSports, skins and loot boxes: Participants, practices and problematic behavior associated with emergent forms of gambling*, New Media & Society,

26   21(1):42-59 (2019).

27   [42]   David Zendle & Paul Cairns, *Video game loot boxes are linked to problem gambling: Results of a large-scale survey*, PLoS One, 13(11):e0206767 (2018).

28   [43]   David Zendle & Paul Cairns, *Loot boxes are again linked to problem gambling: Results of a replication study*, PLoS One, 14(3):e0213194 (2019).

FIRST AMENDED CLASS ACTION COMPLAINT

1  reliable" evidence base held true "regardless of the presence or absence of specific features of loot
2  boxes, if they are being sold to players for real-world money."[44]

3           i.    <u>Zendle, Meyer, & Over (2019)</u>: Large-scale analysis of 16- to 18-year-olds
4  (n=1155) provided evidence linking loot box spending and problem gambling in older adolescents
5  with "an order of magnitude larger than relationships between problem gambling and risk factors
6  such as alcohol dependence."[45]

7           j.    von Meduna et al. (2020): Large-scale analysis of loot box purchasers
8  (n=586) demonstrated "the demand for gambling products and demand for loot boxes are closely
9  related" and "[d]ue to their combination of gambling-like elements with a permanent availability
10 and potentially unlimited number of purchases" the "loot box purchasers are at risk of experiencing
11 gambling problems."[46]

12        117.    For example, Drs. Zendle, Meyer and Over (2019) proved the link between loot box
13 buying and problem gambling in a survey of 1,115 adolescents aged 16-18 years. They reported that
14 "loot boxes either cause problem gambling among older adolescents, allow game companies to
15 profit from adolescents with gambling problems for massive monetary rewards, or both."[47] The
16 researchers found that problem gambling severity increased with the amount of money spent on loot
17 boxes, that these links were even "stronger than relationships previously observed in adults," and
18 that the reasons for buying loot boxes were similar to common motivations for engaging in
19 conventional forms of gambling. The researchers concluded that "[w]hen taken together, these
20 results clearly suggest one thing: spending money on loot boxes is linked to problem gambling in
21 older adolescent populations."

22

23 [44]    Zendle D, Cairns P, Barnett H, McCall C, *Paying for loot boxes is linked to problem*
24 *gambling, regardless of specific features like cash-out and pay-to-win*, Computers in Human
   Behavior, 102:181-91 (2020).
25 [45]    Zendle D, Meyer R, Over H, *Adolescents and loot boxes: links with problem gambling and*
   *motivations for purchase*, R Soc Open Sci, 6(6):190049 (2019).
26 [46]    von Meduna M, Steinmetz F, Ante L, Reynolds J, Fiedler, *Loot boxes are gambling-like*
   *elements in video games with harmful potential: Results from a large-scale population survey*,
27 Technology in Society, 63:101395 (Sept. 10, 2020).
   [47]    Zendle D, Meyer R, Over H, *Adolescents and loot boxes: links with problem gambling and*
28 *motivations for purchase*, R Soc Open Sci, 6(6):190049 (2019).

00175649

118.    Zendle and Cairns (2018) reports the findings from their scientific survey of 7,422 gamers aged 18 or older. The researchers measured both how much these gamers spent on loot boxes and the severity of their problem gambling in order to "establish[] both the existence, the size, and the importance of links between purchasing loot boxes and problem gambling." Drs. Zendle and Cairns concluded their research "provides empirical evidence of a relationship between loot box use and problem gambling. The relationship seen here was neither small, nor trivial. It was stronger than previously observed relationships between problem gambling and factors like alcohol abuse, drug use, and depression." The relationship between other types of microtransactions and problem gambling was not as strong, indicating a specific roll of loot boxes in this association. The researchers also observed that "[d]ue to the formal features that loot boxes share with other forms of gambling, they may be acting as a 'gateway' to problem gambling amongst gamers."[48]

119.    Zendle and Cairns' 2019 peer-reviewed paper titled "Loot boxes are again linked to problem gambling: Results of a replication study," discussed results of a survey that assessed the replicability of their survey results published in 2018 (discussed in Paragraph 62 above). The 2019 paper analyzed the researchers' large-scale survey of 1,172 gamers aged 18 and older. Drs. Zendle and Cairns observed "Loot boxes share psychological and structural features with gambling," that there was again a "significant link" between problem gambling and loot box spending, and "the severity of the link seen here suggests that relevant authorities should seriously consider restricting access to loot boxes as if they were a form of gambling."[49]

120.    Brooks and Clark (2019) found that risky loot box use is associated with increased problem gambling symptoms and gambling related cognitions. Drs. Brooks and Clark studied the relationships between gaming involvement, engagement with loot boxes, and their associations with disordered gambling and gambling-related cognitions. In doing so, the researchers conducted two different surveys: one involving 144 adults and the other of 113 undergraduate students. According

---

[48]    David Zendle & Paul Cairns, *Video game loot boxes are linked to problem gambling: Results of a large-scale survey*, PLoS ONE, 13(11):e0206767 (2018).
[49]    David Zendle & Paul Cairns, *Loot boxes are again linked to problem gambling: Results of a replication study*, PLoS ONE, 14(3):e0213194 (2019).

FIRST AMENDED CLASS ACTION COMPLAINT

to the authors, the survey results "demonstrate that besides the surface similarity of loot boxes to gambling, loot box engagement is correlated with gambling beliefs and problematic gaming behaviour in adult gamers."[50]

121.    In their 2019 peer-reviewed paper, Dr. Wen Li and co-authors from the Center for Gambling Studies at Rutgers University reported direct associations between problem gambling symptoms and loot box spending, problem gaming symptoms and loot box purchasing, and loot box purchasing and psychological distress. The researchers collected data from 618 adult video gamers via an online survey to explore the relationship between loot box purchases and problem video gaming and gambling behaviors. Drs. Li et al. observed that "[t]he advent of loot box purchasing in video games has effectively introduced gambling into the video gaming environment" and concluded "loot box purchasing was directly related to increased problem video gaming and problem gambling severity" and "loot box purchases may also be indirectly related to mental distress due to its association with problem video gaming and problem gambling behavior."[51]

122.    Profs. Macey and Hamari (2018), who conducted a survey, found "evidence of a strong relationship between loot box opening (paid and unpaid) and gambling," stated that "a real-world analogue [of loot boxes] are lottery scratch cards."[52]

123.    Profs. Kristiansen and Severin (2020) conducted a scientific literature review and also found the published results to be consistent:

> Taken together, this research has established that loot box purchasing is associated with increased scores on gambling severity scales, and that expenditure on loot boxes is positively correlated with problem gambling severity.[53]

---

[50]    Gabriel A. Brooks & Luke Clark, *Associations between loot box use, problematic gaming and gambling, and gambling-related cognitions*, Addictive Behaviors, 96:26-34 (2019).
[51]    Wen Li, Devin Mills, Lia Nower, *The relationship of loot box purchases to problem video gaming and problem gambling*, Addictive Behaviors, 97:27-34 (2019).
[52]    Joseph Macey & Juho Hamari, *eSports, skins and loot boxes: Participants, practices and problematic behavior associated with emergent forms of gambling*, New Media & Society, 21(1):42-59 (2019).
[53]    Søren Kristiansen & Majbritt Christine Severin, *Loot box engagement and problem gambling among adolescent gamers: Findings from a national survey*, Addict Behav., 103:106254 (Apr. 2020).

124.    To analyze potential similarities between adults and children in terms of loot box behavior, Kristiansen and Severin (2020) also conducted a large-scale scientific survey of 5,000 gamers aged 12-16. They did so because "the current knowledge seem to suggest that loot box engagement catalyze monetary gambling and gambling problems among video gamers" and "[c]learly, such schemes may pose a risk to young people, who not fully understand the underlying mechanisms and reward system." The authors found that loot box use was prevalent among adolescents, at rates that correspond with studies among adult gamers. Likewise, and corresponding with the scientific research on adult usage of loot boxes, Kristiansen and Severin (2020) demonstrated "significant positive correlation between loot box engagement and problem gambling severity."

125.    These psychologists, gambling experts, and social science researchers who have studied the issue unanimously agree that loot boxes have all the structural and psychological hallmarks of gambling and correlate with problem gambling, among children and adults. The proven link to problem gambling is robust and the results have been replicated. Researchers have determined the scientific findings are "very consistent" among published research:

> [T]he findings are very consistent that there is an association between problem gambling and loot box buying among both adolescents and adults (and that the association may be even stronger among adolescents).[54]

**E.    Countries Have Banned Loot Boxes For Violating Gambling Laws**

126.    During the last two years, some countries have banned loot boxes as an illegal form of unregulated gambling (Belgium, Netherlands, Japan, France), countries such as China regulate loot boxes under national lottery laws, while regulators in others report current investigations, including in Australia where a 2018 report concluded loot boxes are "psychologically akin to gambling," and in the United Kingdom where a July 2020 report from the House of Lords urged the government to immediately "bring loot boxes within the remit of gambling legislation and

---

[54]    Mark D. Griffiths, *Loot box buying among adolescent gamers: A cause for concern?*, Education and Health, 37(3):63-66 (2019).

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

regulation." Similarly, lawmakers in Hawaii, Minnesota and Washington introduced state legislation to ban loot boxes in video games.

127. For instance, the Government of Belgium examined the use of loot boxes in various videogames and determined that they violated that country's gambling laws. In Belgium, as in California, throughout the United States, and nearly everywhere else in the world, the definition of gambling is boiled down to the same three core elements: consideration, prize and chance.[55] The Belgian Gaming Commission specifically found that loot boxes contain "all of the constitutive elements of gambling" and stressed that "[i]f there is no adequate intervention, then games of chance in video games will increasingly cause harm to players, families, and society."[56] Noting the "importance of protecting minors and vulnerable players," the report specifically found the loot box games were illegal gambling:

> The paid loot boxes in the examined games Overwatch, FIFA 18 and Counter-Strike: Global Offensive fit the description of a game of chance because all of the constitutive elements of gambling are present (game, wager, chance, win/loss).[57]

128. Peter Naessens, Director at the Belgian Commission concluded that the sale of loot boxes must stop:

> Paying loot boxes are no innocent component of video games which present themselves as a game of skill. Players are tempted and misled by them and none of the protective measures for games of chance are applied. Now that it has become clear that children and vulnerable persons in particular are being exposed to this without any protection, the game producers, and also the parties involved, are called upon to put a stop to this practice.[58]

129. The Belgian Gaming Commission is not the only regulatory body that has determined loot boxes are a form of gambling. Regulators in the Netherlands, United Kingdom, Japan, France,

---

[55] Under Belgian law, it is illegal to operate a game of chance without first obtaining a permit from the Gaming Commission. California's Gambling Control Act contains the same prohibition. *See* Cal. Bus. & Prof. Code § 19800 et seq.

[56] Belgian Gaming Commission, *Research Report on Loot Boxes* (April 2008), available at https://www.gamingcommission.be/opencms/export/sites/default/jhksweb_nl/documents/onderzoeksrapport-loot-boxen-Engels-publicatie.pdf.

[57] "FIFA Soccer" is the title of the current App version of what used to be called "FIFA 18" which is currently available in Defendant's Google Play Store in the United States.

[58] https://www.gamingcommission.be/opencms/opencms/jhksweb_en/gamingcommission /news/news_0061.html

and China have also all taken various steps to regulate video game loot boxes as gambling. For example, in September 2019 Great Britain Parliament's Digital, Culture, Media and Sport Committee issued a report to Parliament determining that loot boxes constitute gambling and encourage addictive behavior, and recommending that the sale of loot boxes to children should be banned. Committee Chair Damian Collins MP said:

> Loot boxes are particularly lucrative for games companies but come at a high cost, particularly for problem gamblers, while exposing children to potential harm. Buying a loot box is playing a game of chance and it is high time the gambling laws caught up. We challenge the Government to explain why loot boxes should be exempt from the Gambling Act.

130.    A follow-on report published in July 2020 from the United Kingdom's House of Lords recommended immediately "bring[ing] loot boxes within the remit of gambling legislation and regulation."

131.    Loot boxes are themselves games separate and apart from the associated video game. The Belgian Gaming Commission determined that given the active participation required to purchase and open loot boxes, "the game element is present both at the video game level as well as at the loot box level." Likewise, an appellate panel at The Hague rejected the argument that although its Ultimate Team Pack loot boxes were not games of chance, they are inseparable from the FIFA video game in which they were found. Since FIFA (a soccer game) was a game of skill, the loot box must be treated as one, as well. The Hague rejected the argument because loot boxes can be bought separately and opened separately from the FIFA game being played and the goods obtained from loot boxes are separate from the matches. Therefore, loot boxes must be regarded and assessed on their own. There is nothing unique about the loot boxes in FIFA that properly render them – but not other loot boxes – a separate, standalone game of chance. As with FIFA, other loot boxes can be bought and opened separate from playing the associated game.

132.    Government officials in the Netherlands also studied loot boxes in ten popular games. In its April 2018 report, the Netherlands Gaming Authority determined some loot boxes had elements similar to slot machines, and addiction potential similar to blackjack, roulette and bingo. According to the official report, "all of the loot boxes that were studied could be addictive," "loot

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

boxes have a moderate to high addiction risk potential," some "have integral elements that are similar to slot machines" complete with "multiple visual and sound effects are added and a 'near miss' effect is used," and "as a result of opening loot boxes, socially vulnerable groups such as young people could eventually be encouraged to play other games of chance." Noting that all the loot boxes could "foster the development of addiction," the report from the Netherlands Gaming Authority also observed online gamers attribute significant social status value on themselves and other gamers based on the prizes they win from playing loot boxes.[59]

133.     Australian officials also determined the loot box mechanism constitutes a form of gambling that targets minors and otherwise acts "as a gateway to problem gambling and associated harm later in life." Accordingly, the March 2020 report prepared by the Australian House of Representatives Standing Committee on Social Policy and Legal recommended mandatory age verification for loot box purchasing:

> Given their resemblance to gambling, the Committee considers that loot boxes and other simulated gambling elements in video games should be subject to appropriate age restrictions, including through the use of mandatory age verification.[60]

134.     The March 2020 Australian report was preceded by an October 2019 report from the Australian Gambling Research Centre finding "the use of 'loot boxes' or micro-transactions for chance-based items in online video games [is] a form of gambling that is readily accessible to players under the age of 18 years." This 2019 Australian report also found the presence of loot boxes in videogames "normalizes gambling":

> The use of for-money, in-game 'loot boxes' as a mechanism through which additional in-game items can be obtained familiarises players, many of whom are less than 18 years of age, with a gambling activity that is practically identical to games available on external sites. It coexists there with lotteries, eSports betting and other more explicit gambling activities played in virtual currency. This process of 'gamblification' can be seen as analogous to that occurring in the context of sports betting, whereby gambling practices are becoming increasingly normalised as an

---

[59]     Netherlands Gaming Authority (Kansspelautoriteit), *Study into loot boxes: A treasure or a burden?* (Apr. 10, 2018), available at https://kansspelautoriteit.nl/english/loot-boxes/.

[60]     Parliament of the Commonwealth of Australia, House of Representatives Standing Committee on Social Policy and Legal Affairs, *Protecting the age of innocence: Report of the inquiry into age verification for online wagering and online pornography* (Feb. 2020), available at https://parlinfo.aph.gov.au/parlInfo/download/committees/reportrep/024436/toc_pdf/Protectingthe ageofinnocence.pdf.

00175649

FIRST AMENDED CLASS ACTION COMPLAINT

inherent component of sports engagement (Jenkinson, de Lacy-Vawdon, & Carroll, 2018; Lopez-Gonzalez & Griffiths, 2016).[61]

135.    On July 2, 2020, nine months after the UK's Department of Digital, Culture, Media and Sport concluded that loot boxes should be regulated under the UK's gambling laws, the House of Lords called for the immediate regulation of loot boxes as gambling: "While we welcome the government's intention to consider the relationship between gambling and video gaming, we believe that this issue requires more urgent attention." The House of Lords' report noted the "evidence we have heard has stressed the urgency of taking action." According, the House of Lords "echo the conclusion of the [UK's] Children's Commissioner's report, that if a product looks like gambling and feels like gambling, it should be regulated as gambling" and therefore recommended that loot boxes be immediately deemed gambling.[62]

136.    Here in the United States, the Federal Trade Commission recently hosted a workshop on loot boxes and U.S. Senators Maggie Hassan (D-NH)), and Josh Hawley (R-MO) introduced a bi-partisan bill co-sponsored by Ed Markey (D-MA) and Richard Blumenthal (D-CT) titled "The Protecting Children From Abusive Games Act" that would prohibit loot boxes in minor-oriented games. The proposed bill includes a prohibition in minor-oriented games of loot boxes, which it defines as "an add-on transaction to an interactive digital entertainment product that in a randomized or partially randomized fashion unlocks a feature of the product or adds to or enhances the entertainment value of the product[.]"

**F.    The Hague's October 2020 Ruling That Loot Boxes Are Illegal Gambling**

137.    In October 2020, an appellate panel at the Court of The Hague determined that loot boxes are unlicensed games of chance and violate gambling laws.[63] The gambling law at issue had

---

[61]    Uma Jatkar & Rebecca Jenkinson, *House of Representatives Standing Committee on Social Policy and Legal Affairs: Submission to the Inquiry into Age Verification for Online Wagering and Online Pornography*, Australian Gambling Research Center, Australian Institute of Family Studies (Oct. 25, 2019).

[62]    The full report titled "Gambling Harm—Time for Action (July 2, 2020)" from the House of Lords Select Committee on the Social and Economic Impact of the Gambling Industry is available at https://publications.parliament.uk/pa/ld5801/ldselect/ldgamb/79/79.pdf.

[63]    *See* World Today News, *Court: Packs in FIFA are gambling games and EA must adapt game in in the Netherlands* (Oct. 29, 2020), https://www.world-today-news.com/court-packs-in-

the same core elements as the ones here: consideration, chance and prize. Whether loot boxes are a game of chance separable from the associated games that included elements of player skill was also debated.

138.    The three-judge panel at The Hague affirmed a conclusion by the Dutch Gaming Authority that Ultimate Team Pack loot boxes in EA's FIFA video games are an unlicensed, illegal gambling game of chance completely separate from FIFA's game of skill.[64] Citing the need for transparency and to warn consumers about the misconduct, The Hague also rejected the game developer's objections to making the opinion public.

139.    Based on expert testimony, The Hague concluded it has been established "that there is evidence of a correlation between (buying) loot boxes and gambling problems," and therefore loot boxes present a "high risk potential" for gambling addiction.

140.    The Hague also opined that it is particularly problematic that loot boxes expose vulnerable children to the addictive gambling games:

> [E]xperts consider it very plausible that there is a risk that, in particular, underage participants may become more sensitive to addiction as a result of [loot boxes]. Minors are vulnerable and more easily addicted; if they gamble at a minor age they are at greater risk of becoming addicted. In FIFA, minors have access to [loot boxes]. When playing FIFA, they can unintentionally and unprotected come into contact with a game of chance. Experts warn against loot boxes, individual reports have been received from the defendant about loot boxes, including those from plaintiffs, about their addictive effects, and media reports from participants have appeared.

141.    Citing public policies about preventing gambling addiction, particularly in minors – similar to public policies at issue here – The Hague panel held banning loot boxes and imposing fines for their continued use was "necessary, appropriate and proportional" and that any "commercial interests do not outweigh the public interests at stake." In particular, the panel cited

---

fifa-are-gambling-games-and-ea-must-adapt-game-in-the-netherlands-gaming-news/; https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:RBDHA:2020:10428&showbutton =true&keyword=gokken (link to official Hague opinion, last visited Mar. 10, 2021).

[64]    There is nothing about The Hague's ultimate findings that is unique to the structure of the loot boxes in FIFA. The opinion observes similar actions taken involving other loot boxes: "[f]our providers of illegal loot boxes have been contacted and several providers have adjusted their offerings."

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

"[t]he public interests of the prevention of gambling addiction, in particular among minors, the protection of the consumer and the prevention of crime and illegality, [which] can be regarded as legitimate objectives." These public interests in enforcing the loot box ban were "so great" that it was not unreasonable to require the game developer to cease and desist within three weeks.

### G.   Loot Boxes Constitute Gambling in Violation of California Law

142.   Loot boxes are a gambling device and constitute a form of gambling in violation of California law. Cal. Penal Code §§ 330 *et seq.* Further, by "exposing [loot boxes] for play," Google is conducting a gambling operation in violation of California's Gambling Control Act. Cal. Bus. & Prof. Code §§ 19800 *et seq.*

### 1.   Violations of California Penal Code §§ 330 *et seq.*

143.   Under California law, loot boxes constitute illegal "slot machines or devices" when played on a mobile phone, tablet, computer, or other similar device. California Penal Code § 330b(d) broadly defines an unlawful "slot machine or device" as:

> a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value.

144.   The California Bureau of Gambling Control describes a "gambling device" as follows:

> California's gambling device statutes are broad in their coverage and prohibit any person from owning, renting, or possessing illegal gambling devices. (Penal Code, §§ 330a, 330b, 330.1.) An illegal gambling device has three features:
>
> 1.  It is a machine, apparatus, or device (coin operation is not required);
> 2.  Something of value is given to play the device; and

3.   The player has the opportunity to receive something of value by any element of hazard or chance ("something of value" is not limited to coins, bills, or tokens—it also includes free replays, additional playing time, redemption tickets, gift cards, game credits, or anything else with a value, monetary or otherwise.) (Penal Code, §§ 330a, 330b & 330.1.)[65]

145.    The loot boxes at issue meet this definition. First, a player uses his or her Android device to download game apps that offer loot boxes, turning the Android device into a device on which to play a loot box. Second, something of value is used to purchase a play on a loot box, either when the player purchases virtual coins with money to buy chances on loot boxes, or when virtual coins, which are property, are used. Third, the loot box offers the player a randomized chance to obtain something valuable.

146.    The potential prizes are something of value, both to the player and otherwise. People are willing to spend money to try to win these virtual goods, regardless of whether they are cosmetic or improve gameplay. By its very nature, the purpose of purchasing and opening a loot box is to win something of value. A chance at winning a thing of value is the *sine qua non* of selling loot boxes. Google and the game developers are aware of this. In the games, they describe potential winnings as common, rare, and legendary.

147.    Professor Robert Woodruff explains value in a widely cited published paper: "a customer perceived preference for and evaluation of those products attributes, attribute performances, and consequences arising from use that facilitate (or block) achieving the customer's goals and purposes in use situations."[66] This widely adopted definition is based on the fact that value comes from a customer's preferences, evaluations and perceptions. Because the perceived value of an item is rationally greater than the cost of obtaining that item, loot boxes are economically valued at no less than the cost to obtain them.

148.    The value of a loot box's virtual items is derivative of the same factors dictating the value of tangible items. Research demonstrates that "[i]n general, [] virtual items are valued for

---

[65]    Bureau of Gambling Control, Law Enforcement Advisory: Illegal Gambling Devices (Nov. 1, 2010), https://www.abc.ca.gov/wp-content/uploads/2019/06/Law-Enforcement-Advisory-Illegal-Gambling-Devices-1.pdf.
[66]    Robert B. Woodruff, *Customer value: the next source for competitive advantage*, J of the Acad Mark Sci, 25(2):139-153 (1997).

00175649

1    many of the same reasons as more tangible commodities." Nevertheless, because "the symbolic

2    value of a virtual good stems from its role and meaning inside the game…A person not part of that

3    social world would probably not see the good as valuable at all."[67] There would be no incentive to

4    acquire or offer loot box items, including cosmetics if they did not have some sort of value to the

5    player.

6         149.    Analyzing whether loot boxes provided the random chance opportunity to win things

7    of value, the Belgian Gaming Commission – analyzing a broad definition comparable to California's

8    – answered this question with a resounding yes:

> [I]t is not important if a 'skin' in Overwatch, FIFA 18 or C-S: GO is merely of
> aesthetic value. What is important is that players attach value to it and that this value
> is also emphasized by the game developers themselves. Sometimes colour or numeric
> codes are used to assign value to items. The items are also often assigned value by
> creating scarcity. By offering certain items in loot boxes during a certain time frame,
> players will be inclined to buy more loot boxes during that specific period (event)
> because this is the only chance to obtain this 'valuable' item.68

14        150.    Economic theory holds that market price as the best indicator of value. Evidence of

15   the real-world value of the randomized loot box items includes that where these virtual items are

16   tradeable for money, transactions of fiat currency occur. Further, most virtual items are sold for less

17   than the cost of a loot box (representing real financial loss), refuting the assertion that no player who

18   opens a loot box makes a loss. Likewise, gamers who purchase virtual items also spend significantly

19   more in total on games, demonstrating a willingness to spend additional money to acquire virtual

20   items and the additional financial value of these items over and above the game itself.[69] Likewise,

21   where the potential prizes, as with loot box prizes, are categorized by frequency and rarity, value is

---

[67]    Vili Lehdonvirta, *Virtual item sales as a revenue model: identifying attributes that drive purchase decisions*, Electron Commer Res, 9:97-113 (2009).

[68]    Belgian Gaming Commission, *Research Report on Loot Boxes* (April 2018).

[69]    Drummond A, Sauer JD, Hall LC, Zendle D, Loudon MR, *Why loot boxes could be regulated as gambling*, Nat Hum Behav, 4(10):986-988 (Oct. 2020). Drummond and co-authors analyzed sales of 2,319 virtual items from three popular games. In the aggregate, sales of the virtual items exceeded one billion dollars, with the individual items being sold for between $0.03 and $743.80 each. "Contradicting the common argument that loot boxes are not gambling because no player loses upon opening a loot box" the "overwhelming majority of players incur financial losses when on-selling loot box items, with ~93% of sales recouping less than the purchase price."

00175649

1   inherently assigned to the items. Moreover, the collection of rare items is seen as a sign of status

2   within the gaming community, thus ascribing a form of social value to the items.[70] Much consumer

3   spending occurs to obtain or maintain social status. This concept is the very basis of the phrase

4   "keeping up with the Joneses."

5   151.   Professors from the Department of Psychology at the University of Waterloo

6   examined whether "players do indeed find rarer [loot box] items as being subjectively more

7   valuable."[71] To do so, Professors Larche et al. (2019) conducted two experiments to observe whether

8   "loot box rewards are treated in much the same way that monetary outcomes are treated in slots

9   play" and therefore "underscore that both reward structure may lead to similar rewards processing

10   and motivational effects."

11   152.   Results from Experiment 1 showed that "players systematically categorized valuable

12   and non-valuable loots based on increasing rarity, and hence increasing objective value, of the items

13   in a loot box":

> Players subjectively value most those loot boxes with the highest objective worth
> (e.g., those that contains at least one of the most uncommon 'legendary' items)
> compared to loots that were objectively worth less (e.g., those containing more
> common items falling into the 'rare' and 'epic' tiers). Moreover, players also gave
> larger ratings of arousal, valence and urge as the reward value of the loot box
> increased.

18   153.   In Experiment 2, Professors Larche et al. sought to replicate the results of Experiment

19   1, and to also analyze if common loot box items produce higher ratings of disappointment and

20   whether prominent measures of hedonic reward and arousal were associated with the levels of loot.

21   The researchers stated, "Experiment 2 successfully replicated the results for these subjective

---

[70]   For instance, Dr. Vili Lehdonvirta, an economic sociologist, professor at the University of Oxford and former game developer, points out that in the game *Ultima Online*, "one of the most highly valued virtual items in the whole system was a small brown lump named 'horse dung'. Despite its very modest appearance and complete lack of performance or functionality, people have paid the equivalent of hundreds of U.S. dollars for the item." Vili Lehdonvirta, *Virtual item sales as a revenue model: identifying attributes that drive purchase decisions*, Electron Commer Res, 9:97-113 (2009).

[71]   Larche CJ, Chini K, Lee C, Dixon MJ, Fernandes M, *Rare Loot Box Rewards Trigger Larger Arousal and Reward Responses, and Greater Urge to Open More Loot Boxes*, J Gambl Stud, 37(1):141-163 (Mar. 2021).

FIRST AMENDED CLASS ACTION COMPLAINT

measures, in addition to supplying converging evidence of the arousing, hedonically rewarding and motivating nature of these non-monetary rewards with PRPs [or "post reinforcement pauses" – an index of reward reactivity that is longer following wins], SCRs [or "skin conductance responses" – measuring sweat gland activity, a well-established indicator of physiological arousal], and force measures." The researchers found that "[s]imilar to the indisputable, rewarding feeling of winning money, we show that obtaining in-game items within a loot box appear to activate the same reward response in a slot machine" and that "such findings are indicative of players' awareness and sensitivity to the value of different loots, despite loot boxes not conferring any real-world monetary worth."

154.    Professors Drummond, Sauer, Hall, Zendle and Loudon specifically analyzed whether the virtual items that may be won from randomized loot boxes have monetary value. In their 2020 paper published in the top-tier journal *Nature*, Drummond et al. determined that loot boxes have value using numerous economic theories.[72] The authors concluded:

> We have demonstrated that virtual items have monetary value to gamers irrespective of whether they can be cashed out. Therefore, randomised virtual items (loot boxes) purchased for real money likely satisfy the requirements of value needed to meet the legal definitions of gambling in many jurisdictions.[73]

155.    Similarly, Zendle et al. (2020), analyzed 1,200 gamers and determined that the presence of a cash out mechanism is also not a uniquely strong gateway to the robust relationship between loot box spending and problem gambling.[74] Indeed, Zendle (2020) concluded there was "robust and reliable" evidence linking loot boxes to problem gambling "regardless of whether or not loot boxes gave players gameplay advantages, allowed them to trade items for real world money,

---

[72]    Drummond A, Sauer JD, Hall LC, Zendle D, Loudon MR, *Why loot boxes could be regulated as gambling*, Nat Hum Behav, 4(10):986-988 (Oct. 2020).

[73]    The presence of a cash out mechanism is also not a uniquely strong gateway to the robust relationship between loot box spending and problem gambling. Zendle, D., Cairns, P., Barnett, H., & McCall, C., *Paying for loot boxes is linked to problem gambling, regardless of specific features like cash-out and pay-to-win*, Computers in Human Behavior, 102:181–191 (2020). From a gambling definitional perspective, The Hague appellate panel also noted that it is "irrelevant whether prizes can be converted into real money."

[74]    Zendle, D., Cairns, P., Barnett, H., & McCall, C., *Paying for loot boxes is linked to problem gambling, regardless of specific features like cash-out and pay-to-win*, Computers in Human Behavior, 102:181–191 (2020).

00175649

allowed them to cash-out, or showed near-misses." From a gambling definitional perspective, The Hague appellate panel also noted that it is "irrelevant whether prizes can be converted into real money."

156.    While monetization is not a requirement for an item (tangible or not) to provide value, there are also many ways to monetize the prizes won from loot boxes, thereby demonstrating that these prizes are "things of value."[75] The first is known as platform supported sale. Many game creators and storefronts allow virtual items to be traded between accounts through digital marketplaces that involve either fiat or digital currencies that can be used to purchase things that have monetary value.

157.    Additionally, because some of these specific high-demand items in the game can be so difficult (and costly) to obtain, a "gray market" has also sprung up on the internet – websites where the game accounts and in some cases individual items can be (and are) bought and sold for real money outside of the game itself. Numerous websites have been created to broker these transactions, bringing buyer and seller together to sell these items and accounts, for money outside of the game.

158.    The second is known as platform supported trade. Some games allow virtual items to be traded between accounts within the game, often using in-game marketplaces. Theoretically, no fiat currency is utilized in the transaction, however users may communicate and money is then exchanged outside the game in exchange for the transfer of the item for a symbolic in-game price. This is through account exchanges.[76] There is a market for many of the games' player accounts to be bought and sold outside of the game itself. The value, or price, of each game account is determined by the "loot" the player possesses which is "locked" in their account. There are

---

[75]    Rockloff (2020) examined the best-selling video games by revenue, and reported that of games with loot boxes, 84% (43 of 51) "allowed the skins or other items to be sold for cash or traded for other items with a monetary value (e.g., other skins, in-game currency, etc.)." Rockloff M, Russell AMT, Greer MN, Lolé L, Hing N, Browne M, *Loot boxes: Are they grooming youth for gambling?*, NSW Responsible Gambling Fund (2020).

[76]    For example, Electronic Arts has created an "auction house" for its mobile "Madden" NFL franchise game.  The auction house allows gamers to buy and sell various players that were won in loot boxes within the game.

FIRST AMENDED CLASS ACTION COMPLAINT

companies who specialize in buying and selling videogame accounts that contain prizes from loot boxes.

159.    The third is third-party sales of loot box items. Third-party companies commonly referred to as "gold farmers" obtain virtual items and sell them to other players for money, including fiat currency. The products offered may include items where the cost of obtaining the item is lower than the average selling price for the item. Gold farmers do not participate in 'normal' or 'for fun play' and are therefore able to obtain game resources more rapidly than recreational players.

160.    The fourth way to monetize loot box prizes in the real-world economy is through "skin gambling" where players use virtual items and loot boxes as pseudo-currency on third-party gambling sites.[77]

161.    While loot box items can be monetized in a variety of ways, Professor Elizabeth Handsley explained why that overly narrow conceptualization of 'value' ignores psychological processes and is ultimately "neither here nor there" when it comes to valuing loot box prizes:

> [The ability to]…convert loot boxes into real-life money is neither here nor there because the items that are accessed via loot boxes are of value to the player. That's all that really matters from a psychological perspective. Whether that person can then get money or some real-life tangible good in return for the loot boxes is neither here nor there. The player is committed to the game. These games are very absorbing. There are a lot of people who have a lot invested in playing games and getting to higher levels, therefore the value to those can be very high. From a psychological perspective, that's what matters. Whether it's money or some tangible good is really not the point.[78]

162.    Whether the potential loot box items make playing the game easier and more winnable ("functional" items) or allow players to customize the look of their in-game characters ("cosmetic" items), all loot boxes provide a completely randomized chance to win valuable prizes.

163.    For example, Hamari *et al*. (2017) found the value of in-game items that may be obtained to "personalize" video game characters: "One prominent value proposition of a lot of in-

---

[77]    Commonwealth of Australia, The Senate, *Environment and Communications References Committee: Gaming micro-transactions for chance-based items*, at p.23-24 (Nov. 2018).
[78]    Commonwealth of Australia, The Senate, *Environment and Communications References Committee: Gaming micro-transactions for chance-based items*, at p.29 (Nov. 2018).

00175649

game content is that it affords players to differentiate themselves from other players by personalizing their avatar or other belonging in-game."[79]

164.    Lehdonvirta (2009) also observed that both functional and cosmetic attributes of virtual goods drive consumers' purchase decisions. "It could even be speculated that in some cases the functional attributes of a virtual good serve only as an excuse for a purchase that is primarily motivated by hedonic or social aspects, a technique commonly applied in marketing high-performance automobiles."[80]

165.    Because of scarcity bias (i.e., humans place a higher value on an object that is scarce), players gamble money to open loot boxes hoping they can win the "rare" loot box items considered more valuable than the "common" items, which are often worthless duplicates.[81] Knowing this, loot box purveyors "manufacture rarity (also known as 'artificial scarcity') to increase the value of the assets they are selling."[82] The value of potential loot box prizes is not theoretical. At the January 2021 FUT Champions Cup, a staple of the FIFA e-sports calendar, players competed against each other using teams worth $27,000 based on then-current trading prices.

### 2.    Violations of California's Gambling Control Act

166.    Under California's Gambling Control Act, all "controlled games" constitute "gambling" and anyone who "exposes for play one or more controlled games that are dealt, operated, carried on, conducted, or maintained for commercial gain" is conducting a "gambling enterprise" or "gambling operation." *See* Cal. Bus. & Prof. Code §§ 17805(l) ("'Gambling' means to deal, operate, carry on, conduct, maintain, or expose for play a controlled game."), 17805(g) (defining "controlled game"), 17805(m) (defining "gambling enterprise"), 17805(q) (defining "gambling operation").

---

[79]    Hamari J, Alha K, Järvelä S, Kivikangas JM, Koivisto J, & Paavilainen J, *Why do players buy in-game content? An empirical study on concrete purchase motivations*, Computers in Human Behavior, 68:538-546 (2017).
[80]    Vili Lehdonvirta, *Virtual item sales as a revenue model: identifying attributes that drive purchase decisions*, Electron Commer Res, 9:97-113 (2009).
[81]    Mittone L, Savadori L, "The Scarcity Bias," *Applied Psychology*. 58(3): 453-468 (2009).
[82]    Vili Lehdonvirta, *Virtual item sales as a revenue model: identifying attributes that drive purchase decisions*, Electron Commer Res, 9:97-113 (2009) ("Rarity is perhaps the most socially oriented attribute of virtual goods, because its value is strongly associated with its ability to distinguish a (small) group of owners from non-owners.").

00175649

167.    Loot boxes constitute a "controlled game" because they are a "game of chance…played for currency, check, credit, or any other thing of value." Cal. Penal Code § 337j(1).

168.    The marketing and sale of loot boxes also violates the spirit and public policies behind California's Gambling Control Act. The Gambling Control Act provides that "gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families," "[u]nregulated gambling enterprises are inimical to the public health, safety, welfare, and good order," and no "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies." *See* Cal. Bus. & Prof. Code §§ 17801(c), (d); *see also* Cal. Bus. & Prof. Code §§ 19850, 19851, 19852 (requiring state gambling licenses).

169.    By operating or exposing loot boxes for play for commercial gain, Google is conducting an illegal gambling enterprise that is inimical to the public health.

## **CLASS ACTION ALLEGATIONS**

170.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek certification of a nationwide class consisting of:

> All persons who paid to receive randomized virtual items from a purchase (also known as "loot boxes") within an app downloaded from the Google Play Store.

171.    The Class excludes Google's officers and directors, current or former employees, including their immediate family members, as well as any judge, justice or judicial officer presiding over this matter and members of their immediate families and judicial staff. Plaintiffs reserve the right to amend the Class definition or include subclasses if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

172.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all other members of the Class were damaged by the same wrongful conduct committed by Defendant, as alleged more fully herein.

173.    Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the class representatives are coincident with, and not antagonistic to, the interests of the other members of the Class.

00175649

174.   Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation.

175.   Questions of law and fact common to the members of the Class are central here and predominate over questions that may affect only individual members. Among the questions of law and fact common to the Class are:

(a)   Whether loot boxes create or exacerbate addictive behaviors;

(b)   Whether Defendant's conduct violates Cal. Penal Code §§ 330, *et seq.*;

(c)   Whether Defendant's conduct violates California's Gambling Control Act, Cal. Bus. & Prof. Code §§ 19800, *et seq.*;

(d)   Whether Defendant's conduct violates the Illegal Gambling Business Act (18 U.S.C. § 1955);

(e)   Whether Defendant's conduct violates the Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367);

(f)   Whether Google violated Business & Professions Code § 17200 by engaging in an "unlawful" business practice by marketing, selling and distributing loot boxes and videogames with gambling features and in violation of various state and federal laws as set forth herein;

(g)   Whether Google violated Business & Professions Code § 17200 by engaging in an "unfair" business practice by marketing, selling and distributing loot boxes and videogames with gambling features and that create and/or exacerbate addictive behaviors, especially in minors, as alleged herein;

(h)   Whether Google violated Civil Code §§ 1770(a)(14);

(i)   Whether Google was unjustly enriched as a result of the conduct alleged herein;

(j)   Whether Google facilitated the sale of loot boxes;

(k)   Whether Google's conduct violated the other provisions of statutory and common law outlined in this Complaint.

176.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or

contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The burden and expense that would be entailed by individual litigation makes it impracticable or impossible for Class members to prosecute their claims individually. Further, the adjudication of this action presents no unusual management difficulties.

177.   Unless a class is certified, Google will retain monies received as a result of its improper conduct. Unless a classwide injunction is issued, Google will continue to commit the violations alleged, and will continue to promote and engage in the unfair and unlawful gambling activities discussed herein. Google has acted or refused to act on grounds that are generally applicable to the Class so that injunctive and declaratory relief is appropriate to the Class as a whole.

## FIRST CAUSE OF ACTION

### Violation of the "Unlawful Prong" of California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

178.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

179.   Plaintiffs and members of the Class may properly allege violations of the UCL. Google's Terms of Service provide that "California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules," and that "[t]hese disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA."

180.   Plaintiffs and Defendant are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

181.   The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. Prof. Code § 17200.

182.   As a result of engaging in the conduct alleged in this Complaint, Google has violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of the following laws:

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

(a)      **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*)**: Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. As alleged herein, Google operates, carries on, conducts, maintains, and exposes for play gambling activities. Google has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act.

(b)      **California Penal Code § 330a**: Titled "Possession or keeping of slot or card machine or card dice," section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Google violates section 330a because as alleged, Google possesses or permits illegal slot machines or mechanical devices where money or things of value are won or lost upon chance.

(c)      **California Penal Code § 330b**: Titled "Possession or keeping of slot machines or devices," section 330b declares that "[i]t is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or permit the operation, placement, maintenance, or keeping of, in any place, room, space, or building owned,

leased, or occupied, managed, or controlled by that person, any slot machine or device, as defined in this section." As alleged, Google permits the operation, placement, maintenance, or keeping of a slot machine or device as defined by Penal Code § 330b(d).

(d)     **California Penal Code § 330.1, *et seq.***: Titled "Manufacture, possession, or disposition of slot machines or device," section 330.1(a) declares that "Every person who manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends or gives away, transports, or exposes for sale or lease, or offers to sell, rent, lease, let on shares, lend or give away or who permits the operation of or permits to be placed, maintained, used, or kept in any room, space, or building owned, leased, or occupied by him or her or under his or her management or control, any slot machine or device as hereinafter defined, and every person who makes or permits to be made with any person any agreement with reference to any slot machine or device as hereinafter defined, pursuant to which agreement the user thereof, as a result of any element of hazard or chance, may become entitled to receive anything of value or additional chance or right to use that slot machine or device, or to receive any check, slug, token, or memorandum, whether of value or otherwise, entitling the holder to receive anything of value, is guilty of a misdemeanor." Google violates section 330.1 because as alleged, Google possesses or permits illegal slot machines or devices where things of value are won as a result of chance "irrespective of whether it may, apart from any element of hazard or chance, also sell, deliver, or present some…entertainment, or other thing of value" (Cal Penal Code § 330.1(f)).

(e)     **California Penal Code § 337j(a)(1)**: By "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed gambling in this state, Google violates Penal Code § 337j(a)(1).

(f)     **California Penal Code § 337j(a)(2)**: By "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game," Google violates Penal Code § 337j(a)(2).

(g)     **California Penal Code § 337j(a)(3)**: Through the "manufacture, distribut[ion], or repair [of] any gambling equipment within the boundaries of this state" or "receiv[ing], directly or indirectly, any compensation or reward for the manufacture, distribution,

1  or repair of any gambling equipment within the boundaries of this state" Google violates Penal Code

2  § 337j(a)(3).

3  (h)  **The Illegal Gambling Business Act of 1970 (18 U.S.C. § 1955) (the**

4  **"IGBA")**: The IGBA makes illegal gambling businesses. Google's business involves five or more

5  persons, has been in continuous operation for more than thirty days, and violates California's

6  gambling laws as alleged herein. By managing, directing, or controlling all or part of the conduct

7  alleged herein with respect to the Google Play Store, virtual currency and loot boxes, Google

8  violates 18 U.S.C. § 1955, which declares it a crime to "conduct, finance, manage, supervise, direct,

9  or own all of part" of an illegal gambling business.

10  (i)  **The Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C.**

11  **§§ 5361-5367) (the "UIGEA")**: The UIGEA makes it illegal for a "person engaged in the business

12  of betting or wagering" to knowingly accept payments "in connection with the participation of

13  another person in unlawful Internet gambling." 31 U.S.C. § 5633. "Unlawful Internet gambling" is

14  placing, receiving or transmitting a bet or wager through, at least in part, the Internet where such bet

15  or wager "is unlawful under any applicable Federal or State law in the State or Tribal lands in which

16  the bet or wager is initiated, received, or otherwise made." 15 U.S.C. § 5362(10)(a). By accepting

17  payment in connection with unlawful loot box gambling, Google has violated the UIGEA.

18  (j)  **Consumers Legal Remedies Act, California Civil Code § 1770(a)(14)**: As

19  alleged in Count IV below, Google's conduct violates section 1770(a)(14) of the CLRA. Therefore,

20  this constitutes a violation of the UCL's unlawful prong.

21  183.  Plaintiffs reserve the right to allege other violations of law, which constitute other

22  unlawful business acts or practices. Such conduct is ongoing and continues to this date.

23  184.  Google's violations of the UCL continue to this day. Unless restrained and enjoined,

24  Google will continue to engage in the unfair conduct described herein.

25  185.  Defendant's conduct caused and continues to cause substantial injury to Plaintiffs

26  and the other Class members. As described herein, Google promotes, facilitates, and profits off the

27  purchases of loot boxes; indeed, Google ensures its position as the casino pit boss and takes a rake

28  from each wager. But for Google's unlawful and unfair conduct, Plaintiffs and Class members

would not and could not have entered into the transactions to purchase loot box plays. Plaintiffs have suffered injury in fact and have lost money and property as a result of Defendant's unfair conduct.

186.    Pursuant to Business & Professions Code sections 17203 and 17205, Plaintiffs and the Class seek restitution of any money paid to purchase loot boxes, damages, an injunction prohibiting Google from continuing to promote and facilitate gambling through loot boxes and the sale of in-game currency for loot boxes, corrective advertising, all other relief this Court deems appropriate, and to pay the attorney fees and costs incurred by counsel for Plaintiffs and the proposed class in accordance with California Code of Civil Procedure § 1021.5.

## SECOND CAUSE OF ACTION

**Violation of the "Unfair Prong" of California's Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

187.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

188.    Plaintiffs and members of the Class may properly allege violations of the UCL. Google's Terms of Service provide that "California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules," and that "[t]hese disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA."

189.    Plaintiffs and Defendant are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

190.    The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. Prof. Code § 17200.

191.    As a result of engaging in the conduct alleged in this Complaint, Google has violated the UCL's proscription against "unfair" business practices.

192.    Google's unfair conduct alleged in this Complaint is illegal, immoral and unscrupulous. Loot boxes develop compulsive and addictive behaviors as with gambling. They are in essence slot machines or, in the alternative, from a psychological standpoint, are similar to slot

machines, with all of the same sophisticated gambling-like structural hooks, elements, and cognitive traps that lead to addiction and the associated psychological and financial harms. Scientists have concluded that loot boxes are linked to problem gambling by an order of magnitude larger than risk factors such as alcohol dependence. However, because Google has prioritized profit over ethics, Google makes loot boxes available to purchase by children and families at all hours, in any place, and without any spending limitation whatsoever.

193.    Google's unfair conduct also violates legislatively declared policies articulated in, inter alia, California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*), California Penal Code §§ 330, *et seq.*, the Illegal Gambling Business Act (18 U.S.C. § 1955), and the Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) by conducting illegal and unlicensed gambling business including at places not suitable for gambling activities, knowingly accepting payments for unlawful gambling, and promoting predatory gambling as entertainment for children and families.

194.    California's Legislature found and declared that "Gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families." Cal. Bus. & Prof. Code § 19801(c). In violation of this public policy, Google's conduct as described in this Complaint promotes, facilitates, legitimizes, and profits off addictive gambling activities masqueraded as entertaining video games that are marketed, sold and made available to children and families.

195.    California's Legislature also found and declared that "Unregulated gambling enterprises are inimical to the public health, safety, welfare, and good order. Accordingly, no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies." Cal. Bus. & Prof. Code § 19801(d). In violation of this public policy, Defendant engages in unregulated gambling enterprises that are inimical to the public health, safety, welfare, and good order. Defendant has not been permitted by the laws of this State and by ordinances of local governmental bodies to engage and operate the gambling enterprise described herein. California's Legislature also found and declared that "no new gambling establishment may be opened in a city, county, or city and county

in which a gambling establishment was not operating on and before January 1, 1984, except upon the affirmative vote of the electors of that city, county, or city and county." Cal. Bus. & Prof. Code § 19801(e). In violation of this Legislative finding and public policy, Defendant has opened a gambling establishment through its Google Play Store without first receiving the affirmative vote of the electors of any city or county in this State.

196.    California's Legislature also found and declared that "Public trust that permissible gambling will not endanger public health, safety, or welfare requires that comprehensive measures be enacted to ensure that gambling is free from criminal and corruptive elements, that it is conducted honestly and competitively, and that it is conducted in suitable locations." Cal. Bus. & Prof. Code § 19801(g). In violation of this public policy, and undermining "public trust," Google has brought unregulated gambling into the homes and pockets of tens of millions of consumers, including children – 24/7 locations which are not "suitable" to protect the public from the from the dangers of gambling. California's Legislature also found and declared that "All gambling operations, all persons having a significant involvement in gambling operations, all establishments where gambling is conducted, and all manufacturers, sellers, and distributors of gambling equipment must be licensed and regulated to protect the public health, safety, and general welfare of the residents of this state as an exercise of the police powers of the state." Cal. Bus. & Prof. Code § 19801(g). In violation of this public policy, Google is not licensed or regulated despite being significant involved in the gambling operations described herein and operating an establishment where the gambling is conducted.

197.    Google's unfair conduct also includes and arises from promoting, facilitating and profiting from conduct designed to create and exploit addictive tendencies in vulnerable minors and adults alike.

198.    Google has omitted important information and mislead parents of vulnerable minors and adolescents and others concerning the addictive, costly, and random chance nature of the loot box mechanism and its use in Defendant's Google Play Store games. According to psychologists, loot boxes are a "predatory monetization scheme":

00175649

Predatory monetization schemes in video games are purchasing systems that disguise or withhold the long-term cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.[83]

199.    Google also has engaged in "unfair" business practices under the "balancing test." Google's conduct offends established public policies and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. There is no utility to Google's unethical conduct, which creates a gateway to problem gambling, promotes and reinforces addictive behavior, and markets and sells gambling as entertainment to families, children, and other vulnerable populations. Meanwhile, the gravity of harm from Google's unfair conduct is substantial – creating and reinforcing addictive behavior to the financial, social, and psychological detriment of families, children and other vulnerable populations.

200.    Google has also engaged in "unfair" business practices under the "tethering" test. Google's unfair practices violate public policies that are tethered to specific constitutional, statutory, or regulatory provisions and thereby "violate the policy or spirit" of those provisions. *Cel-Tech Comms., Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999). As alleged herein, California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*), California Penal Code §§ 330, *et seq.*, the Illegal Gambling Business Act (18 U.S.C. § 1955), and the Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) each declare that unlicensed or unregulated gambling or gambling activities are inimical to the public health, safety, welfare, and good order, and are not to be promoted or legitimized as entertainment for children or families. Indeed, because even watching gambling take place acts as a gateway for youth, California's Gambling Control Act provides that no person under 21 years of age is permitted to enter a gambling establishment. Cal. Bus. & Prof. Code § 19921. Google's unfair conduct violates these legislatively-tethered public policies.

---

[83]    King DL, Delfabbro PH. *Predatory monetization schemes in video games (e.g. 'loot boxes') and internet gaming disorder*. Addiction. 2018 Nov;113(11):1967-1969. doi: 10.1111/add.14286. Epub 2018 Jun 28. PMID: 29952052.

201.    Google also engaged in "unfair" business practices under the "FTC Act" test. As alleged, the injury to Plaintiffs and Class members is substantial, the injury is not outweighed by any countervailing benefits to consumers or competition, and particularly given the predatory nature of the conduct, the injury is such that it could not reasonably have been avoided.

202.    There is no societal benefit from Google's conduct which includes promoting and facilitating addictive gambling as entertainment for children and families. There is only harm from Google's conduct. While Plaintiffs were harmed, Google was unjustly enriched by its deceptive, predatory, and harmful conduct. As a result, Google's conduct is "unfair" because it offended established public policies. Further, Google engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers as the gravity of Google's conduct outweighs any alleged benefits attributable to such conduct.

203.    There were reasonably available alternatives to further Google's legitimate business interests other than the conduct described herein.

204.    Google's violations of the UCL continue to this day. Unless restrained and enjoined, Google will continue to engage in the unfair conduct described herein.

205.    Defendant's conduct caused and continues to cause substantial injury to Plaintiffs and the other Class members. As described herein, Google promotes, facilitates, and profits from the purchases of loot boxes; indeed, Google ensures its position as the casino pit boss and takes a rake from each wager. But for Google's unlawful and unfair conduct, Plaintiffs and Class members would not and could not have entered into the transactions to purchase loot box plays. Plaintiffs have suffered injury in fact and have lost money and property as a result of Defendant's unfair conduct.

206.    Pursuant to Business & Professions Code sections 17203 and 17205, Plaintiffs and the Class seek restitution of any money paid to purchase loot boxes, an injunction prohibiting Google from continuing to promote and facilitate gambling through loot boxes and the sale of in-game currency for loot boxes, corrective advertising, all other relief this Court deems appropriate, and to pay the attorney fees and costs incurred by counsel for Plaintiffs and the proposed class in accordance with California Code of Civil Procedure § 1021.5.

00175649

**THIRD CAUSE OF ACTION**

**Violation of the Consumers Legal Remedies Act**
**(Cal. Civ. Code §§ 1750, *et seq.*)**

207.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

208.    Plaintiffs and members of the Class may properly allege violations of the CLRA. Google's Terms of Service provide that "California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules," and that "[t]hese disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA."

209.    This claim for relief is brought pursuant to the CLRA. Plaintiffs and members of the Class are "consumers," as that term is defined by Civil Code § 1761(d), because they bought virtual currency, loot boxes and Google Play Store services for personal, family, or household purposes.

210.    Plaintiffs and Class Members have engaged in a "transaction" with Google, as that term is defined by Civil Code § 1761(e).

211.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA and were undertaken by Google in transactions intended to result in, and which resulted in, the sale of goods or services to consumers; namely, the sale of virtual currency, loot boxes and Google Play Store services.

212.    According to the Google Play Terms of Service, "Google Play is a service provided by Google." Further, "[i]n order to purchase Content through Google Play, you must have a Google Payments account and agree to the Google Payments Terms of Service." Plaintiffs and Class members transacted directly with Google for the services that the Google Play platform provides. Each time Plaintiffs and Class members made purchases of in-game content, they did so through Google at the Google Play Store, and in so doing, also paid Google for its Google Play services being furnished in connection with the sale of virtual currency and loot boxes.

213.    Further, according to Google, the in-app content it sells through the Google Play Store is "digital goods or services." Below are screenshots from Google's webpages where it

00175649

describes the in-app content as "digital goods or services." According to Google, these goods are either "durables (once purchased, always available to the user)" or "consumables (items used a limited number of times or for a set period of time)." These so-called durable or consumable products purchased from the Google Play Store include the virtual currency and loot boxes, which are thus, according to Google, "goods or services."[84]



---

[84]    *See Earn: How to build and grow your app's revenue streams*, Google Play Developers, https://developer.android.com/distribute/best-practices/earn (last visited Mar. 18, 2021); *Sell digital purchases with Google Play's billing system*, Google Play Developers, https://developer.android.com/distribute/best-practices/earn/in-app-purchases (last visited Mar. 18, 2021); *Choose a monetization model for your app*, Google Play Developers, https://developer.android.com/distribute/best-practices/earn/monetization-options (last visited Mar. 18, 2021).

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

1    *See Earn: How to build and grow your app's revenue streams*, Google Play Developers,

2    https://developer.android.com/distribute/best-practices/earn (last visited Mar. 18, 2021). Then click

3    "Sell digital goods or services with Play's billing system" to see:



26   *Sell digital purchases with Google Play's billing system*, Google Play Developers,

27   https://developer.android.com/distribute/best-practices/earn/in-app-purchases (last visited Mar. 18,

28   2021).

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

*See Choose a monetization model for your app*, Google Play Developers, https://developer.android.com/distribute/best-practices/earn/monetization-options (last visited Mar. 18, 2021).

214.     As a result of Google's conduct, Plaintiffs and Class members purchased Google Play's goods or services, including the content available through it, to open and play loot boxes, which are prohibited by law.

215.     By engaging in the conduct described herein, Google has violated subdivision (a)(14) of California Civil Code § 1770 by "Representing that a transaction confers or involves rights,

FIRST AMENDED CLASS ACTION COMPLAINT

remedies, or obligations that it does not have or involve, or that are prohibited by law." Under this provision, omissions are actionable.

216.    Defendant violated the CLRA by representing to or omitting from Plaintiffs and Class members that the transactions involving loot boxes confer or involve rights to potentially valuable prizes, when in fact these transactions constitute unlawful gambling transactions that are prohibited by law, foster compulsive and addictive behavior, are not suitable for children, teenagers and many adults, and are a predatory form of duplicitously profiting from others. These omissions are material because a reasonable consumer would deem them important in determining how to act in the transaction at issue and, if prohibited by law, should not have been permitted to purchase loot box plays. Further, the omissions about loot boxes are misleading in light of other facts that Google did disclose.

217.    Defendant's violations of the CLRA proximately caused injury in fact to Plaintiffs and the Class.

218.    Plaintiffs and the Class members transacted with Defendant on the belief that the transaction was lawful. Indeed, a reasonable consumer believes in the lawfulness of his or her transactions.

219.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiffs, individually and on behalf of the other members of the Class, seek a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

220.    Pursuant to Cal. Civ. Code § 1782(a), Defendant was notified in writing by certified mail of the particular violations of Section 1770 of the CLRA, which notification demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. A copy of the letter is attached as Exhibit A to the Complaint filed June 12, 2020. *See* ECF No. 1-1.

221.    Defendant has failed to rectify or agree to rectify the problems associated with the actions detailed above or give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act. Therefore, Plaintiffs further seek claims for actual, punitive and statutory damages, as appropriate.

00175649

222.   Defendant's conduct is fraudulent, wanton, and malicious.

223.   Pursuant to § 1780(d) of the Act, attached as Exhibit B to the Complaint filed on June 12, 2020 (ECF No. 1-2) is the affidavit showing that this action has been commenced in the proper forum.

**FOURTH CAUSE OF ACTION**

**Unjust Enrichment**

224.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

225.   Plaintiffs and Class members bring this claim for unjust enrichment under California law. Google's Terms of Service provide that "California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules," and that "[t]hese disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA."

226.   By its wrongful acts and omissions, Google was unjustly enriched at the expense of and to the detriment of Plaintiffs and the Class. Google was unjustly enriched as a result of the compensation it received from facilitating, marketing, promoting and selling the unlawful and unfair loot boxes to Plaintiffs and the Class and the virtual currency it reasonably and foreseeably knew was being purchased to wager on loot boxes.

227.   Because of Google's conduct, the Google Play Store has become a gateway to problem gambling behavior and its well-established, associated financial, social, and mental harms. Google has received hundreds of millions of dollars off its conduct which promotes and legitimizes addictive gambling as a form of entertainment for children and families.

228.   Plaintiffs and the Class seek restitution from Google and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Google from its wrongful conduct.

229.   Plaintiffs and the Class have no adequate remedy at law.

72

00175649

1

## **PRAYER FOR RELIEF**

2    WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for

3    relief in this Complaint as follows:

4        (a)     For an order certifying the Class as requested herein;

5        (b)     For restitution and disgorgement of the revenues wrongfully retained as a result of

6    Google's wrongful conduct;

7        (c)     For declaratory and injunctive relief as permitted by law or equity;

8        (d)     For an award of attorney fees, where applicable;

9        (e)     For an award of costs; and

10       (f)     For any and all other relief the Court deems just and appropriate.

11

## **DEMAND FOR JURY TRIAL**

12   Based on the foregoing, Plaintiffs, on behalf of themselves, and all others similarly situated,

13   hereby demand a jury trial for all claims so triable.

14                                   Respectfully submitted,

15   Dated: March 11, 2021           By:       *s/ Timothy G. Blood*

16                                    TIMOTHY G. BLOOD

17                                  BLOOD HURST & O'REARDON, LLP
                               TIMOTHY G. BLOOD (149343)

18                                  THOMAS J. O'REARDON II (247952)
                               501 West Broadway, Suite 1490

19                                  San Diego, CA  92101
                               Tel: 619/338-1100

20                                  619/338-1101 (fax)
                               tblood@bholaw.com

21                                  toreardon@bholaw.com

22                                  THE LAW OFFICES OF ANDREW J. BROWN
                               ANDREW J. BROWN (160562)

23                                  501 West Broadway, Suite 1490
                               San Diego, CA  92101

24                                  Tel: 61/501-6550
                               andrewb@thebrownlawfirm.com

25                                  *Attorneys for Plaintiffs*

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

00175649

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on March 19, 2021, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the

5

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6

indicated on the Electronic Mail Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct. Executed on March 19, 2021.

9

10

*s/ Timothy G. Blood*
TIMOTHY G. BLOOD

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

00175649