Bradford K. Newman (State Bar No. 178902)
  bradford.newman@bakermckenzie.com
Alexander G. Davis (State Bar No. 287840)
  alexander.davis@bakermckenzie.com
Anne Kelts Assayag (State Bar No. 298710)
  anne.assayag@bakermckenzie.com
**BAKER & McKENZIE LLP**
600 Hansen Way
Palo Alto, CA 94304
Telephone: +1 650 856 2400
Facsimile:  +1 650 856 9299

Teresa H. Michaud (State Bar No. 296329)
  teresa.michaud@bakermckenzie.com
**BAKER & McKENZIE LLP**
10250 Constellation Blvd., Suite 1850
Los Angeles, CA 90067
Telephone: +1 310 201 4728
Facsimile:  +1 310 201 4721

Attorneys for Defendant
GOOGLE LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

JOHN COFFEE, MEI-LING MONTANEZ, and S.M., a minor by MEI-LING MONTANEZ, S.M.'s parent and guardian, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

GOOGLE LLC,

        Defendant.

**Case No.  5:20-cv-03901-BLF**

**Date Action Filed: June 12, 2020**

**DEFENDANT GOOGLE LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

| | |
|---|---|
| **Date:** | **July 15, 2021** |
| **Time:** | **9:00 a.m.** |
| **Ctrm.:** | **3 - 5th Floor** |
| **Judge:** | **Hon. Beth Labson Freeman** |

**Robert F. Peckham Federal Building & United States Courthouse**
**280 South 1st Street**
**San Jose, CA 95113**

Baker & McKenzie LLP
10250 Constellation Blvd.,
Suite 1850
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.  5:20-cv-03901-BLF
DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND RELIEF REQUESTED ................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ....................................................................... 1

I.   INTRODUCTION ................................................................................................. 2

II.  ALLEGED FACTS ............................................................................................... 4

    A.   Google Manages the Play Store Platform to Permit Downloads of Third-Party Apps  4

    B.   Plaintiffs Download Two Skill-Based Video Games From the Play Store ................. 6

    C.   Google Does Not Create or Sell the Loot Boxes Plaintiffs Allegedly Acquired to Enhance Their Enjoyment of Third-Party Video Games ............................................... 7

    D.   Plaintiffs Rely on Academic Theory and Regulatory Debate To Try To Impose *Legal* Liability on Google for the Content of Third-Party Video Games ............................. 8

    E.   Plaintiffs' Claims Seek To Require Google To Monitor Content-Based Developer Activity in the Play Store and To Recover the Value of Alleged Gambling Losses .... 9

III. ARGUMENT ..................................................................................................... 10

    A.   Despite a Spate of New Conclusory Allegations, Plaintiffs' Factual Allegations Confirm That Section 230 Protects Google From the Claims in the FAC ................. 10

        1.   *Plaintiffs offer mere legal conclusions instead of pleading facts* ................. 10

        2.   *Plaintiffs' attempts to re-characterize old allegations cannot avoid application of Section 230* ............................................................................. 12

        3.   *Plaintiffs' new factual allegations describe Google providing content neutral tools and exercising a platform-wide editorial function for all third-party developers* ................................................................................................ 12

        4.   *The FAC confirms that Google is still entitled to Section 230 protections* .... 14

            a.   Google is still an interactive computer service ................................... 14

            b.   Plaintiffs are still seeking to treat Google as a publisher of third-party content .......................................................................................... 14

            c.   The loot box content at issue was created by third-party app developers, not by Google ........................................................... 17

    B.   Plaintiffs Still Fail To State Plausible Claims for Relief Under the UCL and CLRA 17

        1.   *Plaintiffs cannot solve the fundamental problem that they lack statutory standing* ........................................................................................................ 17

            a.   Plaintiffs allege no economic loss from purchasing virtual currency on set terms ...................................................................................... 18

            b.   Plaintiffs fail to attribute any alleged loss of virtual currency to Google ......................................................................................................... 19

        2.   *Plaintiffs fail to state plausible UCL claims against Google* ........................ 19

            a.   Loot Boxes do not violate California or federal gambling laws ......... 19

                (1)   *California prohibits civil recovery for alleged gambling losses* ................................................................................... 20

                (2)   *Loot boxes do not dispense "thing[s] of value"* ................... 20

Baker & McKenzie LLP
10250 Constellation Blvd.,
Suite 1850
Los Angeles, CA  90067
Tel: 310.201.4728

i

DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

(3)  The loot boxes at issue are seamlessly incorporated into games predominantly of skill ................................................................ 22

b.  Loot Boxes Do Not Provide a Basis for a UCL Unfair Practices Claim ................................................................................................. 23

3.  Plaintiffs have failed to salvage their CLRA cause of action ....................... 24

C.  Plaintiffs Fail to State a Claim for Unjust Enrichment ............................................. 24

IV.  CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alves v. Players Edge, Inc.*,
  No. 05CV1654 WQH (CAB), 2007 WL 6004919 (S.D. Cal. Aug. 8, 2007) ...............................20

*Balzer v. Wal-Mart Stores, Inc.*,
  No. CV 14-9779-JFW, 2015 WL 13828418 (C.D. Cal. Feb. 25, 2015).....................................25

*Barnes v. Yahoo! Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ..........................................................................................10, 14

*Blum v. Caldwell*,
  446 U.S. 1311 (1980).................................................................................................................22

*Duncan v. Walker*,
  533 U.S. 167 (2001)...................................................................................................................22

*Evans v. Hewlett-Packard Co.*,
  No. C 13-02477 WHA, 2013 WL 5594717 (N.D. Cal. Oct. 10, 2013)..................................11, 13

*Goddard v. Google, Inc.*,
  No. C 08-2738 JF (PVT), 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)...................................19

*HomeAway.com v. City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2018) ......................................................................................15, 16, 17

*Kater v. Churchill Downs Inc.*,
  886 F.3d 784 (9th Cir. 2018) .....................................................................................................21

*Kelly v. First Astri Corp.*,
  72 Cal. App. 4th 462 (1999) ............................................................................................2, 4, 20

*Letizia v. Facebook Inc.*,
  267 F. Supp. 3d 1235 (N.D. Cal. 2017) ....................................................................................25

*Mason v. Mach. Zone, Inc.*,
  140 F. Supp. 3d 457 (D. Md. 2015)..............................................................................8, 20, 23

*Merandette v. City & Cty. of S.F.*,
  88 Cal. App. 3d 105 (1979) .......................................................................................................22

*Peterson v. Cellco P'ship*,
  164 Cal. App. 4th 1583 (2008) ..................................................................................................25

*Phillips v. Double Down Interactive LLC*,
  173 F. Supp. 3d 731 (N.D. Ill. 2016) ........................................................................................23

*Ristic v. Mach. Zone, Inc.*,
  No. 15-cv-8996, 2016 WL 4987943 (N.D. Ill. Sep. 19, 2016) ..................................................23

*Rizo v. Yovino*,
  950 F.3d 1217 (9th Cir. 2020) ..................................................................................................21

*Soto v. Sky Union, LLC*,
  159 F. Supp. 3d 871 (N.D. Ill. 2016) ...............................................................................9, 20, 21

*Taylor v. Apple*,
  No. 20-cv-03906-RS (N.D. Cal. Mar. 19, 2021) .......................................................................16

*West v. Palo Alto Hous. Corp.*,
  No. 17-CV-00238-LHK, 2019 WL 2549218 (N.D. Cal. June 20, 2019) ....................................24

**Statutes / Other Authorities**

18 U.S.C. § 1955 ..............................................................................................................................20

31 U.S.C. § 5361-5367 ....................................................................................................................20

47 U.S.C. § 230 (2018) ............................................................................................................ *passim*

Cal. Bus. & Prof. Code § 17200 *et seq.* ................................................................................. *passim*

Cal. Bus. & Prof. Code § 19800, *et seq.* .........................................................................................20

Cal. Consumers Legal Remedies Act ...................................................................................... *passim*

Cal. Civ. Code § 1761 ........................................................................................................................1

Cal. Civ. Code § 1770(a)(14) ...........................................................................................................20

Cal. Pen. Code § 330.2 .....................................................................................................................22

Cal. Pen. Code § 330a(a) ...........................................................................................................20, 21

Cal. Pen. Code § 330b(f) .....................................................................................................20, 22, 23

Cal. Pen. Code § 337j(a)(1)-(3) .......................................................................................................20

Federal Rule of Civil Procedure 12(b)(6) ..........................................................................................1

## NOTICE OF MOTION AND RELIEF REQUESTED

PLEASE TAKE NOTICE ON **July 15, 2021 at 9:00 a.m.**, or as soon thereafter as the matter can be heard, in Courtroom 3 - 5th Floor of the United States District Courthouse located at 280 South 1st Street, San Jose, California 95113, Defendant Google LLC ("Google") will and does move the Court for an order dismissing the First, Second, Third, and Fourth Causes of Action in the First Amended Complaint (ECF No. 59) of Plaintiffs John Coffee, Mei-Ling Montanez, and S.M., a minor by Mei-Ling Montanez (collectively, "Plaintiffs") under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief may be granted.  Google's Motion to Dismiss is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Proposed Order, and any oral argument as may be presented at the hearing, all other papers, records, and pleadings on file in this action, and on such additional evidence and argument as the Court may allow prior to and during the hearing on this motion.

***Relief Requested***: Google respectfully requests that the Court issue an order dismissing with prejudice the First Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state any claim upon which relief may be granted and terminating this action.

## STATEMENT OF ISSUES TO BE DECIDED

1.  Whether Plaintiffs' four state law causes of action are still barred under section 230 of the Communications Decency Act, 47 U.S.C. § 230 (2018).

2.  Whether Plaintiffs continue to lack statutory standing under California's Unfair Competition Law, Cal. Bus. & Profs. Code §§ 17200 *et seq.* ("UCL"), and Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA").

3.  Whether Plaintiffs have failed to allege unlawful or unfair conduct by Google under the UCL (Cal. Bus. & Profs. Code §§ 17200 *et seq.*).

4.  Whether Plaintiffs have failed to allege the purchase of "goods" or "services" from Google as those terms are defined under the CLRA (Cal. Civ. Code § 1761).

5.  Whether Plaintiffs have failed to allege a plausible claim for unjust enrichment.

Baker & McKenzie LLP
10250 Constellation Blvd.,
Suite 1850
Los Angeles, CA  90067
Tel: 310.201.4728

1                                    Case No.  5:20-cv-03901-BLF
DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

## I.    INTRODUCTION

At the hearing granting Google LLC's motion to dismiss Plaintiffs John Coffee, Mei-Ling Montanez, and S.M.'s original Complaint, Plaintiffs' counsel admitted that they have filed this lawsuit to convince the Court to declare currently lawful video game content as *criminal* based on recently-published social science research.  The Court responded that there is "a big difference between something that should be deemed illegal [by] a legislature . . . versus whether it is under existing law," and that the Court "live[s] in the realm of existing law."  (ECF No. 55 (Tr. of Oral Arg.) at 34:7-11.)  The Court subsequently directed Plaintiffs to address fundamental threshold defects in their pleading requiring dismissal of all claims without having to resolve any public policy issues.

In granting Plaintiffs leave to amend, the Court set a high bar: the problems identified in the Court's order granting the motion to dismiss (ECF No. 56 ("Dismissal Order")) are fundamental realities of both "existing law" and the basic structure of Google's platform vis-à-vis third party content developers.  It is perhaps no surprise, then, that Plaintiffs have failed in this essentially impossible task.  While they have doubled the size of their complaint, they do so primarily with more of the same normative social science research that the Court already indicated has little, if any, relevance to resolving the legal claims at issue.  Plaintiffs *purge* from their pleading many of the inconvenient allegations which the Court ordered them to specifically address through amendment.  They then proceed to rely on generic legal conclusions to try and impute conduct of third parties to Google.  The result is a meandering pleading that reveals the following persistent structural defects mandating dismissal, this time with prejudice.

*First*, nothing in the First Amended Complaint ("FAC") affects Google's entitlement to Section 230 protections.  The Court found that Plaintiffs had failed to allege facts showing how Google supposedly "facilitates" alleged illegal gambling.  (Dismissal Order at 14:25-27.)  The FAC now includes the word "facilitates" more than a dozen times, but provides no *facts* to establish any actual "facilitation," only generic legal conclusions.  Plaintiffs similarly attempt to ascribe third party conduct to Google by alleging that Google acts "in concert with" these parties, but again offer no factual support.  The FAC further declines the Court's express invitation to offer *facts* to support Plaintiffs' accusation that Google engages in a "predatory Loot Box scheme."  Instead, the FAC confirms that

the term is simply taken from the title of an academic paper attacking the conduct and content of *third parties*, not a passive platform provider like Google.  What few new fact allegations Plaintiffs *can* muster about Google's operation of its Play Store platform fall squarely within the categories of "neutral tools" to facilitate third party content development, and "editorial parameters" for managing a popular interactive computer service, both of which are protected by Section 230.  Ultimately, Plaintiffs concede that their *own theory* about why loot boxes supposedly constitute illegal gambling is based on purely in-app mechanics: "consideration, chance, and the possibility to win prizes of value."  (FAC ¶ 48.)  Plaintiffs allege no conduct by Google that "materially contributes" to this purported content-based illegality of loot boxes.  The Court should therefore reaffirm its prior conclusion and dismiss this action.

**Second**, Plaintiffs still establish no statutory standing to sue Google for their interactions with third party game developers under California's Unfair Competition Law or Consumer Legal Remedies Act.  In dismissing Plaintiffs' initial complaint, the Court held that any amended pleading "must address the fact that players can choose to 'spend' virtual currency on a variety of game items other than Loot Boxes, and that Google does not appear to have any role in those choices." (Dismissal Order at 19:2-4.)  Despite this express instruction, the FAC makes no effort to remedy this defect.  Instead, Plaintiffs have "addressed" the issue primarily by attempting to delete from their pleading any mention of these inconvenient facts.  But this effort is in vain, as Plaintiffs' new allegations make clear that third party developers, not Google, are solely responsible for creating the various "audio-visual effects" and other circumstances that purportedly induce players to use virtual currency for loot boxes instead of other in-game items.  In short, the FAC again confirms that Plaintiffs' only economic transaction involving Google was the purchase of virtual currency from developers using Google's payment processing tool.  Plaintiffs do not allege this sale to be illegal.  Nor do Plaintiffs claim they ever received less virtual currency than was promised, or that Google misrepresented anything concerning this transaction.  The result is that Plaintiffs' UCL and CLRA claims still fail for lack of standing, and their unjust enrichment claim fails on its merits given that Plaintiffs received the exact amount of virtual currency promised.

**Third**, Plaintiffs still rely on an untenable statutory interpretation to support their claim that

loot boxes in skill-based video games constitute illegal gambling.  The key statutory requirement at issue—that the games dispense "thing[s] of value"—refers to real-world, transferrable value.  Every court to have considered and resolved the issue has generally agreed with this interpretation.  Plaintiffs' alternative theory—that various subjective forms of "symbolic," "aesthetic," or "social" value should suffice—would (i) effectively read a key requirement out of this criminal liability statute entirely, (ii) violate the interpretive principle of *ejusdem generis*, and (iii) short-circuit the current *legislative* process described in the FAC to *consider* whether and to what extent to regulate loot boxes.  Moreover, even accepting Plaintiffs' theory, California has a "strong, broad, and long-standing public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions." *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 477 (1999).  So even if the Plaintiffs' tortured interpretation of the California Penal Code were accepted, the Court would have to dismiss their attempts to obtain restitution or money damages as contrary to firmly-established public policy.

For all of these reasons, and those set forth below, the Court should once again dismiss Plaintiffs' complaint, but this time without leave to amend.

## II.   ALLEGED FACTS

### A.   Google Manages the Play Store Platform to Permit Downloads of Third-Party Apps

Google has created the Android operating system, which Plaintiffs allege is installed on approximately one billion smartphones and other electronic devices.  (FAC ¶ 19.)  Various developers have created content, generally called "apps," to run on Android.  (*See id.* ¶¶ 18, 20.)  Android users access those third-party apps by downloading them through Google's Play Store.  (*Id.* ¶ 19.)

Google provides an array of content-neutral tools and resources to assist third party developers in posting their content to the Play Store.  Google and the developers are parties to a Developer Distribution Agreement.  (*Id.* ¶ 24.)  The Agreement makes clear that the Play Store is a platform on which third parties distribute their products to end users such as Plaintiffs.  (*See id.* ¶¶ 24-25.)  Google's role is limited to providing a "marketplace service" and acting as agent and "Merchant of Record" in processing in-app transactions between players and the developers.  (*Id.* ¶¶ 24, 27.)

Google also provides developers a "Software Development Kit."  (*Id.* ¶ 32.)  This Software

Development Kit contains no tools specific to the so-called "loot box" mechanisms with which Plaintiffs take issue in the FAC.  Instead, as Plaintiffs themselves allege, it is used in *all games* appearing on the Google Play Store.  (*Id.* ¶ 33.)  The Software Development Kit contains a payment processing mechanism used to process *all purchases* made in developers' apps, enables various analytics services to give developers insight into users' activity within their apps, and facilitates service of advertising content.  (*Id.* ¶¶ 32-33.)

Google offers app developers resources and suggestions for displaying and selling ads, offering subscription services, and selling digital or physical goods and services within apps.  (*Id.* ¶ 213.) Again, these resources are not specific to loot boxes; indeed, they are not specific even to game apps, but instead apply to any of the almost 3 million apps that are available for download on the Google Play Store.  (*See id.* ¶¶ 20, 213.)

Like any other mature interactive computer service, Google also imposes various editorial parameters regarding the third-party content that appears in the Play Store.  For example, Google's Developer Program Policy prohibits app developers from including games that allow players to wager for the chance to win prizes of "real world monetary value."  (*Id.* ¶ 35.)  For apps that offer players the option to access "mechanisms to receive randomized virtual items"—generally referred to as "loot boxes"—Google requires developers to disclose the odds of receiving those virtual items.  (*Id.* ¶ 36.) Google requires this disclosure because the developers, not Google, are solely responsible for actually *setting* these odds.  (*See, e.g., id.* ¶ 69 (noting that the developers of the game Brawl Stars use an algorithm to set odds).)  The developers likewise solely control the "scarcity" of loot box items, including whether to describe the items as "Common," "Rare," "Epic," and "Legendary."  (*Id.* ¶ 101.)

Google further requires developers to make certain "parental disclosures" about the content appearing in their games.  (*Id.* ¶ 37.)  This includes industry-standard Entertainment Software Ratings Board ("ESRB") game ratings, which provide "information about what's in a game or app so parents and consumers can make informed choices about which games are right for their family."  (*Id.* ¶¶ 38-39.)  Finally, the Google Play Terms of Service prohibit the sale or transfer of any in-app content, including loot box items.  (*See* Dismissal Order at 6:25-57 (granting request for judicial notice of

DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    Google Play Terms of Service § 4[1]).)

2        **B.    Plaintiffs Download Two Skill-Based Video Games From the Play Store**

3        Although the FAC describes multiple video games available for download through the Play

4    Store, only two are alleged to have been played by Plaintiffs: Final Fantasy Brave Exvius ("Final

5    Fantasy") and Dragon Ball Z Dokkan Battle ("Dokkan Battle").  (FAC ¶¶ 11-12; *see also* Dismissal

6    Order at 2:11-16 (limiting analysis to games actually allegedly played by named plaintiffs).)

7        Final Fantasy is free to download and play.  (FAC ¶ 70.)  It is a role-playing video game,

8    meaning that players assume the role of various characters, and then control those characters through

9    a series of stages.  (*Id.*)  During gameplay, players have the option, but *not* the obligation, to obtain a

10   "Summons," which Plaintiffs characterize as a loot box.  (*Id.* ¶ 71.)  A Summons offers the chance to

11   obtain "new and better characters" to facilitate players' progress through this skill-based game.  (*Id.*)

12   A player may access a Summons with virtual currency known as "Lapis Crystals."  (*Id.*)  A player

13   receives Lapis Crystals for free simply by making progress in the game.  (*Id.* ¶ 72.)  Alternatively, a

14   player may choose to purchase a specific amount of Lapis Crystals for a specific amount of money.

15   (*Id.* ¶ 71.)  After receiving the virtual currency, players may choose to acquire any number of in-game

16   items offered by the developer, of which a Summons is simply one option among many.  (*See, e.g.*,

17   *id.* ¶ 118 (acknowledging the existence of "other types of microtransactions" in video games).)

18       Similarly, Dokkan Battle is a free-to-play game "made up of levels that play like a board game

19   . . . ."  (*Id.* ¶¶ 75, 77.)  During gameplay a player has the option, but never the obligation, to access a

20   "Summons," which Plaintiffs again characterize as a loot box.  (*Id.* ¶¶ 76, 78.)  A Summons dispenses

21   "rewards and characters" that are useful only to help progress through Dokkan Battle's skill-based

22   gameplay.  (*Id.* ¶ 77.)  Players may obtain a Summons using virtual currency called dragon stones.

23   (*Id.* ¶ 76.)  Plaintiffs initially alleged that dragon stones could be acquired for free through normal

24   gameplay.  (ECF No. 1 (Compl.) ¶ 74.)  While they have deleted this allegation in their amended

25   pleading, the FAC alleges nothing to the contrary.  Instead, Plaintiffs note that players may *also*

26   purchase dragon stones on set pricing terms.  (FAC ¶ 76.)

27

28   _____

[1] *See* https://play.google.com/intl/en-US_us/about/play-terms/index.html.

1

2

**C.      Google Does Not Create or Sell the Loot Boxes Plaintiffs Allegedly Acquired to Enhance Their Enjoyment of Third-Party Video Games**

3      Google does not create the video games or the loot box mechanisms which Plaintiffs accessed

4   through the Google Play Store platform.  (*Id.* ¶ 9.)  The loot boxes at issue here are in-app items

5   integrated into and *offered within* skill-based video games.  (*Id.* ¶¶ 42-43.)  They do not dispense items

6   bearing any "real world monetary value."  (*See id.* ¶ 35.)  Instead, loot boxes merely provide "in game

7   item[s] or feature[s] designed or perceived to enhance gameplay or provide competitive advantage"

8   within the game.  (*Id.* ¶ 1.)  Critically, Plaintiffs allege that ***three things*** equate loot boxes to gambling:

9   consideration, chance, and the possibility to win prizes of value.  (*Id.* ¶ 48.)  Each of those alleged

10   game features is created solely by the developer, with no participation at all by Google.

11      Because both Final Fantasy and Dokkan Battle are free to play, Plaintiffs could progress

12   through their various skill-based stages without ever accessing a Summons.  (*See id.* ¶¶ 70, 75.)  If

13   they wanted a Summons, Plaintiffs had two options.  First, they could accrue sufficient virtual currency

14   for free in-game (*see, e.g.*, *id.* ¶¶ 72, 90), and then use that freely-acquired virtual currency to access

15   a Summons.  Second, they could use the Play Store's payment system to purchase virtual currency

16   from the app developer.  (*See id.* ¶¶ 11, 13.)  Google takes a commission for such services.  (*Id.* ¶ 29.)

17      Both Plaintiffs appear to have made the choice to purchase virtual currency from app

18   developers using Google's content-neutral payment processing service.  (*Id.* ¶¶ 11, 13.)  In doing so,

19   they received exactly as much virtual currency—dragon stones or Lapis Crystals—as was promised.

20   They do not claim that they relied upon any representations by Google concerning these purchases of

21   virtual currency.  Plaintiffs instead allege that the *name* of the virtual currency can induce its purchase.

22   (*Id.* ¶ 88.)  But Google does not create video game content (*id.* ¶ 9), and Plaintiffs allege no facts

23   suggesting that Google has any involvement in how developers choose to name virtual currency.

24      Plaintiffs then appear to have chosen to use virtual currency to obtain in-app items offered by

25   developers, including Summonses.  (*Id.* ¶¶ 11, 13.)  They allege no facts indicating that Google had

26   any role in these subsequent transactions, which took place exclusively between Plaintiffs and the

27   third-party video game developers.  Plaintiffs' allegations instead confirm the opposite: they were

28   induced to use their virtual currency for loot boxes instead of other in-app purchase options because

the process of acquiring a loot box involves various "audio-visual effects," including "triumphant music," and "bright lights and colors," all created by the game developers, not Google.  (*Id.* ¶¶ 94, 110.)

### D.   Plaintiffs Rely on Academic Theory and Regulatory Debate To Try To Impose *Legal* Liability on Google for the Content of Third-Party Video Games

Plaintiffs still offer very limited facts about their own gameplay experience.  Instead, they argue, in essence, that the Court should amend U.S. gambling laws based on social science research and ongoing public policy debates in Europe and Asia.  This approach, which underlay both Plaintiffs' original pleading and now their FAC, suffers in several important respects.

First, in their efforts to compare loot boxes to gambling, Plaintiffs charge Google with operating as a casino.  (FAC ¶ 7.)  Eschewing any specific fact allegations, Plaintiffs rely on social science literature revealing this conclusory analogy to be wholly inapt.  For instance, Plaintiffs allege that casinos harm players through the concept of "losses disguised as wins'" when they offer "'complementary' [sic] food, drinks, and accommodations." (*Id.* ¶ 103.)  Yet Plaintiffs nowhere claim that Google ever provides free food, drinks, accommodations, or anything else to encourage players to download content through its Play Store platform.

Plaintiffs also allege that virtual currency purchases are equivalent to how a "casino exchanges cash for chips." (*Id.* ¶ 88.)  They cite an academic paper opining that there are "no differences" between virtual currency in video games and U.S. Dollars. (*Id.* ¶ 92.)  This only underscores the folly of relying on *academic* theories to try to establish *legal* liability for potential violations of state criminal statutes.  California law does not treat dragon stones the same as U.S. dollars.  While declaring both to be forms of "fiat currency" may provide for intriguing academic debate (*see id.*), it does nothing to satisfy Plaintiffs' legal burdens in this case.  Moreover, as courts have acknowledged, the equivalence is false in key respects: casino chips can be freely exchanged for cash, and vice versa; but virtual currency, once purchased, may never be converted back into anything of real world monetary value.  *See, e.g.*, *Mason v. Mach. Zone, Inc.*, 140 F. Supp. 3d 457, 465 (D. Md. 2015) (noting that virtual currency cannot be "cashed out").

Plaintiffs next allege various academic theories why loot box items have some "value," but

these are all inherently subjective formulations: "value com[ing] from a customer's preferences, evaluations and perceptions" (FAC ¶ 147); "symbolic value of a virtual good stems from its role and meaning inside the game" (*id.* ¶ 148); "aesthetic" or "cosmetic" value (*id.* ¶¶ 149, 162, 164); "social value" (*id.* ¶¶ 150, 164); "subjective[] value" (*id.* ¶¶ 151-52); "hedonic reward and arousal . . . despite loot boxes not conferring any real-world monetary worth" (*id.* ¶¶ 153, 164); "value using numerous economic theories" (*id.* ¶ 154); "value to the player . . . from a psychological perspective" (*id.* ¶ 161); "functional" value (*id.*¶ 162); or "personaliz[ation]" value (*id.* ¶¶ 163, 164). Missing entirely is that which the California Penal Code requires: *real-world transferable* value. *See Soto v. Sky Union, LLC*, 159 F. Supp. 3d 871, 880 (N.D. Ill. 2016) (interpreting statutory phrase "thing of value" to refer to an item with "measurable worth").

Finally, Plaintiffs allege that regulators and legislatures—not courts—in other countries have regulated or are considering regulating loot boxes in video games. (*Id.* ¶¶ 126-136.) The basic inference underlying this discussion is that loot boxes are not currently illegal under U.S. law. (*See, e.g.*, *id.* ¶ 136 (describing proposed federal legislation to regulate loot boxes in certain video games).) Even the discussion of the Court of the Hague's October 2020 ruling is misleading for the present circumstances: the Hague Court did not determine in the first instance based solely on allegations in a legal complaint that certain video game mechanics violated Dutch gambling laws. Instead, the appropriate government regulator—the Dutch Gaming Authority—made that policy determination concerning a video game which Plaintiffs do not even allege they ever played. (*See id.* ¶ 138.)

### E. Plaintiffs' Claims Seek To Require Google To Monitor Content-Based Developer Activity in the Play Store and To Recover the Value of Alleged Gambling Losses

Plaintiffs again seek recovery under California's Unfair Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), and for common law unjust enrichment. (FAC ¶¶ 178-229.) Their primary request for monetary relief is to recover money allegedly spent to purchase virtual currency, which was ultimately used to obtain a Summons in Final Fantasy or Dokkan Battle. (*Id.* ¶¶ 186 (seeking "restitution of any money paid to purchase loot boxes"), 206, 219, 228.) As for injunctive relief, Plaintiffs ask the Court to require Google to do exactly what Section 230 proscribes: to monitor the content of every game in the entire Google Play Store and prevent the sale of virtual currency if

Google somehow suspects that the virtual currency may subsequently be used to acquire a loot box. (*See id.* ¶¶ 186 (seeking injunction to prohibit Google from "facilitat[ing]. . . the sale of in-game currency for loot boxes"), 206 (same).)

## III. ARGUMENT

### A. Despite a Spate of New Conclusory Allegations, Plaintiffs' Factual Allegations Confirm That Section 230 Protects Google From the Claims in the FAC

In its Dismissal Order, the Court set out the legal principles governing the application of Section 230 of the Communications Decency Act to Plaintiffs' claims against Google, including the three-factor test described by the Ninth Circuit in *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009). (Dismissal Order at 7:15-8:28.) The Court then confirmed that Section 230 was a complete affirmative defense to Plaintiffs' claims. (*Id.* at 14:2-3.) In reaching this conclusion, the Court fully considered and found insufficient the same general facts that Plaintiffs now assert for a second time: that Google (i) maintains "entire control" over in-app payment processing services in exchange for a commission (*id.* at 3:14-19), (ii) requires developers to disclose odds for obtaining virtual loot box items as well as industry standard ESRB game ratings (*id.* at 13:8-21), and (iii) does not specifically require developers to disclose that games contain loot box mechanisms (*id.* at 13:21-25).

The Court offered Plaintiffs leave to amend to show that "Google's conduct goes beyond the mere publishing of third party content," or to "allege more facts to support" Plaintiffs' characterization that Google is supposedly engaged in a "predatory Loot Box scheme." (*Id.* at 14:17-20.) For the reasons stated below, Plaintiffs have failed to satisfy their burden to avoid application of Section 230.

#### 1. *Plaintiffs offer mere legal conclusions instead of pleading facts*

Plaintiffs' first attempt to plead around Section 230 is simply to pepper their amended pleading with vague accusations—untethered to or even contradicted by their alleged facts—that Google is somehow more than a passive platform provider of *third-party content*. In response to the Court's concern that the terms "permitting" and "facilitating" did not appear in the original Complaint (*id.* at 12:7-8), Plaintiffs now baldly allege that Google "permit[s], control[s], and develop[s] loot boxes" (FAC ¶¶ 4, 6), "permits, promotes, facilitates, and profits off gambling" (*id.* ¶ 7), and "permits, encourages, and directs developers to place loot boxes in every category of game offered through the

Google Play Store" (*id.* ¶ 47), among other similar formulations.  At other times, Plaintiffs attempt to ascribe solely third-party developer conduct to Google with general claims that Google is acting "in concert" (FAC ¶¶ 1, 4, 22) or "hand-in-glove" (FAC ¶ 9) with the video game developers.

Google submits that this is not what the Court had in mind when it directed Plaintiffs to "allege more facts" to show why Section 230 does not foreclose Plaintiffs' claims.  (Dismissal Order at 14:17-20.)  At no time do Plaintiffs allege any factual details of *how* Google "facilitates" or "encourages" game development, or *what* direction is purportedly provided.  Indeed, these generic legal conclusions bear striking similarity to those rejected in *Evans v. Hewlett-Packard Co.*, No. C 13-02477 WHA, 2013 WL 5594717 (N.D. Cal. Oct. 10, 2013), on which the Court relied in dismissing Plaintiffs' original complaint on Section 230 grounds.  (*See* Dismissal Order at 10:20-11:5.)  In *Evans*, Judge Alsup denied the plaintiffs leave to amend their pleading to avoid Section 230 where the proposed amendment relied on conclusory allegations that the interactive computer service "defendants 'created, designed, developed and [sic] transformed' parts of advertisement content and 'assisted in the development, distribution, naming, endorsement and [sic] sale' of the app" at issue.  *Evans*, 2013 WL 5594717 at *3.  The Court should likewise conclude that simply including the terms "facilitating" or "permitting" among a laundry list of legal conclusions cannot plead around Section 230.

The Court also directed Plaintiffs to plead facts in support of their bold (and baseless) claim that Google is engaged in a "predatory Loot Box scheme."  (Dismissal Order at 14:18-19.)  But the FAC confirms that Plaintiffs have no such facts: this phrase instead comes from the title of one of the academic papers on which Plaintiffs have primarily rested their liability claims against Google.  As Plaintiffs further concede, "[a]ccording to psychologists, *loot boxes* are a 'predatory monetization scheme.'" (FAC ¶ 198 (emphasis added).)  But Plaintiffs readily admit that third parties, not Google, create loot boxes.  (*Id.* ¶ 9.)  Moreover, the psychologists' description about alleged harm from loot boxes—including the odds of obtaining a "desirable item" and a "randomly determined outcome" (*id.* ¶ 87)—are matters created and controlled entirely by the developers.  (*See, e.g.*, *id.* ¶ 36 (noting that developers must disclose *their chosen* odds).)  Plaintiffs cannot avoid Section 230 on this purely conclusory basis.

**2.** ***Plaintiffs' attempts to re-characterize old allegations cannot avoid application of Section 230***

Plaintiffs also attempt to recast their earlier allegations, already rejected by the Court as a basis to avoid Section 230, with new conclusory labels and unreasonable inferences.  For example, Plaintiffs again allege that Google requires developers to publish the Entertainment Software Ratings Board ratings for games posted to the Play Store.  (FAC ¶ 38.)  Because these ESRB ratings do not require specific disclosures about loot boxes, Plaintiffs now allege that Google somehow "*effectively* prohibits game developers from making disclosures about loot boxes." (*Id.* ¶ 40 (emphasis added).)  Plaintiffs' logic is nonsensical: requiring one type of disclosure does not preclude developers from providing players with *other* accurate information about the content of their video games.

Plaintiffs have gotten the Court's order backwards.  The Court did not ask Plaintiffs to manufacture new characterizations about previously-alleged facts; it permitted Plaintiffs to try to allege new *facts* to support its conclusory characterizations.  (*See* Dismissal Order at 14:19-20.)  Plaintiffs' attempts to apply new erroneous spins on previous insufficient pleadings cannot force a different conclusion regarding application of Section 230 to this case.

**3.** ***Plaintiffs' new factual allegations describe Google providing content neutral tools and exercising a platform-wide editorial function for all third-party developers***

Where Plaintiffs *have* actually augmented their factual allegations against Google, they confirm the Court's prior conclusion that Google is protected by Section 230.

Plaintiffs first allege Google's provision of neutral tools to facilitate third parties' creation of web content.  The Court has already concluded that "providing third parties with neutral tools to create web content is considered to be squarely within the protections of § 230." (Dismissal Order at 14:8-9 (quoting *Goddard v. Google, Inc.*, No. C 08-2738 JF (PVT), 2008 WL 5245490, at *5 (N.D. Cal. Dec. 17, 2008)).)  Thus, Google's alleged provision of software development kits and other content-neutral resources and suggestions to developers of the almost 3 million apps that are available for download on the Play Store actually *supports* application of Section 230.  (*See* FAC ¶¶ 32, 213.)  Plaintiffs' description of the Developer Distribution Agreement between Google and *all* third parties who post content to the Play Store similarly makes clear that Google's role is limited to providing a

DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

"marketplace service"—*i.e.*, an internet platform—and acting as agent and "Merchant of Record" in processing in-app transactions between players and the developers, conduct this Court has already held to fall under the protections of Section 230. (*Id.* ¶¶ 24, 27; Dismissal Order at 14:6-16.)

Plaintiffs also add allegations about Google's exercise of traditional editorial functions in managing the Play Store, including that Google's Developer Program Policy prohibits app developers from including games that allow players to wager for the chance to win prizes of "real world monetary value" (*id.* ¶ 35) and that Google requires developers to make certain "parental disclosures" about the content appearing in their games (*id.* ¶ 37). Neither of these circumstances amounts to content creation or otherwise calls into question application of Section 230 to bar Plaintiffs' claims.

Again, the *Evans* case is highly instructive. There, the plaintiffs alleged "26 ways"—literally (a) to (z)—"in which defendants exercised control over the app," including mandating specific content, technical criteria, and nomenclature. *Evans*, 2013 WL 5594717, at *4. But such pleading could not salvage a claim otherwise barred by Section 230: these requirements were not specific to the allegedly illegal content at issue, but instead applied *across the platform*. As a result, the court reached the commonsense conclusion that "[t]he third party still provided the published content and [the internet platform] *defendants only provided the editorial parameters*." *Id.* (emphasis added). As this logic applies with equal force to Plaintiffs' new allegations regarding Google's *platform-wide* developer policies and resources, the Court should once again find that Section 230 applies.

Finally, Plaintiffs attempt to overcome Section 230 by reference to a generic statement in the Developer Program Policy about "shared success" in "deliver[ing] the world's most innovative and trusted apps to over a billion people through Google Play." (FAC ¶ 31.) Again, the scope of the statement—delivering apps to more than one billion people—confirms that it has nothing specifically to do with loot box content, but instead with all apps available for download in the Play Store. Moreover, just as Judge Alsup found in similar circumstances, even if "[d]efendants were working 'together' with the content developer to sell apps *in a loose sense*, [they] were not jointly engaged in development of the content." *Evans*, 2013 WL 5594717, at *4 (emphasis added). Plaintiffs' amended pleading fails to carry its burden to warrant revisiting the Court's prior ruling on Section 230.

#### 4. *The FAC confirms that Google is still entitled to Section 230 protections*

Plaintiffs' new legal conclusions and few alleged facts still come nowhere near to creating even a "close case" about application of Section 230. (*See* Dismissal Order at 14:12-16 (citing *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) that close cases should be decided in favor of applying Section 230).)   The Court may therefore confirm its earlier analysis under the governing test in *Barnes*: Plaintiffs' claims are barred because they involve "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." (Dismissal Order at 8:24-27 (internal quotations and citations omitted).)

##### a. Google is still an interactive computer service

Google is an interactive computer service because Plaintiffs continue to allege that the Google Play Store "features over 2.9 million apps," including "thousands of game apps which can be downloaded . . . ." (FAC ¶¶ 20-21.)   Plaintiffs further concede (as they must) that these game apps are created not by Google, but instead by various third party "game developers." (*See, e.g.*, *id.* ¶¶ 9, 24.)   The Court may therefore conclude once again that Google meets the definition of interactive computer service. (*See* Dismissal Order at 9:10-18 (noting that "Plaintiffs do not dispute Google's status as an interactive computer service provider").)

##### b. Plaintiffs are still seeking to treat Google as a publisher of third-party content

Despite the conclusory gloss Plaintiffs apply to their amended pleading, they still inherently seek to hold Google liable for publishing on its platform certain video game content which Plaintiffs ask this Court to declare for the first time to be illegal.   Plaintiffs' theory of Google's "permitting" or "promoting" loot box content can be boiled down to allowing certain video games to be made available for download in the Play Store. (*See* FAC ¶ 7.)   And their theory of "facilitating" gambling involves nothing more than providing various content-neutral tools—including a Software Development Kit (*id.* ¶¶ 32-33), app design resources (*id.* ¶ 213), and a payment processing service (*id.* ¶ 29)—that apply to *all* third-party content offered in the Google Play Store, not just alleged "loot box" games.

As the Court has already determined, "providing third parties with neutral tools to create web content is considered to be squarely within the protections of § 230. [citation omitted].  Moreover, even if a service provider knows that third parties are using such tools to create illegal content, the service's provider's failure to intervene is immunized."  (Dismissal Order at 14:8-11 (quoting *Goddard*, 2008 WL 5245490, at *3) (internal quotations omitted).)  Plaintiffs have added no new facts about Google's *own* conduct that would alter the Court's previous analysis.

Plaintiffs also continue to seek injunctive relief that would require Google to monitor the Play Store and prevent the sale of virtual currency if Google suspects that the virtual currency may be used to acquire a loot box.  (*See* FAC ¶¶ 186, 206.)  The Court previously found this type of relief would compel Google to act "squarely within [its] role of a publisher under *Roommates*," thereby triggering Section 230.  (Dismissal Order at 10:14-17.)

Plaintiffs further confirm their intention to treat Google as a publisher of third party content by seeking "restitution of any money paid to purchase loot boxes."  (*See* FAC ¶¶ 186, 206*.*)  The FAC concedes that loot boxes are obtained with virtual currency, not money.  (*See id.* ¶¶ 11, 13.)  Plaintiffs therefore appear to be asking the Court to require Google to somehow trace past purchases of third-party developers' virtual currency and determine whether that currency was *subsequently* used in the developers' video games to obtain a loot box, as opposed to any other number of in-app items which Plaintiffs do not allege to be illegal.  Plaintiffs do not allege that Google even has the capability to determine how virtual currency, *once purchased or acquired*, is actually used in a particular game.  They do not allege, for example, that they used Google's payment processing system to acquire virtual items (e.g., weapons, characters, or loot boxes) using virtual currency.  These in-app exchanges are exclusively a matter between players and the developers, without any involvement by Google.  Plaintiffs' prayer for restitution therefore seeks to hold Google liable for the interactive app content of third-party developers.  (*See* Dismissal Order at 11:4-5 (concluding that "Section 230 may apply when the published content is an app").)

Any resort by Plaintiffs to the Ninth Circuit's decision in *HomeAway.com v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2018) is unavailing.  *HomeAway* is fundamentally distinguishable from the present case because the local ordinance at issue did not by its plain terms "proscribe,

mandate, or even discuss the content of the listings that the Platforms display on their websites." *See HomeAway.com*, 918 F.3d at 683.  Nor did the law at issue directly require HomeAway to display or remove *any third party content* from its website.  Instead, the ordinance simply prohibited the platform from processing a certain type of transaction meeting certain objective criteria, which in turn required HomeAway to monitor a single, discrete activity: "*incoming requests* to complete a booking transaction—content that, while *resulting from* the third-party listings, is distinct, internal, and nonpublic."  *See id.* at 682 (second emphasis in original).  This meant that HomeAway could likewise comply with the ordinance by simply *refusing to process requests to rent* short-term housing within the city limits of Santa Monica.  *See id.*  The Ninth Circuit panel correctly reasoned that this latter class of activity did not implicate any public-facing content but instead involved entirely "internal" transaction processing.  *See HomeAway.com*, 918 F.3d at 682.

Plaintiffs' "transaction facilitation" allegations against Google, by contrast, fall far outside the narrow Section 230 exception described in *HomeAway*.  For one, the only transactions identified in the FAC involving Google are the purchase of *virtual currency*, which is not even the activity that Plaintiffs can claim is covered by California's gambling laws.  Plaintiffs ask the Court to require that Google somehow monitor every player's *in-game activity* to determine whether the user already used, is using, or potentially might use virtual currency to acquire a loot box as opposed to another in-app purchase item, or, alternatively, to review the content of every game on the Google Play platform and outlaw those deemed to include "illegal" loot boxes.  This is precisely the sort of scenario which would "necessarily require an internet company to monitor third-party content," and therefore triggers Section 230's protections.  *See HomeAway*, 918 F.3d at 682.

Finally, a recent opinion involving Apple, Inc., ECF No. 46, *Taylor v. Apple,* No. 20-cv-03906-RS (N.D. Cal. Mar. 19, 2021), should not dissuade this Court from affirming its prior legal analysis and holding that Plaintiffs' claims seek to hold Google liable as the publisher of third party content.  That court's Section 230 analysis was *dicta*, and did not, among other things, acknowledge or confront the "neutral tools" doctrine that this Court has found to apply to Plaintiffs' allegations against Google.  (*See* Dismissal Order at 14:6-11.)

### c. The loot box content at issue was created by third-party app developers, not by Google

As described in Section III.A.3, *supra*, Plaintiffs have made no serious attempt to offer facts suggesting that Google is any way responsible for the loot box content with which Plaintiffs take issue. Plaintiffs concede that "Google does not itself create the[] videogames or the loot box[es]." (FAC ¶ 9.) Instead, they allege once again that Google provides "ancillary and necessary" services to third party developers by (1) allowing the games to be downloaded through the Google Play Store (what Plaintiffs refer to as "distributi[on]"), and (2) providing a content-neutral commission-based payment tool to allow players to make optional purchases of virtual currency from developers. (*See id.*) The Court has already considered and rejected these and other circumstances re-alleged in the FAC as a basis for concluding that Google itself is an information content provider for purposes of Section 230. (*See* Dismissal Order at 3:11-12, 3:26-27, 13:8-25.)

As the Court also previously noted, development of content refers "not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." (*Id.* at 13:3-5 (citing *Roommates*, 521 F.3d at 1167-68).) Plaintiffs make clear that their theory of what makes loot boxes illegal is based entirely on the randomization and prize mechanics developed exclusively by game developers, and with which Google has no involvement. Specifically, Plaintiffs concede that "each loot box contains the *elements that constitute gambling*: consideration, chance, and the possibility to win prizes of value." (FAC ¶ 48.) Plaintiffs' allegations of Google's conduct—providing a platform to download the games, processing purchases of virtual currency, and requiring developers to disclose certain information about the content of the video games—in no way materially contributes to the purported illegality of loot boxes under Plaintiffs' own logic.

For all of these reasons, the Court should reaffirm its prior holding and dismiss Plaintiffs' amended complaint with prejudice under Section 230.

### B. Plaintiffs Still Fail To State Plausible Claims for Relief Under the UCL and CLRA

#### 1. *Plaintiffs cannot solve the fundamental problem that they lack statutory standing*

Plaintiffs still concede, as they must, that their only alleged transaction involving Google was

the purchase of virtual currency from game developers (which utilized Google as a payment processing agent), and that they received exactly as much virtual currency as was promised.  (*See* FAC ¶¶ 11, 13.)  This unavoidable reality remains fatal to their attempts to state claims under California consumer protection laws and for unjust enrichment.

In granting leave to amend, the Court informed Plaintiffs that "[i]n order to make out a plausible claim for unfair competition against Google based on its role in converting real money into virtual currency, Plaintiffs must address the fact that players can choose to 'spend' virtual currency on a variety of game items other than Loot Boxes, and that Google does not appear to have any role in those choices."  (Dismissal Order at 18:28-19:4.)  Plaintiffs have responded to the Court's order by simply deleting *some*, but not all, of the admissions that virtual currency has many uses in the skill-based games at issue.  (*Compare, e.g.*, ECF No. 1 (Compl.) ¶ 18 ("S.M. has spent more than $100 on in-game purchases *including Loot Boxes*) (emphasis added) *with* FAC ¶ 13 ("S.M. has paid . . . more than $100 on in-app purchases from the Google Play Store, including on purchasing the virtual currency required to buy loot boxes.").)  The FAC also describes a new game which neither Plaintiff alleges he ever played.  (FAC ¶¶ 79-84.)  And their pleading now contains the phrase "injury in fact." (*Id.* ¶¶ 11-12.)  Once again, Google submits that this is not what the Court had in mind: Plaintiffs cannot "address" the issue through obfuscation, irrelevant facts, and legal conclusions.

Ultimately, the Court may *still* reasonably infer based on the FAC's remaining allegations that virtual currency may be used for a variety of in-app items, of which a loot box is only one option.  (*See, e.g.*, FAC ¶ 118 (describing "other types of microtransactions" in video games containing loot boxes), ¶ 150 (noting that "most virtual items are sold for less than the cost of a loot box")).  And Plaintiffs still offer no facts suggesting that Google has *any* involvement with players' decisions about how to use virtual currency within the games offered for download through the Play Store.  The Court should therefore once again dismiss Plaintiffs' UCL and CLRA claims for lack of statutory standing, this time with prejudice.  (*See* Dismissal Order at 16:11-12.)

> ### a. Plaintiffs allege no economic loss from purchasing virtual currency on set terms

The FAC again confirms that Google does not sell loot boxes to players.  Instead, it provides

a service whereby players may purchase virtual currency from developers, rather than wait to acquire that virtual currency for free through normal gameplay.  (*See* FAC ¶¶ 7, 72.)  Plaintiffs do not contend that purchasing a specific amount of virtual currency in exchange for a specific amount of dollars is in any way illegal.  Plaintiffs' only transactions involving Google were the purchase of certain amounts of dragon stones or Lapis Crystals in exchange for a certain amount of money.  (*Id.* ¶¶ 11, 13, 71, 76.)  Plaintiffs do not allege receiving less virtual currency than promised.  (*See* Dismissal Order at 17:1-5.)  In short, Plaintiffs received the benefit of their bargain in their transactions involving Google.  Where, as here, Plaintiffs do not allege fraud or misrepresentation, the Court has already determined they lack standing to assert their California consumer protection claims against Google.  (*See* Dismissal Order at 17:10-12 (citing *Johnson v. Mitsubishi Digital Elecs. Am., Inc.*, 365 F. App'x 830, 832 (9th Cir. 2010)).)

        **b.**    **Plaintiffs fail to attribute any alleged loss of virtual currency to Google**

Plaintiffs have clarified that their theory of economic loss is each lost *property* "in the form of virtual currency he used to buy chances on loot boxes."  (FAC ¶¶ 11, 12.)  But Plaintiffs delivered that virtual currency—and so allegedly "lost" it—to third-party app developers, not to Google.  Plaintiffs also continue to concede they can use virtual currency for an *array* of in-app items, not just loot boxes, and allege no facts about how *Google* influences their in-game decisions.  (*See* FAC ¶¶ 118, 150.)  To the contrary, the FAC contains more allegations about how content created by the third-party app developer content is supposedly responsible:  *e.g.*, various "audio-visual effects," including "triumphant music," "bright lights and colors" (*id.* ¶ 94); attractive names for virtual currency (*id.* ¶ 88).  Google does not create these video games in general or the loot boxes in particular (*id.* ¶ 9), and has no role in any of these developer content choices.  Plaintiffs ignored the Court's directive to address these fundamental defects, and so their claims should be dismissed with prejudice.

      **2.**    *Plaintiffs fail to state plausible UCL claims against Google*

        **a.**    **Loot Boxes do not violate California or federal gambling laws**

As with Plaintiffs' original complaint, Plaintiffs' claims must again be dismissed under Section 230 and for lack of statutory standing.  As a result, the Court still need not resolve whether loot boxes

DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

in skill-based video games constitute illegal gambling devices.  Nevertheless, to the extent this Court wishes to join the unanimous consensus that these mechanisms do not give rise to civil liability based on California gambling laws, *e.g.*, *Soto v. Sky Union, LLC*, 159 F. Supp. 3d 871 (N.D. Ill. 2016); *Mason*, 140 F. Supp. 3d 457 (D. Md. 2015), the Court may choose from any of the following dispositive bases to dismiss Plaintiffs' claims.

### (1)  *California prohibits civil recovery for alleged gambling losses*

As noted above, Plaintiffs seek to recover the cost of virtual currency which they claim they used to engage in illegal slot machine transactions.  (*See, e.g.*, FAC ¶ 186.)  The California legislature has not enacted a civil gambling loss recovery statute.  To the contrary, the state has adopted a "strong, broad, and long-standing public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions."  *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 477 (1999).  Thus, "in the absence of a statute authorizing a recovery of gambling losses, the courts in California will . . . refus[e] to lend their process to adjudicate actions for enforcement of claimed rights arising out of gambling transactions."  *Id.* at 483 (citing *Wallace v. Opinham*, 73 Cal. App. 2d 25 (1946)).  Likewise, California's *in pari delicto* doctrine prevents courts from "aid[ing] or assist[ing] a plaintiff to recover money lost in a gambling game that is prohibited by law . . . ."  *Id.* at 490.

Plaintiffs have not identified a California statute permitting them to recover for alleged gambling losses.  Courts have cited *Kelly* and California public policy to bar claims asserted under the UCL and related statutes to recover gambling losses.  *See, e.g.*, *Mason*, 140 F. Supp. 3d at 466; *Alves v. Players Edge, Inc.*, No. 05CV1654 WQH (CAB), 2007 WL 6004919, at *14 (S.D. Cal. Aug. 8, 2007).  While Google strongly disputes that loot boxes constitute illegal slot machines in the first place, even accepting Plaintiffs' theory of liability on its face requires that the Court dismiss the FAC's four causes of action.

### (2)  *Loot boxes do not dispense "thing[s] of value"*

Plaintiffs cite 10 different statutes in an effort to identify some way in which loot boxes constitute illegal gambling machines.  (FAC ¶ 182.)  Certain of these laws—Cal. Bus. & Prof. Code §§ 19800, *et seq.*, Cal. Pen. Code §§ 337j(a)(1)-(3), 18 U.S.C. § 1955, 31 U.S.C. §§ 5361-5367, Cal. Civ. Code § 1770(a)(14)—do not themselves define any illegal or controlled gambling activity, but

merely rely on predicate violations and definitions.  The remaining statutes all contain the same requirement: that gambling machines dispense "thing[s] of value."  *See* Cal. Pen. Code §§ 330a(a); 330b(d); 330.1; 337j(e)(1).  **A "thing of value" under the relevant statutes must be something with real-world, transferable value**.  *See Soto v. Sky Union, LLC*, 159 F. Supp. 3d 871, 880 (N.D. Ill. January 29, 2016).  Google likewise distinguishes actual gambling from other in-app activity on a similar basis, drawing the line at content that offers chanced-based prizes of "cash or other real world value." (FAC ¶ 35.)

By contrast, Plaintiffs concede that the loot box items simply "enhance gameplay or provide competitive advantage."  (*Id.* ¶ 1.)  And they cite various social science studies confirming that loot box items provide only *subjective* and/or *theoretical* value: *e.g.*, "value com[ing] from a customer's preferences, evaluations and perceptions" (*id.* ¶ 147); "symbolic value of a virtual good stem[ming] from its role and meaning inside the game" (*id.* ¶ 148); and so on.

Despite Plaintiffs' references to "gray markets" and other third-party channels to trade or sell loot box items or accounts (*id.* ¶¶ 156-160), the Google Play Terms of Service prohibit the sale or transfer of any in-app content, including loot box items.  (Dismissal Order at 6:25-57 (granting request for judicial notice of Google Play Terms of Service § 4[2]).)  "Virtual items cannot constitute a 'thing of value' based on an expressly prohibited sales channel."  *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.2 (9th Cir. 2018).

Therefore, Plaintiffs do not, and cannot allege, either of the following: that Google permits players to exchange or redeem loot box items for any real world items, or that Google permits loot box items to be transferred from one user to another.  These circumstances place loot boxes outside the scope of California's gambling statutes.  *See Soto*, 159 F. Supp. 3d at 880.

Plaintiffs' alternative interpretation—that various forms of subjective entertainment value are sufficient to trigger California gambling laws—violates numerous maxims of statutory interpretation.  First, Plaintiffs' interpretation conflicts with the principle of *ejusdem generis*: that is, where "a more general term follows more specific terms in a list, the general term is usually understood to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Rizo v.*

---

[2] *See* https://play.google.com/intl/en-US_us/about/play-terms/index.html

*Yovino*, 950 F.3d 1217, 1225 (9th Cir. 2020).  Here, a "thing of value" is defined as "any money, coin, currency, check, chip, allowance, token, credit, merchandise, property, or any representative of value." Cal. Pen. Code § 330.2.  Each specific term describes items which both have objectively ascertainable value and generally allow for exchange for other items in the real world and transferability among individuals.  Given this specific list, the final general term "any representative of value" is not intended to include loot box items that provide only "hedonic or social" value (FAC ¶ 164).

Second, Plaintiffs' proposed interpretation violates the so-called "surplusage canon," which California courts have applied to Section 330b.  *See Merandette v. City & Cty. of S.F.*, 88 Cal. App. 3d 105, 113 (1979).  Plaintiffs' interpretation has no limiting principle: if "thing of value" under Section 330b includes anything that provides a feeling of purely subjective amusement, then literally anything will satisfy the statutory definition.  The result would be to read the requirement out of these statutes altogether, violating the rule that "a statute ought . . . to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Third, Plaintiffs' subjective amusement theory inherently contradicts their references to current legislation *proposals* to "ban loot boxes in video games."  (FAC ¶¶ 126, 136.)  The existence of an active legislative debate on the issue strongly implies that the conduct is not *currently* illegal.  *See, e.g.*, *Blum v. Caldwell*, 446 U.S. 1311, 1317 (1980) (crediting state appellate court's rejection of alleged Medicaid rules interpretation because "Congress is considering legislation [for the rule], which suggests that such a rule is not presently allowed").  Even Plaintiffs' cited academic authority concedes that loot boxes are not illegal under any *current* U.S. laws or regulations, but simply that they *should be*.  (*See* FAC ¶ 119 ("[R]elevant authorities should seriously *consider* restricting access to loot boxes *as if they were* a form of gambling.") (emphasis added).)

### *(3)    The loot boxes at issue are seamlessly incorporated into games predominantly of skill*

Finally, California law excludes from the definition of "slot machine" those devices which are "predominantly games of skill."  Cal. Pen. Code § 330b(f).  The two games Plaintiffs allegedly played—Final Fantasy and Dokkan Battle—clearly meet this definition.  Final Fantasy is "a role-

playing game where players command their characters to attack and move through a series of stages until they encounter and defeat the 'boss.'" (FAC ¶ 70.)  Likewise, Dokkan Battle is "made up of levels that play like a board game, with spots dedicated to items, power-ups, traps, and fights."  (*Id.* ¶ 77.)  For both games, the virtual items obtained from alleged loot boxes are only "useful *in the game*," and have no other apparent application.  (*Id.*; *see also id.* ¶ 71 ("A Summons offers the chance of winning rewards and new and better characters.").)

Courts have previously found that strategy video games containing loot boxes are "predominantly games of skill" under section 330b of the California Penal Code.  *See, e.g.*, *Mason*, 140 F. Supp. 3d at 463.  In doing so, they have specifically rejected the same argument advanced by Plaintiffs again here: that loot boxes are stand-alone games that must be evaluated on their own.  This would read the exception out of the statute.  *See id.*  As a result, the Court may conclude that the "Summons" mechanisms integrated into the skill-based games played by Plaintiffs are not illegal slot machines under California law.

### b.    Loot Boxes Do Not Provide a Basis for a UCL Unfair Practices Claim

Because Google's alleged conduct is protected by Section 230, and because Plaintiffs have failed to establish statutory standing to assert any UCL claim, the Court should deny Plaintiffs' efforts to legislate public policy through a UCL "unfairness" claim.  (*See* FAC ¶¶ 187-206.)

Even considering the "merits" of such allegations, courts have rejected "unfair conduct" claims asserted against developers of video games featuring loot boxes: consumers like Plaintiffs are free to play these games at their discretion; Plaintiffs were never forced to purchase loot boxes in order to play any of these games; and they could have opted for other forms of entertainment.  *See, e.g.*, *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016) (rejecting argument that virtual casino constituted "immoral, . . . unethical, oppressive, [and] unscrupulous conduct" or exploited "psychological triggers associated with gambling and addiction" because plaintiff "could have picked other forms of entertainment"); *see also Ristic v. Mach. Zone, Inc.*, No. 15-cv-8996, 2016 WL 4987943 at *4 (N.D. Ill. Sep. 19, 2016) ("[W]hile any type of addiction is unfortunate, this Court. . . . does not read the [Illinois version of the California UCL] to protect [plaintiff] from his own

1  decision to play the Casino" loot box feature within the "Game of War" video game).

2  Plaintiffs' allegations under the UCL "unfair" prong also necessarily fail, as they are derivative

3  of, and entirely dependent on, Plaintiffs allegations that loot boxes amount to illegal gambling.  (*See,*

4  *e.g.*, FAC ¶ 192 ("Google's unfair conduct alleged in this Complaint *is illegal*, immoral and

5  unscrupulous") (emphasis added); ¶ 193 ("Google's unfair conduct also violates legislatively declared

6  policies . . . *by conducting illegal and unlicensed gambling business*") (emphasis added).)  Where an

7  "unlawful prong claim cannot survive, [the] unfair prong also must fail" when based on the same

8  alleged conduct.  *See West v. Palo Alto Hous. Corp.*, No. 17-CV-00238-LHK, 2019 WL 2549218, at

9  *26 (N.D. Cal. June 20, 2019).

10  ### 3.    *Plaintiffs have failed to salvage their CLRA cause of action*

11  Plaintiffs have also proven unable to allege any new facts to state a plausible CLRA claim.

12  The Court previously dismissed this claim, holding that virtual currency is not a good or service for

13  purposes of the CLRA and that Plaintiffs failed to identify any representations at all, much less

14  *mis*representations, by Google about loot boxes.  (Dismissal Order at 20:5-9, 13-14.)

15  Plaintiffs' new allegations do not salvage their claim, because the fact remains that the only

16  *transaction* involving Plaintiffs and Google was for the purchase of developers' virtual currency.

17  Google provides no services in connection with Plaintiffs' *subsequent in-app exchanges* of virtual

18  currency for items such as characters, weapons, or loot boxes.  The screenshots cited by Plaintiffs in

19  support of their CLRA claim confirm that Google's billing system services are limited to *selling* digital

20  goods.  (FAC ¶ 213.)  The digital goods allegedly sold here are *dragon stones* and *Lapis Crystal*

21  currency, *not* the "Summons" which Plaintiffs allege to be a loot box.

22  Finally, Plaintiffs again identify no representation by Google to consumers regarding loot

23  boxes.  Instead, they confirm once again that their theory of CLRA liability is that Google *failed* to

24  disclose that loot boxes are gambling devices prohibited by California law.  But no U.S. regulatory,

25  judicial, or legislative body has ever found loot boxes to be illegal.  Google has no obligation to

26  disclose false information.

27  ### C.    **Plaintiffs Fail to State a Claim for Unjust Enrichment**

28  For essentially the same reasons that Plaintiffs cannot establish standing to support their UCL

and CLRA claims, they likewise cannot state a plausible claim for unjust enrichment under California law.  Plaintiffs cannot establish the required elements: (1) the receipt of a benefit by Google, and (2) the unjust retention of the benefit at Plaintiffs' expense.  *See Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008).  Plaintiffs allegedly purchased virtual currency from app developers using Google's payment processing services.  (FAC ¶¶ 11, 13.)  Plaintiffs appear to have received exactly the amount of virtual currency promised, so there is no "unjust retention."   Any subsequent transactions involving loot boxes, on the other hand, involve property that was delivered to third party game developers: Google *receives no benefit at all* from such exchanges of virtual currency for in-game items, and Plaintiffs do not contend to the contrary.

Second, Plaintiffs' unjust enrichment claim arises from their interactions with the Google Play platform.  Plaintiffs' use of this platform is governed by the Google Play Terms Of Service, an enforceable contract.  Plaintiffs are therefore precluded from asserting a *quasi*-contract claim such as unjust enrichment.  *See Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1253 (N.D. Cal. 2017) (dismissing quasi-contract claim with prejudice because Facebook's judicially-noticed advertising terms were contracts covering the same subject matter).

Third, the Court should dismiss Plaintiffs' unjust enrichment claim because it is entirely duplicative of the gravamen of their UCL and CLRA claims.  *Balzer v. Wal-Mart Stores, Inc.*, No. CV 14-9779-JFW (PJWx), 2015 WL 13828418, at *4-5 (C.D. Cal. Feb. 25, 2015) (dismissing with prejudice quasi-contract claim because it "allege[d] no facts not already covered by the UCL, FAL, and CLRA claims, which already provide for restitution as a remedy").

## IV.   CONCLUSION

For the foregoing reasons, the Court should once again dismiss Plaintiffs' FAC.  Because any amendment would be futile, the dismissal should be with prejudice.

Dated:  April 19, 2021

Respectfully submitted,

**BAKER & McKENZIE LLP**

By:/s/ Teresa H. Michaud
Teresa H. Michaud
Attorneys for Defendant
GOOGLE LLC